IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:21-cv-00106-M

WAYNE NUTT,                              )
                                        )
              Plaintiff,                 )
                                        )
       v.                                )
                                        )   **MEMORANDUM IN SUPPORT**
                                        )   **OF DEFENDANTS' MOTION FOR**
ANDREW L. RITTER, in his official        )   **SUMMARY JUDGMENT**
capacity as Executive Director of the    )
North Carolina Board of Examiners for    )
Engineers and Surveyors; and JOHN        )
M. LOGSDON, JONATHAN S. CARE,            )
DENNIS K. HOYLE, RICHARD M.              )
BENTON, CARL M. ELLINGTON, JR.,          )
CEDRIC D. FAIRBANKS, BRENDA L.           )
MOORE, CAROL SALLOUM and                 )
ANDREW G. ZOUTWELLE, in their            )
official capacities as members of the    )
North Carolina Board of Examiners for    )
Engineers and Surveyors,                 )
                                        )
              Defendants.                )

# TABLE OF CONTENTS

NATURE OF THE CASE ............................................................. 1

REGULATION OF ENGINEERING IN NORTH CAROLINA ............................................................ 2

UNDISPUTED FACTS................................................ 4

WAYNE NUTT'S WORK AS A DESIGNATED EXPERT WITNESS IN THE FIELD OF ENGINEERING ............................................. 4

Wayne Nutt acted as an expert witness in support of a lawsuit filed by a group of North Carolina homeowners ................................... 4

Wayne Nutt engaged in conduct by practicing engineering ................................................ 6

Wayne Nutt performed an analysis of the stormwater system ......................................... 9

Wayne Nutt expected that his work product would be used by others in the *Autry* ........................ 12

BOARD INVESTIGATION................................. 13

ARGUMENT ................................................ 14

THE ACT, AS APPLIED TO PLAINTIFF AND ON ITS FACE, REGULATES PROFESSIONAL CONDUCT AND IS NOT A VIOLATION OF THE FIRST AMENDMENT'S SPEECH CLAUSE .................. 14

The Act regulates conduct not protected speech ........ 14

In the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on speech ...................... 17

The Act is content-neutral and seeks to establish minimum qualifications for someone to practice the profession of engineering ...................................... 20

i

The Act passes constitutional scrutiny........................ 22

North Carolina's interest in regulating the profession of engineering is at least substantial........ 22

The Act is sufficiently drawn to protect the substantial state interests.......................................... 24

DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE DECLARATORY JUDGMENT CLAIM ....................................................... 30

# TABLE OF AUTHORITIES

Cases and Statutes           Page(s)

N.C.G.S. § 89C-2 ................................................. 3, 4, 15, 21, 22, 30

N.C.G.S. § 89C-4 ........................................................................ 4

N.C.G.S. § 89C-3(6)................................................................ 3, 30

N.C.G.S. § 89C-10(a)................................................................... 4

N.C.G.S. § 89C-23 ................................................................. 2, 21

*Capital Associated Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019)................................................ 18-20, 22, 24, 26

*Cornelius v. NAACP Legal Def. & Educ.* Fund, 473 U.S. 788 (1985) ................................................................... 17

*Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291 (4th Cir. 2013) .................................................. 29, 30

*Goldfarb v. State Bar*, 421 U.S. 773 (1975) ......................... 15, 22

*Lowe v. S.E.C.*, 472 U.S. 181 (1985) (White, J., concurring) ................................................................. 16

*McCullen v. Coakley*, 573 U.S. 464, 480, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014) ................................. 21, 25

*Nat'l Inst. Of Family & Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018) ........... 15, 18-22, 25

*Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 98 S. Ct. 1912, 56 L. Ed. 2d. 444 (1978) ........................................ 19, 25

*People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547 (M.D.N.C. June 12, 2020) ..................... 23

*Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) ....... 19, 20, 25

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ........................... 21

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ...................... 17

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) ...................... 21

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............ 25

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......... 20, 215

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008) ........... 29

Case 7:21-cv-00106-M   Document 45   Filed 04/28/22   Page 5 of 38

Defendants, through counsel, respectfully submits this Memorandum in Support of Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## NATURE OF THE CASE

This case arises out of Wayne Nutt's work as an expert witness in the field of engineering. Plaintiff Wayne Nutt ("Nutt") asserts a single cause of action under the First Amendment's Speech Clause seeking a judicial declaration that an unlicensed engineer has a constitutional right to act as a designated expert witness in the field of engineering. The dispute involves Nutt's work as an expert witness on behalf of a group of North Carolina homeowners in a lawsuit filed in New Hanover County Superior Court (the "*Autry* lawsuit").

In this role as a designated expert, Nutt did the following work: (1) performed a site inspection; (2) analyzed "as built" calculations on the storm water system at issue; (3) analyzed the information by referring to engineering literature and considered engineering methodologies in the field of hydraulics, fluid flow and piping systems; (4) performed engineering calculations; (5) prepared charts and graphs based on theoretical cases and observations; and (6) prepared an expert report in support of the lawsuit filed by a group of North Carolina landowners.[1] The issue is whether this work constitutes the unauthorized practice of engineering as defined by North Carolina statute.

---

[1] ECF Doc. 29-1 at pp. 20, 31, 35-36 and 41-49

Plaintiff ignores the engineering work and attempts to reframe the issue as one involving only speech:

> Wayne does not want a license to practice engineering because Wayne does not want to practice engineering. He just wants to talk about it.[2]

In truth, Nutt asserts a constitutional right to practice engineering without a license. Indeed, Nutt's request for relief seeks a "judgment declaring that North Carolina General Statutes sections 89C-3(6) (definition of 'practice of engineering') and 89C-23 (prohibition on unauthorized practice of engineering and use of the word 'engineer') . . . , violate the Speech Clause of the First Amendment of the United States Constitution, both on their face and as applied to Plaintiff and others similarly situated[.]"[3] Plaintiffs thus challenge the regulation of engineering in North Carolina and the state legislature's authority to pass laws governing the practice of engineering within the state's boundaries.

## REGULATION OF ENGINEERING IN NORTH CAROLINA

The North Carolina Legislature designated the practice of engineering as a profession in 1921. [SOF ¶ 1]. This is a "practice act." Only persons duly licensed by the Board are authorized to practice engineering or offer to practice engineering as defined in the Act or to hold themselves out as an engineer.[4]

---

[2] ECF Doc. 1, Complaint (Introduction).
[3] ECF Doc. 1, Complaint (Request for Relief, paragraph A).
[4] *See* N.C.G.S. § 89C-23.

2

"It shall be unlawful for any person to practice or to offer to practice engineering," as defined in the Act, "unless the person has been duly licensed."[5] The term "practice of engineering" is defined as follows by N.C.G.S. § 89C-3(6):

> Any service or creative work, the adequate performance of which requires engineering education, training, and experience, in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems, planning the use of land and water, engineering surveys, and the observation of construction for the purposes of assuring compliance with drawings and specifications, including the consultation, investigation, evaluation, planning, and design for either private or public use, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products or equipment of a mechanical, electrical, hydraulic, pneumatic or thermal nature, insofar as they involve safeguarding life, health or property, and including such other professional services as may be necessary to the planning, progress and completion of any engineering services.
>
> A person shall be construed to practice or offer to practice engineering, within the meaning and intent of this Chapter, who practices any branch of the profession of engineering; or who, by verbal claim, sign, advertisement, letterhead, card, or in any other way represents the person to be a professional engineer, or through the use of some other title implies that the person is a professional engineer or that the person is licensed under this Chapter; or who holds the person out as able to perform, or who does perform any engineering service or work not exempted by this Chapter, or any other service designated by the practitioner which is recognized as engineering.

The Act provides that "[i]n order to safeguard life, health, and property, and to promote the public welfare, the practice of engineering and the practice of land

---

[5] *See* N.C.G.S. § 89C-2.

surveying in this State are hereby declared to be subject to regulation in the public interest."[6]  The Act establishes a North Carolina Board of Examiners for Engineers and Surveyors (the "Board") to administer the provisions of the Act.[7]  The Board may adopt rules for the proper performance of its duties under the Act.[8]

## UNDISPUTED FACTS

I. **WAYNE NUTT'S WORK AS A DESIGNATED EXPERT WITNESS IN THE FIELD OF ENGINEERING**

A. **Wayne Nutt acted as an expert witness in support of a lawsuit filed by a group of North Carolina homeowners**

On January 29, 2021, Nutt was designated as an expert witness by Plaintiffs – a group of North Carolina homeowners – in a lawsuit filed in New Hanover County Superior Court and further identified as *Jackie W. Autry, et a. v. Bill Clark Homes, LLC, et al.*, File No. 19 CVS 4520 (the "*Autry* lawsuit").  [SOF ¶ 2].  Plaintiffs' Designation of Expert Witnesses includes an expert report prepared by Wayne Nutt with the following title: "Stormwater Flow Characteristics of a 36" Reinforced Concrete Pipe."  [SOF ¶ 3].  Following additional work, Wayne Nutt prepared a revised report date March 2, 2021, identified as Exhibit A to the Verified Complaint.[9]

Nutt is not a licensed engineer in North Carolina.  [SOF ¶ 5].  Nutt previously worked as a chemical engineer for DuPont under the industrial exception – an exception to the licensing requirement in North Carolina.  [SOF ¶ 6].  Nutt's prior work experience is limited to chemical engineering.  [SOF ¶ 7].  Nutt does not claim

---

[6]  *See* N.C.G.S. § 89C-2.
[7]  *See* N.C.G.S. § 89C-4.
[8]  *See* N.C.G.S. § 89C-10(a).
[9]  ECF Doc. 1-1.

4

to be a civil engineer or a stormwater management engineer. [SOF ¶ 8]. Indeed, Nutt does not claim to be competent in the field of stormwater management engineering [SOF ¶ 9]:

> Q. So you're not competent to analyze a stormwater engineering system or water system?
> A. That is correct.[10]

Nutt testified that John Oglesby was retained to act as the stormwater management expert for plaintiffs in the *Autry* litigation.[11]

Nutt was asked to inspect the stormwater system at issue in the case and provide opinions in hydraulics, piping, and fluid flow mechanics. [SOF ¶ 10]. The expert designation provided notice of the following opinion to be provided by Nutt concerning stormwater and the backup of stormwater:

> Mr. Nutt is expected to testify that the observed blockage of the 36" pipe outfall in September of 2018 caused a substantial reduction of capacity to discharge storm water, resulting in the backup of storm water into the streets and homes of the Plaintiffs.[12]

Nutt testified that the opinions he provided were engineering opinions [SOF ¶ 11]:

> Q. Would you agree that the opinions that you provided in this lawsuit fall under the category of engineering?
> A. Yes.[13]

---

[10] Nutt Depo part II at p. 37 (Appendix Exhibit 2).
[11] Nutt Depo part II at pp. 31-32 ("He [John Oglesby] was to look at all aspects of this case with respect to stormwater management." (Appendix Exhibit 2).
[12] ECF Doc. 25-1 at p. 3.
[13] ECF Doc. 29-1 at p. 33.

Nutt offered those opinions to a reasonable degree of engineering certainty. [SOF ¶ 12]. The opinions were based on engineering calculations:

> Q. And in this case, you did some engineering calculations; correct?
> A. Yes. That is correct.
> Q. And in this case, you did some independent analysis that involved engineering; correct?
> A. That is correct - - hydraulics and engineering.
> Q. And, ultimately, you were able to - - after the work you did, to form opinions in the field of engineering and hydraulics; correct?
> A. That is correct.[14]

[SOF ¶ 13].

## B. Wayne Nutt engaged in conduct by practicing engineering

There is no dispute that the expert report prepared by Nutt contained engineering work [SOF ¶ 14]:

> Q. And so you would agree that this is - - this report contains some engineering; correct?
> A. Hydraulics and engineering calculations.

Moreover, there is no dispute that Nutt was performing engineering services in this case.[15] In preparing his expert report, Nutt performed the following services: (1) reviewed documents produced in discovery; (2) reviewed witness statements; (3) performed a site inspection; (4) analyzed "as built" calculations on the storm water system at issue; (5) analyzed the information by referring to engineering literature and considered engineering methodologies in the field of hydraulics, fluid flow and piping systems; (6) performed engineering calculations; (7) prepared charts and

---

[14] ECF Doc. 29-1 at p. 80.
[15] ECF Doc. 29-1 at p. 72.

graphs based on theoretical cases and observations; and (8) documented his work product in a detailed Excel spreadsheet used to prepare his expert reports. [SOF ¶ 15].

The calculations performed by Nutt were engineering calculations. [SOF ¶ 16]. Nutt relied upon engineering literature to perform his calculations. [SOF ¶ 17]. The calculations and services provided by Nutt were engineering services [SOF ¶ 18]:

> Q. Would you agree that you were performing services in this case?
> A. Yes.
> Q. All right. And the services that you were performing, do you consider that to be engineering services?
> A. Without the word "practice."
> Q. Correct. I got rid of the word you don't like.
> A. Yeah. I was doing hydraulics and engineering calculations.

Nutt not only performed engineering calculations, but also worked on theoretical cases and charts to support the opinions set forth in his report [SOF ¶ 19]:

> Q. And you performed calculations?
> A. Later, yes.
> Q. And I believe you talked about tools or theoretical cases that you created?
> A. Yes.
> Q. And from those theoretical cases, you produced charges that you included in your expert report?
> A. Yes

Following the inspection of the system at issue, the actual configuration of the Diverter System, review of the referenced engineering literature, and consideration of engineering methodologies in the field of engineering, Nutt performed an analysis of four separate study cases, plus a separate special "Partial RCP" case. [SOF ¶ 20].

7

The theoretical cases also took into consideration rainfall levels reported by the National Weather Service. [SOF ¶ 21].

The March 2, 2021 expert report provides the following information identified as Fig 4 – Drainage System Elevation Profiles[16]:



The expert report provides an explanation of the work performed to generate Figure 4 – Drainage System Elevation Profiles:

> In order to evaluate the pipe flow we must understand the configuration of the pipe to ditch flow feature. Additionally, the ditch cross section geometry, surface

---

[16] ECF Doc. 1-1 at p. 9.

roughness, and ditch slope determine the operating level of the ditch at any given flow. I used the cross section of a trapezoidal ditch, 4 ft width at the bottom, with 1/1 slope for the sides. The surface roughness factor used was, as presented in tables from several sources, for a "good condition" ditch. The entrance elevation of the ditch was assumed to have exactly matched the "invert" elevation of the RCP Expansion Discharge piece (12.36 ft). I used "Manning's Formula" online flow calculator available at Eng.Auburn.Edu, for open channel drains of various cross sections. In all cases a ditch slope [0.4%] and the ditch level were input variables and the flow rate was the output variable. Multiple results were cross checked using other available online software; crosschecked results agreed with 0.3%.

[SOF ¶ 22].

### C.  Wayne Nutt performed an analysis of the stormwater system

As a designated expert, Nutt reviewed documents concerning the stormwater permit, reviewed documents regarding the stormwater system at issue, and performed a site inspection. [SOF ¶ 23].

During his work as a designated expert, Nutt conducted a fluid flow analysis of a section of a stormwater collection system identified as the "diverter line," including fluid flow calculations to support his expert opinions in the field of engineering. [SOF ¶ 24]. "I have analyzed the actual configuration of the Diverter System and used that information to determine the capacity of the piping system."[17] The "diverter line" is a modification to the stormwater management system. [SOF ¶ 25].

---

[17] ECF Doc. 1-1 at p. 3.

In addition to the "diverter line" and "pipe flow," Nutt also analyzed other components of the stormwater system:

> In order to evaluate the pipe flow we must understand the configuration of the pipe to the ditch flow feature. Additionally, the ditch cross section geometry, surface roughness, and ditch slope determine the operating level of the ditch at any given flow.

[SOF ¶ 26].   Nutt used Manning's Equation to analyze operating level of the ditch.

[SOF ¶ 27].   The expert report also noted that "[a] properly functioning ditch is required to avoid obstructing the discharge water flow from the outfall location."[18] Nutt's analysis (and theoretical cases) included components of the stormwater system, including the "ditch" receiving the flow of water:

> The analysis of the "As Built" installed 36" diameter Reinforced Concrete Pipe [RCP] flow capacity requires a definition of the discharge geometry of the "ditch" receiving the flow.   The standard "ditch" implied and used for the purpose of this study was a uniform trapezoidal ditch.   The flat bottom of the ditch, for calculation purposes, was assumed to be 4 ft width and the sides slope at 1/1 pitch. The liquid flow rate verses depth of water for the ditch was determined using an on-line model which calculates results from the "Manning equation".   A sensitivity check analysis was performed for an alternate ditch of 3 ft width and 2/1 side slope.   Results indicated that design would operate at 2-3 inches lower levels at the same flows.

[SOF ¶ 28].

> Q.    Okay.   So you were analyzing - - if I understand what you're saying, the ditch is part of the stormwater system, correct?
> A.    Yes.
> Q.    And the diverter is also part of the stormwater system?

---

[18]  ECF Doc. 1-1 at p. 3.

A.     Yes.[19]

Nutt studied not only the diverter system but also the operation of the ditch and the elevation of the ditch. [SOF ¶ 29]. The expert report also contained a section on "Ditch Flow Sensitivity to Condition" which contained an "analysis" performed by Wayne Nutt "to determine how flow capability of a trapezoidal ditch is affected by the general condition of the ditch." [SOF ¶ 30]. In his analysis, Nutt opines that "[a] larger ditch and/or greater slope would have improved the performance of the system." [SOF ¶ 31]. The performance of the "system" referred to the stormwater management system. [SOF ¶ 32].

Nutt testified that the issue in the *Autry* lawsuit involved flooding and related design issues with the stormwater system – a system "designed by licensed professional engineers." [SOF ¶ 33]. According to Nutt, he was "the only person that published any information about how this diverter line would perform." [SOF ¶ 34]. Nutt's published expert report is critical of the design of the stormwater system:

> Q.     Okay. The lawsuit, the issue in the lawsuit, had to do with the performance of the stormwater management system?
> MR. GAY: Objection.
> A.     Specifically the diverter additional to the stormwater management system. They already knew from the 200/2001 that it would flood. They were flooded once without a diverter system. Then they were told this isn't a design that was reviewed and approved, went through the State. They weren't given any hydraulics, what the calculations were, but people were told now we fixed your system. It won't flood again because we've taken care of the other errors that was made by licensed professional engineers was not - - and this is stormwater

[19] Nutt Depo part II at p. 54 (Appendix Exhibit 2).

11

> management people, by prescribing what area would
> drain into the system, and they were off by a lot.

[SOF ¶ 35]. Nutt published an expert report in the *Autry* lawsuit critical of the design

of the stormwater management system notwithstanding the fact that he admitted he

was not qualified to analyze the system. [SOF ¶ 36].

Nutt's role as a designated expert was to "provide opinion testimony in support

of the Plaintiff's case in chief". [SOF ¶ 37].

> Q. Okay. The plaintiffs in the lawsuit that you were
> acting as an expert witness, they were complaining
> that the stormwater management system didn't
> function properly, correct?
> A. Yes. Failed. Failed and backed up.
> Q. And the lawsuit was dismissed last summer or in the
> fall?
> A. It's under appeal, I believe.[20]

Based on the dismissal of the underlying lawsuit, Nutt filed a notice of withdrawal

his motion for preliminary injunction.[21]

### D. Wayne Nutt expected that his work product would be used by others in the *Autry* lawsuit

Nutt testified that he made engineering judgments in the underlying lawsuit

by preparing an engineering report. [SOF ¶ 38]. Nutt expected that his engineering

judgments would be used by others, including the Plaintiff's designated expert in the

field of wastewater management systems (Mr. Oglesby). [SOF ¶ 39].

> Q. Okay. So you expected the plaintiffs - - you were
> acting as their expert witness. You expected the
> plaintiffs could use this information?
> A. Yes.

---

[20] Nutt Depo part II at p. 69 (Appendix Exhibit 2).
[21] ECF Doc. 37.

| Q. | And you expected the legal counsel to use this information? |
|---|---|
| A. | Yes. |
| Q. | And when you talked about, you know, the folks who were going to second-guess it, you're talking about the opposing legal counsel? |
| A. | Sure. |
| Q. | Okay. And the opposing parties, the defendants? |
| A. | Sure. |
| Q. | And the Court or the jury, whoever's going to be the trier of the fact or facts, you expected them to be able to use it? |
| A. | Yes. |
| Q. | Okay. And, in essence, the general public you expected to be the user? |
| A. | I would try to present engineering information results that a common user, if he takes the time to read this rather drab technical report could understand, yeah. He could go to Figure 1. Go to statement 3. Go to page 2, and he can work his way through it if he chooses to do so. |

## II.    BOARD INVESTIGATION

On May 12, 2021, the Board received a letter of complaint that Wayne Nutt was engaged in the unlawful practice of engineering. [SOF ¶ 40]. The letter of complaint stated the following [SOF ¶ 41].

> During my initial review of the plaintiff's expert designations, I noticed that Mr. Nutt had prepared a report that appears to be technical in nature and would be supported by engineering calculations.

The letter of complaint also states that Nutt testified that his expert findings are accurate to a degree of engineering certainty. [SOF ¶ 42]. Based on the expert report prepared by Nutt, the letter of complaint states that "Mr. Nutt appears to be practicing engineering without a license." [SOF ¶ 43].

In response to the letter of complaint, the Board opened a case and notified Nutt by letter dated May 19, 2021. [SOF ¶ 44]. The scope of the investigation, and the corresponding scope of this declaratory judgment action, was identified by the Board as follows [SOF ¶ 45]:

> The allegations pertain to your report dated March 2, 2021, Re: **Stormwater Flow Characteristics of a 36" Reinforced Concrete Pipe Tidalholm Village Diverter Line** and associated engineering calculations; and engineering testimony in depositions on March 8, 2021 and April 27, 2021, in the case of Jackie W. Autry, et al. v. Bill Clark Homes, LLC, et al (New Hanover Co. File No. 19-CVS-4520).

Nutt did not respond to the Board's letter dated May 19, 2021, but instead chose to file the above-captioned lawsuit. [SOF ¶ 46]. On July 15, 2021, the Board issued a letter to Nutt placing him on notice that there is sufficient evidence to support the claim that he is practicing engineering in North Carolina without a license. [SOF ¶ 47]. The letter went on to state the following:

> You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation.

[SOF ¶ 48].

## ARGUMENT

## I. THE ACT, AS APPLIED TO PLAINTIFF AND ON ITS FACE, REGULATES PROFESSIONAL CONDUCT AND IS NOT A VIOLATION OF THE FIRST AMENDMENT'S SPEECH CLAUSE

### A. The Act regulates conduct not protected speech

14

Plaintiff does not have a constitutional right to practice engineering without a license. "States may regulate professional conduct even though that conduct incidentally involves speech." *Nat'l Inst. Of Family & Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2372, 201 L. Ed. 2d 835 (2018).

Plaintiff argues that his work as a designated expert witness in the field of engineering is nothing more than the communication of a message protected by the First Amendment. [ECF Doc. 1 at p. 1; *see also* ECF Doc. 4-1 at p. 7]. Plaintiff next argues that any attempt by the State of North Carolina to regulate his unauthorized practice of engineering fails because it is unconstitutional. If successful, this argument would undermine the regulation of professions in North Carolina, professions such as the practice of law and medicine.

The Supreme Court has long recognized "that the States have . . . broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. State Bar*, 421 U.S. 773, 792 (1975). Similarly, the North Carolina Legislature declared that the practice of engineering is "subject to regulation in the public interest." *Id.* N.C.G.S. § 89C-2 (the purpose of the Act is to "*safeguard life, health, and property, and to promote the public welfare.*"). The controversy between Nutt and the Board is limited to his work as a designated expert witness.[22] As a designated expert, Nutt agreed to provide engineering opinions on behalf of the plaintiffs in the *Autry* lawsuit. [ECF Doc. 29-1 at pp. 27 and 30]. "One

---

[22] Nutt Depo part II at p. 6 (Appendix Exhibit 2).

who takes the affairs of a client personally in hand and purports to exercises judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession." *Lowe v. S.E.C.*, 472 U.S. 181, 211 (1985) (White, J., concurring). It is undisputed that Nutt was performing engineering services for his clients:

> Q. Do you consider the services you're providing in this case for the plaintiff as an expert, do you consider that the practice of chemical engineering?
> A. It wouldn't specifically be chemical engineering but there was some engineering calculations done, and it's definitely hydraulics.[23]

The controversy in this case has nothing to do with any form of public advocacy – the controversy is limited to Nutt's role as a designated expert:

> Q. Other than - - again, other than your role as an expert witness in the state court lawsuit *Autry verses Bill Clark Homes, LLC*, is there anything that you've identified in your complaint and which the board has said you're not allowed to do that or cautioned you you might not want to do that?
> A. Not the board.[24]

"If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to <u>First Amendment</u> scrutiny." *Lowe*, 472 U.S. at 232.

Plaintiff is not the first person to assert a challenge to the unauthorized practice of a profession in North Carolina. Recently, the Fourth Circuit addressed

---

[23] ECF Doc. 29-1 at p. 70.
[24] ECF Doc. 29-1 at p. 84.

the issue involving a challenge to the statutes prohibiting the authorized practice of law in North Carolina ("UPL statutes"). *See Capital Associated Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019) (holding that North Carolina's unauthorized practice of law statutes was a regulation of conduct and not the communicative aspects of practicing law). The Fourth Circuit in *Capital Associated Indus.* correctly noted that the UPL statutes focused on the question of who may conduct themselves as a lawyer. "Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the Supreme Court has treated them differently than restrictions on speech." *Id.* at 207-208.

Plaintiffs bear the burden of establishing that the Act burdens speech, not conduct. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). The issue in this case involves the preparation of an expert report in the field of engineering. The report was submitted in support of legal claims asserted by North Carolina landowners. The work at issue in this case is conduct not protected speech. This case does not involve speech in a public forum, such as a sidewalk or public right-of-way. "The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *NIFLA*, 138 S. Ct. at 2373 (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011)).

**B.    In the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on speech**

As with the UPL statutes in *Capital Associated Indus.*[25], the Act focuses on the question of who can practice engineering in North Carolina. The Fourth Circuit considered a similar unauthorized practice challenge and concluded "that the UPL statues regulate conduct":

> The UPL statues don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of who may conduct themselves as a lawyer. Licensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession.

*Capital Associated Indus.*, 922 F.3d at 208. "North Carolina's ban on the practice of law by corporations fits within *NIFLA's* exception for professional regulations that incidentally affect speech." *Id.* at 207.

In *NIFLA*, the Court addressed a California law requiring certain clinics, that primarily serve pregnant women, to post notices about what services they did not offer and about free state services that were offered. *NIFLA*, 138 S. Ct. at 2368-70. Although the law applied in a professional context, the Court declined to recognize "professional speech" as a separate category of speech. *Id.* at 2371. The Supreme Court in *NIFLA* did "recognize two situations in which states have broader authority to regulate the speech of professionals than that of nonprofessionals." *Capital Associated Indus.*, 922 F.3d at 207. Under the umbrella of professional speech and occupational licensing, the Court held that "[s]tates may regulate professional

---

[25] "In this case, any impact the UPL statutes have on speech is incidental to the overarching purpose of regulating who may practice law." *Capital Associated Indus.* at 207.

conduct, even though that conduct incidentally involves speech." *Id.; see also Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S. Ct. 1912, 56 L. Ed. 2d. 444 (1978); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 120 L. Ed. 2d. 674 (1992). Assuming the regulation of the profession is a substantial state interest, all that is required is that the regulation is "sufficiently drawn" to protect that interest. NIFLA, 138 S. Ct. at 2375; *see also Capital Associated Indus.*, 922 F.3d at 209.

In *Ohralik*, the Supreme Court considered an Ohio State Bar Association prohibition on lawyers' in-person solicitation of remunerative employment – "a business transaction in which speech is an essential but subordinate component." *Ohralik*, 436 U.S. at 457. "While this does not remove the speech from the protection of the First Amendment, . . . it lowers the level of appropriate judicial scrutiny." *Id.* In upholding the prohibition, the Court determined that "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns," which "falls within the State's property sphere of economic and professional regulation." *Id.* at 459. The Court concluded that the lawyer's conduct was "subject to regulation in furtherance of important state interests." *Id.* The Court found that the State had a strong interest "in protecting consumers and regulating commercial transactions," and "maintaining standards among members of the licensed professions." *Id.* at 460.

The second case cited by *NIFLA* for the proposition that States may regulate professional conduct, even though that conduct incidentally involves speech, involved

19

the practice of medicine. *See Casey*, 505 U.S. 833. The opinion in *Casey* explained that the law regulated speech only "as part of the practice of medicine, subject to reasonable licensing and regulation by the State. *Casey*, 505 U.S. at 884; *see also NIFLA*, 138 S. Ct. at 2373.

In analyzing *NIFLA*, the Fourth Circuit recognized that in the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on traditional speech. *Capital Associated Indus.* at 207-208.

## C. The Act is content-neutral and seeks to establish minimum qualifications for someone to practice the profession of engineering

Under the proper First Amendment analysis, courts are required to determine whether a regulation "on its face" draws a distinction "based on the message a speaker conveys." *Id*. The Act draws no such distinction and does not target the communicative aspects of practicing engineering. The Act is a reasonable regulation on the practice of engineering that is generally applicable to all who seek to practice engineering in North Carolina.

A law that does not "target speech based on its communicative content" is content neutral. *NIFLA* at 2371. Stated another way, a law is content neutral if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The profession of engineering has long been recognized in North Carolina and is regulated under the Act. This is a "practice act." The Legislature declared that the practice of engineering is "subject to regulation in the

public interest." N.C.G.S. § 89C-2. Only persons duly licensed by the Board are authorized to practice engineering. N.C.G.S. § 89C-23. The purpose of the Act is to regulate who may practice engineering. On its face, the Act's regulation of engineering has nothing to do with any message or speech.

If the law is content-neutral on its face, the analysis next requires a court to consider the law's justification or purpose. *Reed v. Town of Gilbert,* 576 U.S. 155, 166 (2015). A law may still reflect a content preference if it was "adopted by the government 'because of disagreement with the message [the speech] conveys." *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). In making this determination, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "[A] regulation that serves purposes unrelated to the context of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *McCullen v. Coakley*, 573 U.S. 464, 480, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014) (quoting *Ward*, 491 U.S. at 791). The Act passes this test.

The purpose of the Act is to "safeguard life, health, and property, and to promote the public welfare." N.C.G.S. § 89C-2. Such a purpose reflects conduct (the practice of engineering), not the expression of certain content. *See McCullen*, 573 U.S. at 480. The Act applies equally to all who seek to practice engineering. This would be the same for offering legal services without being licensed to practice law. A determination that the Act is content-neutral will result in a lower standard of scrutiny. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). "Thus, we can

say with some confidence that the standard for conduct-regulating laws can't be greater than intermediate scrutiny." *Capital Associated Indus.*, 922 F.3d at 208-209.

## D. The Act passes constitutional scrutiny

### 1. North Carolina's interest in regulating the profession of engineering is at least substantial

In this case, the Board must show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest. *Id.* at 209 (citing *NIFLA*, 138 S. Ct. at 2375). The North Carolina Legislature designated the practice of engineering as a profession in 1921. [SOF ¶ 1]. The Legislature declared that the practice of engineering is "subject to regulation in the public interest." *See* N.C.G.S. § 89C-2. Specifically, the Legislature declared that the purpose of the Act was "to safeguard life, health, and property, and to promote the public welfare". *Id.* Courts have consistently held that "States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb*, 421 U.S. at 792. In addition to the self-declared purpose set forth in the Act, the record evidence identifies a multiple significant interests advanced by the Act.

First, the regulation and licensing of engineering in North Carolina works to establish a minimum level of competence (education, exam, and experience). [SOF ¶ 49]. The minimum level of competency works to protect the health, safety, and welfare of the public. [*Id.*]. With respect to the minimum level of competence, the Board testified as follows [SOF ¶ 50]:

"We call it the three Es - - education, experience, and exam - - an it's a little bit of a sliding scale, but your typical engineer has a degree in engineering from an ABET accredited institution; they have four years progressive engineering experience, half of which has to be under the supervision of a licensed professional engineer, an then they have to pass two exams, Fundamentals of Engineering exam and the Principles and Practice of Engineering exam."

Second, the regulation and licensing of engineering provides a system of accountability. [SOF ¶ 51]. "[T]he public is protected by the accountability under our statute that, if the person is licensed and he does not provide competent work, we have jurisdictional authority over that person. We're able to discipline him. The public is protected there." [*Id.*]. By way of example, the Board has the authority to discipline a licensee due to misconduct, incompetence or gross negligence by either reprimanding the licensee, mandating more continuing education, suspension or revocation. [SOF ¶ 52]. However, unlicensed persons such as Nutt do not fall under the jurisdiction of the Board and cannot be disciplined. [SOF ¶ 53].

Third, the regulation and licensing of engineering works to safeguard property. [SOF ¶ 54]. The purpose of the Act is plainly set forth in N.C.G.S. § 89C-2 ("In order to safeguard life, health, and property"]. "The Supreme Court in *McCullen* recognized that protecting property rights is a legitimate government interest." *People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547, 577 (M.D.N.C. June 12, 2020).

Fourth, the regulation and licensing of engineering in North Carolina works to ensure that the professional engineer follows the professional rules of conduct,

including ethics and practicing within the licensee's area of competence. [SOF ¶ 55]. "If they violate the Rules of Professional Conduct, it comes under our disciplinary procedure, back to reprimand, reprimand and civil penalty, or actions against their license." [*Id.*]. An engineer's area of competence "is based on a combination of the three E's, combination of your exam, experience, and education." [SOF ¶ 56].

Fifth, the regulation and licensing of engineering works to safeguard life and health. [SOF ¶ 57].

Finally, Defendants' designated expert witness, Stacey A. Smith, provided the following testimony that summarized the multiple significant interests advanced by the Act:

> Q.   And does the Act further substantial government interests?
> A.   I believe so.
> Q.   Okay. And what government interests are furthered by the regulation of engineering in North Carolina?
> A.   Primarily the protection of life, health, and property, the protection of that and public welfare. Other, as outlined in my letter, is protecting the public of misrepresentation, providing public confidence in the profession, maintaining the minimum level of competency to become licensed, maintaining the continuing education of the licensees, and then accountability for all of these things.

[SOF ¶ 58].

## 2.   The Act is sufficiently drawn to protect the substantial state interests

In a case involving the regulation and licensing of a profession, the Act must be sufficiently drawn to protect the state interests identified above. *Capital Associated Indus.* at 209 (citing *NIFLA*, 138 S. Ct. at 2375). The appropriate level of

24

constitutional scrutiny requires only a "reasonable fit between the challenged 'regulation' and the state's interest – not the least restrictive means." *Id.* at 209-210 (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010). Likewise, the Supreme Court in *Casey* explained that the regulation of medicine is subject to reasonable licensing and regulation by the State. *Casey*, 505 U.S. at 884. The "reasonable" standard was also cited by the Supreme Court in a case involving the regulation and licensing of lawyers. *See Ohralik*, 436 U.S. at 467.

In cases involving the regulation and licensing of a profession, courts have not applied a "narrowly tailored" standard unless the regulation at issue restricts protected speech. One example of protected speech involves restrictions on speech in traditionally public areas like sidewalks – places that have traditionally been open for speech activities. In such cases, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *McCullen.* at 465 (citing *Ward*, 491 U.S. at 791). Because this case does not involve restrictions of traditional speech, the "time, place, or manner" analysis does not apply. Instead, the proper constitutional analysis for the regulation and licensing of a profession is limited to whether the regulation is "sufficiently drawn" to achieve the state interest. *NIFLA*, 138 S. Ct. at 2375.

In the analogous case involving the unauthorized practice of law, the Fourth Circuit concluded that "[b]arring corporations from practicing law is sufficiently drawn to protect" the state interests involved in the case. *Capital Associated Indus.* at 209. One example cited by the Fourth Circuit was the fact that professional integrity "could suffer if the state allows lawyers to practice on behalf of organizations owned and run by nonlawyers". It is important to note that the court looked at possible adverse outcomes related to the protection of state interests. In the present case, there is sufficient evidence that the prohibition against the unauthorized practice of engineering is sufficiently drawn to protect the many significant interests identified.

First, the regulation and licensing of engineering in North Carolina works to establish a minimum level of competence (education, exam, and experience) in the person's area. In this case, Nutt agreed to serve as a designated expert for a group of North Carolina homeowners. In this role, Nutt agreed to inspect the stormwater system at issue and provide opinions and analysis critical of the stormwater system design. The Act, if followed, would ensure that only engineers that meet minimum levels of competency are licensed. The Act not only protects the clients (North Carolina homeowners) but others that would use and rely upon the published findings of Plaintiff Nutt. In this regard, Nutt testified that his report contained engineering judgment and he prepared his report with the understanding that it would be used by others in the case, including his clients. [SOF ¶¶ 38-39].

Second, the regulation and licensing of engineering provides a system of accountability. Because Nutt is not a licensed engineer, he is not accountable to the Board for any mistakes made in his published report or any violations of the Professional Rules of Conduct. The Act is sufficiently drawn to allow for accountability of licensed professional engineers.

Third, the Act is sufficiently drawn to ensure that the professional engineer follows the Professional Rules of Conduct, including limiting his or her practicing within the licensee's area of competence. In this case, Nutt argues that he is competent to perform chemical engineering notwithstanding the fact that he is not licensed. Nutt's prior work experience is limited to the field of chemical engineering. [SOF ¶ 7]. Nutt does not claim to be a civil engineer or a stormwater management engineer. [SOF ¶ 8]. However, the published report ventures far outside the area of chemical engineering and is better described as stormwater engineering[26]. In so doing, Nutt performed engineering work outside his self-proclaimed area of competence. [Stacey A. Smith Deposition at p. 89 (Appendix Exhibit 4)].

Nutt testified that the issue in the lawsuit involved flooding and related design issues with the stormwater system – a system "designed by licensed professional engineers." [SOF ¶ 33]. According to Nutt, he was "the only person that published any information about how this diverter line would perform." [SOF ¶ 34]. Nutt's published expert report is critical of the design of the stormwater system. [SOF ¶ 35].

---

[26] The practice of stormwater design is a recognized area under the umbrella of civil engineering. [Stacey A. Smith Deposition at p. 84].

In addition to the "diverter line" and "pipe flow," Nutt also analyzed other components of the stormwater system to include the operation of the ditch.

> Q.     Okay. So you were analyzing - - if I understand what you're saying, the ditch is part of the stormwater system, correct?
> A.     Yes.
> Q.     And the diverter is also part of the stormwater system?
> A.     Yes.

[Nutt Depo part II at p. 54 (Appendix Exhibit 2)]. Nutt then used Manning's Equation to analyze the operating level of the ditch. [Nutt Depo. part II at pp 82-83 (Appendix Exhibit 2)]. Defendants' expert witness testified that Nutt used Manning's Equation to analyze the stormwater system, and this requires judgment and experience specific to stormwater engineering. [Stacey A. Smith Deposition at pp. 100-101 (Appendix Exhibit 4)]. Moreover, Stacey Smith offered the opinion that Nutt was practicing outside of his self-proclaimed area:

> Q.     And so it look like, again, in order to analyze the pipe itself, he's trying to understand how it operates within the context of the entire stormwater system, correct?
> A.     Yes.
> Q.     In your view, is this work product, is this the practice of engineering?
> A.     Yes.
> Q.     Is this the practice of engineering or stormwater engineering in your view?
> A.     Yes.
> Q.     And do you believe that, based on what you reviewed, do you believe that this stormwater engineering performed by Mr. Nutt is outside of his area of competence?
> A.     Yes.

[Stacey A. Smith Deposition at p. 106 (Appendix Exhibit 4)].

The Act is sufficiently drawn to establish a minimum level of competence for licensing professional engineers and to ensure the licensees practice within their area of competence.

### E.     Plaintiff's facial challenge fails as a matter of law

Plaintiff challenges the Act both facially and as applied to him. "The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry." *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013). To succeed on a facial challenge, Plaintiffs must demonstrate that there are "no set of circumstances" in which the Act can be validly applied or that it lacks any plainly legitimate sweep. *Id.* Facial challenges are disfavored. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008). Plaintiff cannot meet the burden of a facial challenge to the Act – a proper regulation of the professions of both land surveying and engineering.

In contrast, as-applied challenges "test the constitutionality of a statute applied to the plaintiff based on the record." *Capital Associated Indus.*, 922 F.3d at 204; *see also Insley*, 731 F.3d at 298 (an as-applied challenge is based on a developed factual record and application of a statute to a specific plaintiff). In distinguishing between facial and as-applied challenged, the Fourth Circuit noted the following:

> Under a facial challenge, a plaintiff may sustain its burden in one of two ways. First, a plaintiff asserting a facial challenge may demonstrate that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep. Second, a plaintiff asserting a facial challenge may also prevail if he or she show[s] that the law is overbroad because a substantial

> number of its applications are unconstitutional, judged in
> relation to the statute's plainly legitimate sweep.

*Insley*, 731 F.3d at 298.  As stated above, Plaintiffs' as-applied challenge also fails

and must be dismissed.

## II.   DEFENDANTS ARE ENTILTED TO SUMMARY JUDGMENT ON THE DECLARATORY JUDGMENT CLAIM

A counterclaim was asserted involving the dispute – whether the activities of

Wayne Nutt in the performance of services and work as a designated expert witness

constitutes the unauthorized practice of engineering.  This is a statutory claim.

The Act regulates the practice of engineering.  Only persons duly licensed by

the Board are authorized to practice engineering or offer to practice engineering as

defined in the Act.[27]  The term "Practice of engineering" is defined by N.C.G.S. § 89C-

3(6).  Pursuant to N.C.G.S. § 89C-2, "[i]t shall be unlawful for any person to practice

or to offer to practice engineering" in North Carolina as defined in the Act.

Nutt is not a licensed engineer in North Carolina.  The facts regarding the

expert engineering report produced by Nutt on behalf of his clients in the Autry

litigation is not in dispute.  There is no dispute that the expert report prepared by

Nutt contained engineering work:

> Q.   And so you would agree that this is - - this report
>       contains some engineering; correct?
> A.   Hydraulics and engineering calculations.

[SOF ¶ 14].

Nutt performed the following engineering services:

---

[27]  *See* N.C.G.S. § 89C-23.

30

- Nutt reviewed documents concerning the stormwater permit and reviewed documents regarding the stormwater system at issue. [SOF ¶ 23].
- Nutt inspected the stormwater system at issue in the *Autry* lawsuit. [SOF ¶ 10].
- The calculations performed by Nutt were engineering calculations. [SOF ¶ 16].
- Nutt relied upon engineering literature to perform his calculations. [SOF ¶ 17].
- Nutt not only performed engineering calculations, but also worked on theoretical cases and charts to support the opinions set forth in his report [SOF ¶ 19].
- Nutt published an expert report in the *Autry* lawsuit critical of the design of the stormwater management system. [SOF ¶ 35].
- Nutt testified that he made engineering judgments in the underlying lawsuit by preparing an engineering report. [SOF ¶ 38].
- Nutt expected that his engineering judgments would be used by others in the *Autry* lawsuit. [SOF ¶ 39].
- Nutt's role as a designated expert was to "provide opinion testimony in support of the Plaintiff's case in chief". [SOF ¶ 37].

Counterclaim Plaintiffs seeks a declaratory ruling from the court that the work completed by Wayne Nutt as a designated expert witness in the *Autry* lawsuit constitutes the unauthorized practice of engineering.

Respectfully submitted this the 28th day of April 2022.

FITZGERALD HANNA & SULLIVAN, PLLC

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225
M. Todd Sullivan, NCSB #24554
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 863-9095
*Attorneys for Defendants*

31

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1(f)</u>

I hereby certify that this brief, excluding the case caption, table of contents, table of authorities and the certificate of service, is in compliance with the limit of 8400 words.

This the 28th day of April, 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

W. Cory Reiss, Reiss & Nutt, PLLC, wcreiss@reissnutt.com

Robert J. McNamara, Institute for Justice, rmcnamara@ij.org

Joseph Gay, Institute for Justice, jgay@ij.org

This the 28th day of April, 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225