**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| WAYNE NUTT, | ) | Case No. 7:21-CV-00106-M |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM IN SUPPORT** |
| v. | ) | **OF PLAINTIFF'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| ANDREW L. RITTER, in his official | ) | |
| capacity as Executive Director of the North | ) | |
| Carolina Board of Examiners for Engineers | ) | |
| and Surveyors, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

W. Cory Reiss (NC Bar No. 41549)
REISS & NUTT, PLLC
1221 Floral Parkway, Ste 104
Wilmington, NC 28403
Phone: (910) 420-4674
Fax: (910) 420-4637
E-mail: wcreiss@reissnutt.com
*Local Civil Rule 83.1(d)*
*Counsel for Plaintiff*

Joseph Gay (D.C. Bar No. 1011079)*
Robert J. McNamara (VA Bar No. 73208)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: jgay@ij.org
        rmcnamara@ij.org
*\* Special Appearance pursuant to
  Local Rule 83.1(e)*

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

I.    Plaintiff Wayne Nutt Is An Engineer Who Wants To Speak Publicly About
Engineering Matters. ......................................................................................... 1

    A.   Wayne Nutt Is An Engineer. ................................................................. 1

    B.   In Retirement, Wayne Nutt Wants To Talk About Engineering Matters. ............. 3

    C.   Wayne Nutt Expresses An Engineering Opinion About A Concrete
Pipe In The *Autry* Litigation. ................................................................. 4

II.    The Board Prohibits Testimony And Other Speech About Engineering Matters
Without A License. ........................................................................................... 6

    A.   It Is Illegal To Practice Engineering In North Carolina Without A License. ......... 6

    B.   The Board Prohibits Testimony About Engineering "In The Courtroom, In
Arbitrations Or During Depositions" Without A License. .................................... 7

    C.   The Board Has Proceeded Against Members Of The Public For Speaking
About Engineering Without A License. ................................................................. 8

III.    Consistent With Its "Long Standing Position," The Board Orders Wayne To Stop
Speaking About Engineering Matters In Written Reports And Testimony. .................... 9

    A.   The Board Tells Wayne He Needs A License To Testify About Engineering. ....... 9

    B.   The Board Investigates Wayne For Speaking About Engineering Matters
In Written Reports And Testimony. ..................................................................... 11

    C.   After Wayne Files This Lawsuit, The Board Tells Him He Must Stop
Speaking In The Future About Engineering Matters In Written Reports
And Testimony. ..................................................................................................... 12

    D.   After Wayne Files This Lawsuit, The Board Also Seeks A Declaratory
Judgment That His Past Written Reports And Deposition Testimony
About Engineering Matters Were Illegal. ............................................................ 13

IV.    The Board Has No Evidence That Prohibiting Testimony About Engineering
Matters Without A License Is Narrowly Tailored To Serve A Compelling Interest. ..... 14

A. The Board May Regulate Who Is Allowed To Stamp Building Plans And Cause Things To Be Built. ......................................................... 14

B. The Board Has No Evidence That Restricting Speech About Engineering Is Narrowly Tailored To Serve A Compelling Interest. ..................................... 15

STANDARD OF REVIEW ................................................................ 17

ARGUMENT ...................................................................................... 17

I. Defendants' Ban On Testifying About Engineering Imposes A Content-Based Restriction On Speech And Is Therefore Subject To Strict Scrutiny. .......................... 18

A. Wayne's Reports And Testimony About Engineering Are Protected Speech. ... 19

B. Treating Wayne's Protected Speech As The Prohibited "Practice Of Engineering" Imposes A Content-Based Burden On Speech. ....................... 22

1. The licensing requirement applies based solely on what Wayne says...... 23

2. The Board only justifies its actions by reference to Wayne's speech....... 24

3. No established First Amendment exception applies. ............................... 24

II. Defendants' Ban On Testifying About Engineering Fails Under Any Level Of First Amendment Scrutiny. .................................................................. 26

CONCLUSION.................................................................................. 30

CERTIFICATE OF SERVICE ........................................................... 31

ii

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020) ........................................................................ *passim*

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011)..........................................................................................21

*Buehrle v. City of Key West*,
    813 F.3d 973 (11th Cir. 2015) ........................................................................22

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) ..........................................................................25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................17

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) ..........................................................................26

*Chesapeake & Potomac Tel. Co. v. United States*,
    42 F.3d 181 (4th Cir. 1994) ............................................................................29

*Chesapeake & Potomac Tel. Co. v. United States*,
    516 U.S. 415 (1996)..........................................................................................29

*Citizens United v. FEC*,
    558 U.S. 310 (2010) .........................................................................................22

*Cohen v. California*,
    403 U.S. 15 (1971)............................................................................................25

*Drewitt v. Pratt*,
    999 F.2d 774 (4th Cir. 1993) ..........................................................................17

*Edenfield v. Fane*,
    507 U.S. 761 (1993)..........................................................................................26

*Fields v. City of Philadelphia*,
    862 F.3d 353 (3d Cir. 2017).............................................................................21

*Geophysical Sys. Corp. v. Seismograph Serv. Corp.*,
    738 F. Supp. 348 (C.D. Cal. 1990) .................................................................16

iii

*Harris v. Quinn*,
573 U.S. 616 (2014)....................................................................................25

*Hickory Fire Fighters Ass'n, Loc. 2653 v. City of Hickory*,
656 F.2d 917 (4th Cir. 1981) ....................................................................20

*Holder v. Humanitarian Law Proj.*,
561 U.S. 1 (2010)................................................................................ *passim*

*Hoover v. Morales*,
164 F.3d 221 (5th Cir. 1998) ....................................................................20

*Lance v. Luzerne County Mfrs. Ass'n*,
77 A.2d 386 (Pa. 1951) .............................................................................16

*Lane v. Franks*,
573 U.S. 228 (2014)....................................................................................20

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................................................................................24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018).........................................................................25, 26

*S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*,
410 A.2d 1359 (Vt. 1980)..........................................................................16

*Sedar v. Reston Town Ctr. Prop., LLC*,
988 F.3d 756 (4th Cir. 2021) ....................................................................17

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011).............................................................................21, 24

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015).............................................................................22, 23, 24

*Regal Cinemas, Inc. v. Town of Culpeper*,
No. 3:21-cv-4, 2021 WL 2953679 (W.D. Va. July 14, 2021) ................18

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ...............................................................26, 28

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995)....................................................................................27

iv

*Turner v. Driver*,
    848 F.3d 678 (5th Cir. 2017) ................................................................22

*Wash. Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ...............................................................23

*Wright v. Las Vegas Hacienda, Inc.*,
    720 P.2d 696 (Nev. 1986) ....................................................................16

*United States v. Alvarez*,
    567 U.S. 709 (2012) .............................................................................27

*United States v. Stevens*,
    559 U.S. 460 (2010) .............................................................................25

## RULES

Fed. R. Civ. P. 56(a) ......................................................................................17

## STATUTES

Mo. Rev. Stat. § 327.076(1) ..........................................................................16

N.C. Gen. Stat. § 15A-1340.23 ........................................................................6

N.C. Gen. Stat. § 89C-3(6) ..............................................................................7

N.C. Gen. Stat. § 89C-3(6)(a) ........................................................................27

N.C. Gen. Stat. § 89C-16 ...............................................................................14

N.C. Gen. Stat. § 89C-23 .......................................................................*passim*

N.C. Gen. Stat. § 89C-25(7a) ...........................................................................2

N.C. Gen. Stat. § 130A-309.219 ....................................................................14

N.C. Gen. Stat. § 130A-336.1 .........................................................................14

N.C. Gen. Stat. § 133-1.1 ...............................................................................14

N.C. Gen. Stat. § 143-228.12 .....................................................................14, 15

N.C. Gen. Stat. § 160A-300.1 ........................................................................14

N.C. Gen. Stat. Ann. § 160D-406 ..................................................................20

N.C. Gen. Stat. § 160D-1110(b) ........................................................................................14

N.C. Gen. Stat. § 160D-1402(j)(3)(c) ...............................................................................4

Tex. Occ. Code Ann. § 1001.004(e) ..................................................................................16

vi

## INTRODUCTION

Wayne Nutt is an engineer. For nearly 50 years, he practiced as an engineer, mostly in North Carolina. And now, in retirement, Wayne[1] wants to talk about engineering—to point out flaws he sees in other people's work or analysis and express his opinions. Defendants, the members of the North Carolina Board of Examiners for Engineers and Surveyors, have ordered him to stop expressing those opinions. Not because Wayne's words have any legal effect—Wayne cannot authorize the building of bridges or other structures—but because Defendants are worried someone might listen to and be persuaded by what Wayne has to say. Because the First Amendment does not allow the government to silence speech in order to protect listeners from persuasion, Wayne is entitled to summary judgment.

## STATEMENT OF FACTS

**I.    Plaintiff Wayne Nutt Is An Engineer Who Wants To Speak Publicly About Engineering Matters.**

**A.    Wayne Nutt Is An Engineer.**

Plaintiff Wayne Nutt is an engineer. (SUMF ¶ 1).[2] He graduated from the University of Iowa with a Bachelor of Science in Chemical Engineering in 1967 and spent the next forty-plus years working as a chemical engineer. (*Id.* ¶ 2). He spent most of his career at E.I. du Pont de Nemours (commonly called DuPont), where he worked from 1967 until January 2002. (*Id.*). DuPont assigned him to various plants around the U.S. and internationally, but he spent the bulk of his time at a chemical plant in Brunswick County, just outside Wilmington, North Carolina.

---

[1] Because the facts here involve both Wayne Nutt and his son, Kyle Nutt, this brief refers to each by their first name for the sake of clarity.
[2] "SUMF" refers to the Statement of Undisputed Material Facts that Plaintiff is filing at the same time as his Motion for Summary Judgment under Local Rule 56.1(a)(1).

(*Id.*). When DuPont sold the Brunswick County facility, the new ownership asked Wayne to work for them, which he did from 2002 until his eventual retirement in 2013. (*Id.*).

Wayne had a variety of responsibilities over his four decades as an engineer, such as supervising a chemical laboratory and working as a research fellow. (*Id.* ¶ 3). While his formal training is in chemical engineering and he calls himself a "chemical engineer," much of his career was spent designing things that were built in the physical world, including designing and supervising the design and installation of various processing equipment and systems at chemical plants. (*Id.* ¶¶ 4, 6–7). For example, chemical plants are open to the weather, so his duties involved designing and overseeing the design and installation of systems of trenches to manage both stormwater and potential chemical spills. (*Id.* ¶ 7). These systems are essentially stormwater management systems by another name. (*Id.*). More generally, his duties involved designing and overseeing the design, construction, and repair of piping systems for cooling systems or to move large amounts of fluid between different pieces of equipment. (*Id.* ¶¶ 6, 8). These duties required him to develop expertise in hydraulics, fluid flow, and piping systems. (*Id.* ¶ 6).

Although he is an engineer by training, experience, and competence, Wayne has never been a licensed professional engineer. (*Id.* ¶ 10). Wayne never needed a professional engineering license over his forty-year career because he worked for manufacturing companies, and thus (like most everyone else in his field) could work as an engineer under what is commonly known as the "industrial exemption" to engineering licensure. (*Id.*); *see also* N.C. Gen. Stat. § 89C-25(7a). And now that he is retired, Wayne certainly has no desire to obtain an engineering license. (SUMF ¶ 11). He does not, for example, want to design or oversee the installation of engineering projects anymore. (*Id.*). But he does want to speak publicly about engineering matters. (*Id.*).

**B.  In Retirement, Wayne Nutt Wants To Talk About Engineering Matters.**

Although Wayne retired in 2013, he continues to want to publicly speak his mind about engineering matters that come to his attention. And many matters do, in part because Wayne is part of an informal network of community members who scrutinize local development proposals. (*Id.* ¶¶ 12–18). Through this network, neighborhood groups and others ask Wayne to look at, analyze, and in some cases speak about, the engineering-related issues that various development proposals may raise. (*Id.*).

For example, several years ago Wayne examined a development proposal at the request of the Ogden Preservation Group. (*Id.* ¶ 14). And his examination revealed flaws, including a flaw in the traffic study that had failed to account for recent new development in the area, and he also believed there were alternatives that might allow the project to, for example, save more trees. (*Id.* ¶ 15). Wayne presented his findings through testimony to the Wilmington City Council, and ultimately several of his criticisms and suggestions were reflected in the final project design. (*Id.* ¶ 16).

Another time, the Ogden Preservation Group asked Wayne to review the stormwater plan for a nearby townhome development. (*Id.* ¶ 18). Wayne again discovered an error in the engineer's work—the plan called for a stormwater detention pond offsite but did not consider rainfall directly into the pond when calculating the pond's stormwater capacity. (*Id.*). After Wayne pointed this out in testimony, the developer ultimately revised its stormwater management plan and corrected the error. (*Id.*).

But Wayne's advocacy extends beyond this. He has testified to state boards about engineering as well. (*Id.* ¶ 17). And, before the pandemic hit, he was engaged in an active debate with the New Hanover County Engineer about how the county considers stormwater issues when approving new development. (*Id.* ¶¶ 20–22). The County Engineer eventually told him that the

3

pandemic made it impractical to continue this debate but that they could resume the discussion later. (*Id.*) Wayne continues to believe that he is right and that New Hanover County makes systematic errors, and he wants to renew this debate—including testifying about it publicly if he is ultimately unsuccessful in persuading the County Engineer. (*Id.*).

In Wayne's experience, his engineering expertise is crucial for his ongoing advocacy and communications about the engineering issues implicated by development in his community. (*Id.* ¶ 19). He relies on his engineering education, experience, and expertise to review and to discover possible errors in nearby development proposals. (*Id.* ¶¶ 14–22). And he believes that criticism and comments about building projects will be more persuasive if they are supported by rigorous analysis and calculations. (*Id.* ¶ 19). Indeed, he understands that critiques of local projects that are not based on such analyses could even be counterproductive, because government decisions that rely on qualitative opinions offered by laypersons could be subject to legal challenge. (*Id.*); *see also* N.C. Gen. Stat. § 160D-1402(j)(3)(c) (decisions may not be based on lay opinion testimony about matters that generally require expert testimony).

### C. Wayne Nutt Expresses An Engineering Opinion About A Concrete Pipe In The *Autry* Litigation.

A few years ago, Wayne agreed to help his son Kyle Nutt (who is an attorney) with a state-court lawsuit, *Autry v. Bill Clark Homes, LLC* (New Hanover Co. File No. 19-CVS-4520) (the *Autry* litigation). Kyle represents the plaintiff homeowners, who allege that flooding was caused by a stormwater management system during Hurricane Florence. (SUMF ¶¶ 23–24). Initially, Wayne helped Kyle with reviewing and understanding the documents received in discovery. (*Id.* ¶ 25). At one point, Wayne learned that no one in the case was testifying about a diverter pipe's fluid capacity and the consequences that an observed blockage would be expected

4

to have on that capacity. (*Id.* ¶¶ 26–27). Wayne volunteered to help by testifying—for free—as an expert witness about that pipe. (*Id.* ¶ 28).

This type of question fell squarely within Wayne's wheelhouse. He had decades of experience relating to hydraulics, fluid flow, and piping systems. (*Id.* ¶ 29). The diverter line at issue in the Autry litigation was basically the same type of concrete pipe that Wayne had worked with his entire career. (*Id.* ¶ 30). Wayne was therefore perfectly qualified to calculate the fluid capacity of the diverter line and simulate how that capacity would be impacted by different sizes of blockages at the end of the pipe, which might help clarify whether a blockage had contributed to or caused the flooding. (*Id.* ¶¶ 29–30, 34).

Wayne prepared a report that showed the results of calculating the fluid-flow capacity of a 3-foot concrete pipe diverter line under different scenarios, including if it had been built according to the plans approved by the County, as well as the capacity with two types of obstructions. (*Id.* ¶ 35). The report concluded that the obstructions would reduce the fluid-flow capacity of the pipe and back up the water level in a manner consistent both with the spouting observed by a county employee and with the water levels observed by one of the nearby homeowners. (*Id.*).[3]

Kyle did not ask Wayne to opine about the overall stormwater system design. (*Id.* ¶ 32). Instead, Wayne's narrow task was to opine about the effect of a blockage on the fluid capacity of a single diverter line. (*Id.* ¶ 33; *see also id.* ¶ 39). Another testifying expert—John Oglesby, who was a licensed professional stormwater engineer—would then incorporate Wayne's opinions into his own opinion testimony from a broader stormwater-engineering perspective. (*Id.*). Kyle

---

[3] Wayne later prepared an updated report with a few minimal revisions. (*Id.* ¶ 36).

designated both Oglesby and Wayne as testifying expert witnesses, but only Oglesby was described as either a licensed professional or as a stormwater engineer. (*Id.* ¶ 37).

This division of labor worked well. Oglesby testified that Wayne's report was "significant" to the opinions Oglesby reached in the case, although he did his own due diligence to vet and understand what Wayne did. (*Id.* ¶ 38). Oglesby concluded that Wayne's report "was a very good academic analysis," that it "was very academic, very thorough, and it followed the basic principles of hydraulic engineering, which are not incredibly complex principles." (*Id.*). For Oglesby it was "almost like reviewing a textbook." (*Id.*).

It never occurred to Wayne that truthfully testifying about his engineering knowledge might be illegal until he sat for a deposition in the case. (*Id.* ¶ 41). During the deposition, counsel for the *Autry* defendants asserted that Wayne could not legally testify about his opinion about the fluid capacity of the diverter pipe because he was not a licensed professional engineer. (*Id.* ¶ 42). The parties suspended the deposition so that Kyle and Wayne could investigate the issue. (*Id.*).

## II.    The Board Prohibits Testimony And Other Speech About Engineering Matters Without A License.

### A.    It Is Illegal To Practice Engineering In North Carolina Without A License.

In North Carolina, "[a]ny person who shall practice, or offer to practice, engineering . . . without first being licensed . . . shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 89C-23. Violators face as much as 60 days in jail and a fine. *Id.* § 15A-1340.23.

The "practice of engineering" that is subject to this criminal prohibition is defined in sweeping terms. The "[p]ractice of engineering" includes, in part, "[a]ny service or creative work, the adequate performance of which requires engineering education, training, and experience, in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation,

planning, and design of engineering works and systems . . . ." *Id.* § 89C-3(6). Obtaining a license requires passing examinations and paying fees; retaining a license requires fees and regular continuing education. (SUMF ¶ 81).

**B.    The Board Prohibits Testimony About Engineering "In The Courtroom, In Arbitrations Or During Depositions" Without A License.**

The Board has a long history of interpreting Section 89C-23's prohibition against the unlicensed practice of engineering as banning reports and testimony about engineering matters. It has "always" been the Board's policy that unlicensed engineering testimony is illegal, and the Board's counsel has consistently expressed that position to anyone who asked for at least 15 years. (SUMF ¶¶ 44–50).

For example, in 2006, a law student asked the Board's counsel if "testifying as an expert in engineering (as in a trial)" requires a license in North Carolina. (*Id.* ¶ 45). The Board's counsel (David Tuttle) responded that "[o]ur Board has taken the position that giving testimony on engineering matters is within the definition of engineering." (*Id.*). As he explained: "Testimony is just another way of presenting the engineering service to the public." (*Id.*). Tuttle had given the same answer to several other attorneys over the previous few weeks and months of 2006. (*Id.*). And he would continue to give the same answer over the next 15 years. (*Id.* ¶ 46).

Consistent with Tuttle's explanation in 2006, the Board has been insistent over the years that this prohibition applies even to *trial* testimony. (*Id.* ¶ 47). When an attorney asked in June 2011 specifically about offering engineering testimony "at a North Carolina trial," the Board's counsel responded that "giving expert witness testimony on engineering . . . matters in the courtroom or during investigative depositions falls within the defined professional practice." (*Id.*). Tuttle sent a nearly identical response a decade later when asked whether an unlicensed engineer who was licensed in another state could "provide courtroom expert witness testimony in

7

North Carolina[.]" (*Id.*). The Board provided this identical response to members of the public on many other occasions. (*Id.*).

The Board has also explained many times that its determination that someone illegally testified about engineering is separate from a court's determination that an expert opinion on engineering is admissible. (*Id.* ¶ 48). As Tuttle explained in 2006, "courts are not prohibited from allowing testimony from unlicensed persons, even though an action may be pursued by the Board against the individual." (*Id.*). Fourteen years later, he continued to insist that the licensing requirement "does not prevent the Court from allowing the testimony, but the individual can be found by our Board to have engaged in unlicensed practice." (*Id.*). He has provided a similar explanation to members of the public many times over the years. (*Id.*).

Finally, the Board has explained that the restriction on engineering testimony by non-licensees applies whether or not the testimony would ever impact the built environment. When an attorney asked in 2012 whether his non-licensed expert witness (who was licensed out of state) could "simply opine" about why existing engineering work had failed, which would not be used "for actual construction or repair work," the Board's answer was the same. Tuttle—citing how this issue had been addressed over the previous 18 years—still maintained that "[g]iving of engineering testimony is the practice of engineering in North Carolina." (*Id.* ¶ 49).

### C.  The Board Has Proceeded Against Members Of The Public For Speaking About Engineering Without A License.

The Board's unequivocal position over at least the past 15 years is no mere bluff—when it learns about unlicensed engineers issuing reports or testifying about engineering matters, it acts. Over the years, it has sent several cease-and-desist letters commanding people who lacked a North Carolina license to stop testifying about engineering matters. (SUMF ¶¶ 51–52). These letters, like the Board's longstanding legal position, distinguish between unlicensed individuals

8

falsely using the designation "Professional Engineer" and unlicensed individuals offering testimony the board views as being about engineering, each of which is separately illegal. (*Id.*). And there is no evidence that the Board has ever declined to act when it has learned that an unlicensed engineer has provided an expert report or testified about engineering matters in North Carolina. (*Id.* ¶ 54).

In sum, for at least 15 years the Board's unvarying policy has been that any testimony about engineering in North Carolina is illegal absent a license from the Board, and it has enforced that policy without exception whenever violations have come to its attention. (*Id.* ¶ 53).

## III. Consistent With Its "Long Standing Position," The Board Orders Wayne To Stop Speaking About Engineering Matters In Written Reports And Testimony.

### A. The Board Tells Wayne He Needs A License To Testify About Engineering.

Wayne's initial deposition was suspended after the *Autry* opposing counsel questioned the legality of Nutt's testimony. (SUMF ¶ 55). Kyle then immediately called the Board to confirm its position. (*Id.*). The *Autry* defendants' expert also contacted the Board. (*Id.* ¶ 62).

The Board's counsel (David Tuttle) responded to Kyle by email that afternoon, first explaining that non-licensees are not "prohibited" from using the title "engineer" internally, such as for "job titles for personnel and payroll purposes." (*Id.* ¶ 56). But, he said, they cannot use the term publicly, such as for a resume or website, because that would then be "holding out engineering expertise," which non-licensees may not do. (*Id.*). Either way, he continued, even if a non-licensee does not describe himself as an engineer, the content of any testimony must be "analyzed to determine if there is a holding our [sic] of engineering expertise" and if the public would view it as "engineering advice." (*Id.*).

Tuttle also attached "the explanation developed over the years" about engineering-related testimony. (*Id.* ¶ 57). The document, entitled "Expert Testimony in North Carolina" and dated

February 4, 2021, is substantively identical to the explanations the Board had long provided to the public. (*Id.* ¶ 59). And the document is unequivocal: "The practice of engineering in North Carolina for projects or testimony impacting the public in North Carolina requires that the individual and company must be licensed in North Carolina." (*Id.* ¶ 58). And, like all the Board's other public explanations, "Expert Testimony in North Carolina" makes clear that the prohibition on testimony applies no matter the forum, including for "expert witness testimony on engineering . . . matters in the courtroom, in arbitrations or during depositions." (*Id.* ¶ 60). There is also the standard caveat that even if a court deems the testimony admissible, "[t]he Board addresses the practice engineering issues separate from a court determination of what is admissible." (*Id.*). Finally, there is a warning that "[t]he Board has proceeded against unlicensed individuals, including those licensed in other states but not in NC, for the unlicensed practice of engineering" relating to their testimony on engineering matters. (*Id.*).

Kyle responded to Tuttle's email, disputing the Board's prohibition against non-licensees testifying about engineering matters on statutory and First Amendment grounds. Kyle received no response, and the rest of Wayne's deposition took place on April 27, 2021. (*Id.* ¶ 61).

The morning after Wayne's deposition concluded, the *Autry* defendants' expert (an engineer licensed in North Carolina) again contacted the Board's counsel to complain about Wayne's unlicensed testimony. (SUMF ¶ 62). The Board's counsel then emailed Kyle, explaining that the Board's counsel had just had the "first opportunity" to have the Board's Engineering Committee (composed of 5 out of the 9 total Board members) review and comment on Kyle's question about whether testimony is the practice of engineering. (*Id.*).

At a meeting a few days later, the Engineering Committee met to consider the matter in-depth and, following a lengthy discussion, concurred with the legal position the Board's counsel

10

had sent to Kyle. (*Id.* ¶ 64). Ultimately, the Board ratified the following response that was emailed to Kyle:

> The committee concurred with the response that had previously been given in my earlier emails to you that referred to the long standing position of the Board as further expressed in the attached "Expert Testimony in North Carolina." The committee members had reviewed the information that you submitted in your emails, and after statements by the Board members reinforcing the interpretation of the Board, confirmed that rendering opinions on engineering matters in testimony is the practice of engineering, recognizing that the Court makes its own determination of what testimony is allowed.

(*Id.* ¶ 65).

### B. The Board Investigates Wayne For Speaking About Engineering Matters In Written Reports And Testimony.

Meanwhile, the Board was already formally investigating Wayne's expert reports and deposition testimony. On May 12, 2021, the opposing expert from the *Autry* litigation submitted a formal complaint that Wayne was practicing engineering without a license. (*Id.* ¶ 66). The Board then opened an investigation. (*Id.*).

On May 23, 2021, Wayne received a certified letter dated May 19, 2021, from the Board's assistant director. (*Id.* ¶ 67). The letter informed Wayne that "[c]harges have been filed with the Board" alleging that he "may be in violation of G.S. 89C-23 for practicing, or offering to practice, engineering without a license." (*Id.*). According to the letter, the "[c]harges" pertained to Wayne's expert report and associated engineering calculations, as well as to "engineering testimony in depositions on March 8, 2021 and April 27, 2021." (*Id.*).

Wayne interpreted the letter as an effort to intimidate him into silence. (*Id.* ¶ 68). And Wayne believes that, but for the fact that he found pro bono counsel, that effort would have

succeeded. Wayne does not want to break the law, and he plans to obey the Board's commands to stop talking about engineering unless he succeeds in this action. (*Id.* ¶ 69).[4]

But Wayne wants to speak about these issues, so he decided to fight back. Wayne filed this lawsuit to protect his right to continue to express his opinion about the fluid capacity of the concrete pipe in the *Autry* litigation and about engineering issues more generally. (*Id.* ¶ 70; *see also* Verified Compl., ECF 1). Wayne's most immediate concern was his ability to testify at the *Autry* trial scheduled for July 19, 2021. (SUMF ¶ 71). The trial court later dismissed the *Autry* case (for reasons unrelated to Wayne's testimony), and the matter remains pending on appeal. (*Id.*). In the meantime, Wayne continues to desire to speak publicly, in testimony and otherwise, about engineering issues affecting his community. (*Id.* ¶¶ 72, 77–78). And he wants to testify in the *Autry* matter when and if it returns to the trial court after the appeal. (*Id.* ¶ 71).

### C.   After Wayne Files This Lawsuit, The Board Tells Him He Must Stop Speaking In The Future About Engineering Matters In Written Reports And Testimony.

After this lawsuit began, Wayne received a certified letter from the executive director of the Board (defendant Andrew Ritter). (*Id.* ¶ 73). The letter informed Wayne that the Board had determined his testimony in *Autry* was the unlicensed practice of engineering—and it ordered Wayne not to do it again. It warned Wayne that "further action may be taken by the Board" if he did not "come into compliance" by "not participating in the activities that fall within the practice of engineering." (*Id.* ¶ 74). The "activities" prohibited by the letter included "producing a 'chemical engineering' report," holding himself out to the public as having "any engineering expertise" from "training and education as a 'chemical engineer' in providing findings and

---

[4] Wayne has consistently behaved in a way that shows he takes the Board's threats seriously. Even at his deposition in this case, he expressed concern about whether he could legally answer technical engineering questions. (SUMF ¶ 79).

conclusions in the report," and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." (*Id.*).

As with the earlier letter, Wayne viewed this letter as an effort to intimidate him into silence. (*Id.* ¶ 75). He also understood that he might face consequences if he provided an opinion to "a reasonable degree of engineering certainty . . . in testimony" ever again. (*Id.*).

Besides the letter, the Board published a notice of Wayne's "violation" in its newsletter, which is publicly available online. (*Id.* ¶ 76). Wayne's name and the Board's conclusion that he violated Section 89C-23 also remain publicly available in the Board's online "Violations Lookup" database. (*Id.*). Wayne is upset by this. Publicly identifying him as someone who violated the law related to his work as an expert witness in the *Autry* litigation disparages him and his work, and Wayne views this as yet another effort to intimidate him into not speaking in the future and to punish him for speaking in the past. (*Id.*).

### D.    After Wayne Files This Lawsuit, The Board Also Seeks A Declaratory Judgment That His Past Written Reports And Deposition Testimony About Engineering Matters Were Illegal.

The Board has not just told Wayne that he may not write reports or testify about engineering matters *in the future*. They have also filed a counterclaim here seeking a declaration from this Court that Wayne broke the law in the past by speaking about engineering matters without a license. *See* Answer, Decl. Judgment Countercl., ECF 25. They ask the Court to: (1) "declare that the work completed by Wayne Nutt in consultation with his clients in [the *Autry* litigation], engineering calculations performed by Wayne Nutt, analysis conducted by Wayne Nutt, and preparation of the expert report(s) in the [*Autry* litigation] constitutes the unauthorized practice of engineering"; and (2) "declare that the prior work of testifying at the discovery depositions in support of the work contained in the expert report prepared by Wayne Nutt in [the *Autry* litigation] constitutes the unauthorized practice of engineering." *Id.* at 38.

13

In apparent support of this counterclaim, the Board also designated an expert witness on engineering licensure. (SUMF ¶¶ 83–84). That expert concluded that Wayne's reports and testimony were the unlicensed practice of engineering, though he also confessed he could not define the phrase "practice of engineering" without using the word "engineering." (*Id.* ¶ 84). He separately opined that Wayne had testified outside his area of expertise because the stormwater system at issue in *Autry* should have been analyzed by a stormwater engineer instead of just someone with experience analyzing fluid-carrying pipes. At deposition, though, he appeared somewhat confused by the fact that the system *had* been analyzed by a stormwater engineer who had been working alongside Wayne. (*Id.* ¶ 85).

## IV. The Board Has No Evidence That Prohibiting Testimony About Engineering Matters Without A License Is Narrowly Tailored To Serve A Compelling Interest.

### A. The Board May Regulate Who Is Allowed To Stamp Building Plans And Cause Things To Be Built.

Licensed professional engineers in North Carolina are issued seals bearing their license number and the designation "professional engineer." N.C. Gen. Stat. § 89C-16; (SUMF ¶¶ 86–87). Certain things in North Carolina can be built only if their plans are stamped and sealed by a licensed professional engineer. *See, e.g.*, N.C. Gen. Stat. § 133-1.1 (requiring buildings that receive specified public funding to be designed and sealed by an engineer or architect); N.C. Gen. Stat. § 160D-1110(b) (requiring engineer-stamped plans for certain building permits); N.C. Gen. Stat. § 130A-309.219 (authorizing requirement of engineer-stamped analysis for certain coal-combustion); N.C. Gen. Stat. § 160A-300.1 (authorizing use of traffic-control photographic systems only where yellow-light timing conforms to a traffic plan sealed by a licensed engineer). In other instances, an engineer's stamp and seal will streamline regulatory approval to build something. *See* N.C. Gen. Stat. § 130A-336.1 (providing alternative process for wastewater system approvals if a licensed engineer prepares signed and sealed plans for the system); N.C.

14

Gen. Stat. § 143-228.12 (mandating creation of informal review processes for regulatory submissions stamped by a licensed engineer but not already covered by a reviewing authority's existing procedures). Only a licensed engineer may use a stamp and seal, and licensed engineers are subject to various disciplinary and regulatory restrictions in their work. (SUMF ¶ 87).

Whatever the merits of these regulations, they are all aimed at an obvious governmental interest: the safety of the built environment. North Carolina can (and does) restrict the building of certain structures without the approval of a licensed engineer, just as it can (and does) prohibit the unlicensed from stamping plans or holding themselves out as licensed engineers.

### B. The Board Has No Evidence That Restricting Speech About Engineering Is Narrowly Tailored To Serve A Compelling Interest.

North Carolina, however, does not just require a professional engineer's license when building things. The Board's "long standing position" also prohibits testimony about engineering matters, including in related written reports. (SUMF ¶¶ 44–50). But testimony does not build anything—indeed, frequently (as with Wayne's testimony in the *Autry* case) testimony is just opining about things that have already been built. And the record is devoid of anything that would justify a criminal prohibition on simply offering one's opinion. (*Id.* ¶ 92).

The Board's asserted interest in prohibiting testimony about engineering matters without a license is that non-licensees are more likely to provide incompetent or untruthful testimony because they haven't demonstrated competence by meeting the licensing requirements and are not subject to punishment by the Board for dishonest or low-quality testimony. (SUMF ¶ 90). That testimony therefore creates a risk, according to the Board, that "a decision is going to be made on not the best information, and a bad decision is going to be reached." (SUMF ¶ 91). The "Board doesn't want to see a decision reached based on incompetent information or untruthful information." (*Id.*). Instead, the Board "want[s] the best decision to be reached" and "want[s] the

15

public to have confidence that the best decision was reached based on competent information delivered." (*Id.*). The Board also asserts that requiring a license to testify about engineering matters promotes more general public trust in engineers and the engineering profession. (*Id.*).

There are no facts in the record, however, supporting the idea that the Board's prohibition on unlicensed testimony actually achieves any of this—or anything at all. (*Id.* ¶ 92). Neither the Board nor its expert could point to any evidence or studies suggesting that prohibiting unlicensed engineering testimony protects the public health or safety—nor could either identify any instance in which anyone had ever been harmed by unlicensed engineering testimony. (*Id.* ¶¶ 92–105).

Not only is there no evidence that North Carolina is achieving anything by banning unlicensed testimony, there is no evidence that states adopting less-restrictive regimes have suffered for it. After all, not all states require an engineering license to testify about engineering.[5] Do these states see more "bad decision[s]" or less public confidence in engineers? Not so far as the record here shows. (*Id.* ¶¶ 100–01).

Similarly, not all technical fields require a government license to testify. *See, e.g.*, *Geophysical Sys. Corp. v. Seismograph Serv. Corp.*, 738 F. Supp. 348, 349 (C.D. Cal. 1990) (finding testimony not the "practice" of geophysics under California law); *Wright v. Las Vegas Hacienda, Inc.*, 720 P.2d 696, 263 (Nev. 1986) ("[C]ontrary to the district court's conclusion, a person does not unlawfully engage in the unlicensed practice of psychology or engineering when

---

[5] *See, e.g.*, *Lance v. Luzerne County Mfrs. Ass'n*, 77 A.2d 386, 388 (Pa. 1951) (holding testimony not "practice of engineering" under state law); *accord S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 410 A.2d 1359, 1367 (Vt. 1980) (noting trial court's "incorrect" ruling that expert testimony could constitute the "practice of engineering"); Mo. Rev. Stat. § 327.076(1) (the practice of engineering in Missouri "shall not include the rendering of opinions or giving of testimony in a civil or criminal proceeding by a licensed professional"); Tex. Occ. Code Ann. § 1001.004(e) (engineering licensure "does not . . . prohibit or otherwise restrict a person from giving testimony or preparing an exhibit or document for the sole purpose of being placed in evidence before an administrative or judicial tribunal").

16

he testifies to his knowledge of the subject in a court of law."). Yet, again, the record reveals no evidence that the public has been harmed in any way by the testimony of unlicensed physicists. (SUMF ¶¶ 102–03).

Finally, there is no evidence that less restrictive alternatives to outright banning non-licensees from testifying about engineering have ever been considered, let alone tried, even though other states have actually adopted these alternatives. (*Id.* ¶¶ 98–99).

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party "bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue." *Id.* The "mere existence of a scintilla of evidence in favor of the non-movant's position is insufficient." *Id.* (internal quotation marks omitted). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Id.* (internal quotation marks omitted). Trial courts have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

## ARGUMENT

This case involves two claims that are mirror images of each other. First, Wayne claims that prohibiting him from testifying about engineering issues violates the First Amendment; he seeks prospective relief permitting him to express engineering opinions in the future. Second, the

17

Board counterclaims that Wayne violated the law by preparing written reports and giving deposition testimony in the *Autry* litigation, while Wayne defends that he did not violate the law because that the First Amendment protected his right to do those things.[6] Both Wayne's claim and the Board's counterclaim (subject to Wayne's defense) ask same question: Can the Board ban people from expressing opinions about engineering matters without a license? Because the answer is no, summary judgment in Wayne's favor is appropriate on both his cause of action and on the Board's counterclaim.

As Section I explains below, the Board's prohibition on engineering-related testimony without a license is subject to First Amendment scrutiny because it burdens protected speech. The prohibition also applies based on the content of speech and thus it is subject to strict scrutiny. And as Section II explains, even if strict scrutiny does not apply, the prohibition on engineering testimony is at least subject to intermediate scrutiny, which it cannot survive because the Board has no evidence to meet its daunting burden that the prohibition is narrowly tailored to serve a significant government interest.

I.    **Defendants' Ban On Testifying About Engineering Imposes A Content-Based Restriction On Speech And Is Therefore Subject To Strict Scrutiny.**

Part A below establishes that Wayne's testimony about engineering is speech protected by the First Amendment. Part B establishes that criminalizing Wayne's testimony about engineering but not other subjects imposes a content-based burden on speech that is subject to strict scrutiny.

---

[6] The Board's counterclaim, which seems to ask for an advisory opinion about the legal status of Wayne's past speech, is procedurally unusual, but it may nonetheless be justiciable. Wayne wants to continue speaking in the future, and the Board apparently wants to continue ordering him not to, which means resolving whether he had the legal right to speak in the past will help "guide [the] parties in their future conduct in relation to each other." *Regal Cinemas, Inc. v. Town of Culpeper*, No. 3:21-cv-4, 2021 WL 2953679 (W.D. Va. July 14, 2021) (citation omitted).

A.     **Wayne's Reports And Testimony About Engineering Are Protected Speech.**

Defendants' "long standing position" that testifying about engineering matters requires a license burdens Wayne's protected speech. The Supreme Court has made clear that even if a law may generally "be described as directed at conduct," the law is still a restriction on speech if, "as applied to" the plaintiff, "the conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 28 (2010). And the Fourth Circuit has applied this simple rule to occupational licensing laws, most recently finding that an ordinance licensing tour guides was a restriction on protected speech because "the business of leading tours depends on the expression of ideas" and "the [challenged ordinance forbade] unlicensed tour guides for hire from expressing those ideas on public thoroughfares." *Billups v. City of Charleston*, 961 F.3d 673, 684 (4th Cir. 2020).

So too here. Defendants have told Wayne that he may not do things like write "a 'chemical engineering' report" and "provid[e] opinions to a 'reasonable degree of engineering certainty,' including in testimony" (SUMF ¶ 74). But writing reports and providing opinions are "the expression of ideas[.]" *Billups*, 961 F.3d at 684. Wayne wants to explain how much fluid he thinks could flow through a particular size pipe under certain conditions and to explain in detail why he thinks this. (SUMF ¶¶ 33–35). He wants to help people in nearby neighborhoods by pointing out issues with the stormwater management plans for new development proposals. (*Id.* ¶¶ 13–19). And he wants to explain why New Hanover County's approach to evaluating how new developments impact stormwater issues is misguided. (*Id.* ¶¶ 20–22). But he does not plan to engage in any conduct—he is not building pipes or roads or stormwater systems, or causing them to be built. His testimony "consists of communicating a message," which means that, to the extent his testimony triggers the application of North Carolina's engineering law, that law is a

19

restriction on speech. *Holder*, 561 U.S. at 28. Simply put, Wayne wants to talk about

engineering, and simply talking about engineering (like talking about anything else) is speech.

This conclusion is reinforced by the fact that the federal courts have long held that

testifying at a trial is protected speech. As a unanimous Supreme Court recently held, "[s]worn

testimony in judicial proceedings is a quintessential example of speech as a citizen[.]" *Lane v.*

*Franks*, 573 U.S. 228, 238 (2014); *accord Hoover v. Morales*, 164 F.3d 221, 227 (5th Cir. 1998)

(affirming on First Amendment grounds preliminary injunction against prohibition on state

employees testifying as expert witnesses when the state was a defendant). And in North Carolina,

many development decisions—such as the ones Wayne wants to speak about—occur through

quasi-judicial proceedings that include evidentiary hearings, sworn testimony, and cross-

examination. N.C. Gen. Stat. Ann. § 160D-406 (describing quasi-judicial procedures for special

use permits, variances, and other land-use decisions). More generally, it cannot be disputed that

speaking to local government bodies is protected speech. *See Hickory Fire Fighters Ass'n, Loc.*

*2653 v. City of Hickory*, 656 F.2d 917, 920–21 (4th Cir. 1981) (city could not prohibit

representatives of city employees from speaking at city council meetings if it was open to other

members of the public).

To be sure, these repeated holdings about the First Amendment status of testimony have

largely come in cases about the rights of public employees, but that distinction only makes the

analysis here easier. In public employment cases, courts must strike a "careful balance between

the interests between the interests of the employee, as a citizen, in commenting upon matters of

public concern and the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees." *Lane*, 573 U.S. at 231 (cleaned up); *Hickory*

*Fire Fighters Ass'n*, 656 F.2d at 920–21 ("balancing of interests" tilted toward allowing speech

20

"even though the speakers are public employees"). There is no such balance to be struck here. Wayne is a private citizen who wants to truthfully describe his engineering expertise and express engineering opinions. The First Amendment protects his right to do so.

Defendants cannot sidestep these simple principles by asserting that they are simply prohibiting the act of creating speech. *See, e.g.*, Answer, Decl. Judgment Countercl. ¶¶ 48–49, ECF 25 at 37 (describing Wayne's testimony as the product of "work" like consulting with clients, performing calculations, and conducting analysis). To begin, this attempted recharacterization contradicts the Board's own description of how it applies its prohibition against engineering testimony. The Board's own counsel's repeated policy statements make clear that it views the licensing requirement as a prohibition on *testifying*, not a prohibition on privately performing calculations. (SUMF ¶¶ 45–46). The Board's restriction on engineering testimony does not target "consulting with clients" or "performing calculations." It targets the testimony itself.

And the Board's recharacterization also faces a more fundamental problem: the government cannot ban speech through the backdoor by prohibiting the creation of speech. As the Supreme Court has held, "the *creation* and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (emphasis added). For the First Amendment's protections "to have meaning the Amendment must also protect the act of creating [protected] material." *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) (act of recording video is protected because recordings are protected); *accord Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."). As the Supreme Court has recognized, "[l]aws enacted to control or suppress

21

speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010); *see also Turner v. Driver*, 848 F.3d 678, 689 (5th Cir. 2017) (rejecting "distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded"); *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015) ("A regulation limiting the creation of [speech] curtails expression as effectively as a regulation limiting its display."). Just as the government could not restrict news reporting by prohibiting reporters from "aggregating information," it may not restrict engineering testimony by prohibiting the underlying thought processes—whether called "engineering calculations" or "analysis"—on which the testimony relies.[7]

### B. Treating Wayne's Protected Speech As The Prohibited "Practice Of Engineering" Imposes A Content-Based Burden On Speech.

A restriction on speech "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed" or if it "cannot be justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 164 (2015) (cleaned up). "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. And a law that draws distinctions based on content is content-based even if it is not motivated by hostility to a particular viewpoint. *Id.* at 168–69.

As applied to Wayne, then, North Carolina's engineering-licensing requirement is content based in two independent ways. First, as discussed in part 1 below, it applies to Wayne only

---

[7] Moreover, even if "performing calculations" could be viewed as conduct, the Board has no legitimate interest in preventing that conduct and has not ordered Wayne to cease that conduct. The Board does not care if Wayne sits at home and does engineering calculations. It only cares if Wayne then shares his thoughts with others, which is why it ordered Wayne to stop expressing opinions rather than ordering him to stop privately engaging in mathematics. (SUMF ¶ 74).

because of what he says. Second, as addressed in part 2, the Board's only justification for silencing Wayne hinges on the content of his speech—on the Board's worry that people might listen to what he says. And finally, as addressed in part 3, the Board's content-based rules do not fall into any of the Supreme Court's exceptions to ordinary First Amendment doctrine.

*1. The licensing requirement applies based solely on what Wayne says.*

As applied to Wayne, North Carolina's engineering-licensing requirement turns solely on what he says in his testimony. If Wayne testifies about facts—that he has seen a particular pipe or the field in which it sits and measured their dimensions—he is not subject to punishment. He is only subject to punishment if his testimony truthfully describes his engineering experience (SUMF ¶ 74), truthfully describes himself as an "engineer" (*id.*), draws on his "engineering knowledge" (*id.* ¶ 59), or "render[s] opinions on engineering matters" (*id.* ¶ 65). This is a "distinction[] drawn based on the message [Wayne] conveys and, therefore, [is] subject to strict scrutiny." *Reed*, 576 U.S. at 163–64; *see also Wash. Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (holding a law was content based because it "single[d] out one particular topic of speech . . . for regulatory attention").

Moreover, North Carolina's law is content-based because it draws distinctions based on the *level of expertise* embodied in someone's speech. Wayne is free to speak in broad generalities about engineering ("pipes carry fluid"). He violates the law only if he draws on his expertise to offer an opinion to a degree of "engineering certainty." (SUMF ¶ 74). This distinction between general and expert advice is exactly the sort of line-drawing that triggered strict scrutiny in *Holder*. In that case, the Supreme Court held a law was content-based precisely because it prohibited the plaintiffs from "communicat[ing] advice derived from 'specialized knowledge'" but not from communicating "only general or unspecialized knowledge." *Holder*, 561 U.S. at 27.

The same holds true here, and the same conclusion follows: The challenged prohibition is content-based.

> ### 2. *The Board only justifies its actions by reference to Wayne's speech.*

Even if the law were not drawing content-based distinctions, it would still be subject to strict scrutiny because the Board cannot justify its actions without reference to the content of Wayne's speech. *Reed*, 576 U.S. at 165. Asked to justify these restrictions, both the Board and its designated expert repeatedly explained that the problem with unlicensed speech is that someone might listen to it: The Board worries that "a decision is going to be made on not the best information, and a bad decision is going to be reached." (SUMF ¶ 91).

In other words, the Board thinks Wayne should remain silent because if he speaks, people might listen to him or take his ideas seriously—and Wayne, says the Board, is not the sort of person who should be listened to or taken seriously. But in our constitutional order, those determinations are not for licensing authorities to make. Indeed, "the fear that speech might persuade provides no lawful basis for quieting it" and to contend otherwise is "contrary to basic First Amendment principles." *Sorrell*, 564 U.S. at 576. At minimum, the fact that the government's regulatory interest is solely in protecting people from hearing and heeding the regulated speech makes the law here subject to strict scrutiny. *E.g.*, *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (restriction on speech "would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech" (internal quotation marks omitted))

> ### 3. *No established First Amendment exception applies.*

And none of these content-based distinctions are drawn because Wayne's speech falls into any categories of speech the Supreme Court has recognized as receiving less protection

under the First Amendment. *Cf. United States v. Stevens*, 559 U.S. 460, 472 (2010) (cautioning that there is no "freewheeling authority to declare new categories of speech outside the scope of the First Amendment" beyond those categories already identified). Talking about engineering is not obscenity, defamation, fraud, or incitement.[8] Neither is talking about engineering removed from ordinary First Amendment scrutiny simply because North Carolina has chosen to license engineers. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("*NIFLA*") (rejecting the idea that its cases supported a "professional speech" exception to the First Amendment and holding that "[s]peech is not unprotected merely because it is uttered by 'professionals'"). As the Fourth Circuit has explained, a law regulating commerce cannot escape First Amendment scrutiny if it "completely prohibits unlicensed [individuals] . . . from an activity which, by its very nature, depends upon speech or expressive conduct." *Billups*, 961 F.3d at 683. Talking about engineering, of course, "depends upon speech" and is entitled to full First Amendment protection.

Nor is the Board's outright ban on engineering testimony subject to lesser scrutiny as a regulation of professional conduct. The Supreme Court has recognized that "regulations of professional conduct that incidentally burden speech" may receive lower First Amendment scrutiny. *NIFLA*, 138 S. Ct. at 2373. But regulations do not "incidentally" burden speech when they are triggered by speech itself. *Holder*, 561 U.S. at 27–28 (citing *Cohen v. California*, 403 U.S. 15 (1971)). *Holder*, for example, involved providing "material support" to terrorist organizations, "which most often does not take the form of speech at all." 561 U.S. at 26. But the

---

[8] Nutt is also not engaged in commercial speech because he is not "propos[ing] a commercial transaction" or advertising his services as an expert witness. *Harris v. Quinn*, 573 U.S. 616, 648 (2014). It is worth noting, though, that even if Nutt *were* simply urging people to hire him by truthfully explaining his background as an engineer he would have every right to do so. *See, e.g.*, *Byrum v. Landreth*, 566 F.3d 442, 447 (5th Cir. 2009) (holding that prohibition on truthful use of the term "interior design" in commercial speech violated the First Amendment).

25

Case 7:21-cv-00106-M   Document 47   Filed 04/29/22   Page 32 of 38

burden on the plaintiffs' speech was not "incidental" because, "as applied" to them, "the conduct triggering coverage under the statute consists of communicating a message." *Holder*, 561 U.S. at 28. Similarly, *NIFLA* involved medicine—a profession equally if not more heavily regulated than engineering. 138 S. Ct. at 2368. But the numerous regulations of the profession in general did not matter in *NIFLA* because just as Wayne's speech here is restricted even though he is not building anything, the restriction in *NIFLA* applied "regardless of whether a medical procedure is ever sought, offered or performed." 138 S. Ct. at 2373. The challenged restriction in *NIFLA* thus was not an incidental burden on speech but instead "regulate[d] speech as speech." So too here.

## II. Defendants' Ban On Testifying About Engineering Fails Under Any Level Of First Amendment Scrutiny.

Ultimately, the government's arguments here are doomed because the government bears an affirmative burden of proof under any level of First Amendment scrutiny, and Defendants here cannot carry any such burden. *E.g.*, *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) ("This burden is not satisfied by mere speculation or conjecture . . . ."); *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (explaining at summary judgment stage that once a plaintiff shows that speech has been restricted, "the burden then falls on the government to prove the constitutionality of the speech restriction"). Content-based restrictions like the one challenged here are subject to strict scrutiny, which means the government must show that they are narrowly tailored to promote a compelling government interest. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 189 (4th Cir. 2013) (en banc). But even if the Court assumes that the law is content-neutral and subject to intermediate scrutiny, the government still must prove that it is narrowly tailored to serve a significant government interest and that it leaves open ample alternative channels for communication of the information. *Billups*, 961 F.3d at 685 (assuming

26

without deciding that law was subject to intermediate scrutiny because it failed under either standard). Defendants can do no such thing.

To begin, the government has no legitimate, let alone significant or compelling, interest in prohibiting Wayne from testifying about engineering. Wayne's speech cannot cause a bridge to collapse or a pipeline to overflow. It can, at most, persuade his listeners or change the way they view the world slightly. And that is precisely what the Board is trying to do: prevent speech that may persuade listeners to make "bad decision[s]." (SUMF ¶ 91). But the government has no interest in preventing that. *Cf. Rubin v. Coors Brewing Co.*, 514 U.S. 476, 496 (1995) (Stevens, J., concurring) (questioning the existence of the government's "interest in suppressing [ ] truthful, unadorned, informative speech"). To the contrary, under the First Amendment, the "response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *United States v. Alvarez*, 567 U.S. 709, 727 (2012) (plurality opinion). If the Board worries about what unlicensed engineers will say in testimony, the answer is to permit more speech, not to "orchestrate public discussion through content-based mandates." *Id.* at 728.

And Defendants fare no better on the question of tailoring. The statutory definition of the "practice of engineering" is sweeping. N.C. Gen. Stat. § 89C-3(6)(a). It applies to "[a]ny service or creative work," and over the course of 143 words uses the term "engineering" five separate times. *Id.* Defendants' gloss on that definition, which prohibits any testimony that "requires engineering knowledge" (SUMF ¶ 46) is similarly sweeping. Any valid government interest in regulating engineers' speech—like ensuring that engineers do not lie about their credentials—is tiny compared to the sweep of the law here.

This enormous sweep is well illustrated by the facts of this case. Wayne Nutt—who, so far as the record reveals, has never been mistaken by anyone for a licensed professional

engineer—has frequently expressed opinions about engineering matters in the past. (SUMF ¶ 12). And those opinions have often been *right*, such that public bodies and licensed engineers alike have adopted his suggestions. (SUMF ¶¶ 16, 18). Even in the *Autry* litigation that set off this current dispute, it seemed that everyone, including the licensed engineer hired by the plaintiffs, understood the scope of Wayne's qualifications and found his work helpful. (SUMF ¶¶ 37–39). But the Board's position is that all of Wayne's criticisms were, in fact, crimes. It does not matter that people wanted to hear him or even that he was right: Wayne, by operation of North Carolina law, must be silent.

But to silence truthful speech like Wayne's requires the government to carry a heavy evidentiary burden. Even under intermediate scrutiny, the government must, at a minimum, "present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it.'" *Billups*, 961 F.3d at 688. This means it must present actual evidence establishing that any interest it asserts could not be addressed by the enforcement of other laws or by adopting less restrictive laws like those that exist in other jurisdictions. *See id.* at 689–90 (finding tour-guide ordinance failed intermediate scrutiny because the city failed to present real evidence that existing less-restrictive laws were insufficient or that other jurisdictions' less-restrictive laws had been seriously considered); *accord Reynolds*, 779 F.3d at 230–31.

Defendants cannot do this. They possess no evidence that their prohibition achieves anything; no evidence that less restrictive alternatives would be less effective; no evidence that jurisdictions that have not adopted similar prohibitions have suffered in any way. (SUMF ¶¶ 92–104). At most, the Board has an intuition that members of the public would be confused and wrongly assume that anyone testifying about engineering is licensed. (SUMF ¶¶ 90–91).

But these sorts of "uncorroborated assertions" are not enough. *Billups*, 961 F.3d at 687–89 n.10. To prevail here, the government would need to prove, for example, that its existing restrictions on who may stamp plans is insufficient to warn the public about whose testimony the Board thinks it should listen to. On that front, the government has less than nothing. Indeed, its own expert placed his engineer's seal on his expert report and testified that he "expect[ed] members of the public to rely on that stamp to know that [he had] a certain minimum level of qualifications." (SUMF ¶¶ 96–97). This is precisely the sort of less restrictive alternative the Fourth Circuit relied on in *Billups*, which struck down a tour-guide licensing law in part because the city failed to prove it could not achieve its ends by allowing guides who met its standards to advertise themselves with a "special insignia." *Billups*, 961 F.3d at 689–90. If anything, the government's position is weaker here than in *Billups* because it *already has* a "special insignia" it bestows upon its preferred speakers, and it has declined to offer proof that this insignia is insufficient.

Beyond its evidentiary default, the prohibition on unlicensed testimony fails intermediate scrutiny because it does not leave open "ample alternative methods of communication" by which Wayne can get his message out. *Chesapeake & Potomac Tel. Co. v. United States*, 42 F.3d 181, 203 (4th Cir. 1994), *vacated on other grounds*, 516 U.S. 415 (1996). Here, there are no alternatives because Defendants' objections to Wayne's speech do not rest on where or how he is speaking, but on what he is saying. There are no circumstances in which Wayne can give testimony based on his (undisputed) "knowledge of engineering"—no disclaimer he can append, no amount of cross-examination he can undergo—because Defendants' position is that unlicensed people like Wayne simply cannot say things like this in public. Even under intermediate scrutiny, such a sweeping prohibition must fail.

29

*     *     *

In sum, the problem with Defendants' position is that speech about engineering is just that: speech. It cannot make bridges fall down (or go up, for that matter) And the government cannot restrict speech simply because it fears someone might wrongly choose to listen to it. Summary judgment should therefore be granted in favor of Wayne.

## CONCLUSION

For the above reasons, the Court should grant summary judgment in Wayne's favor on both his First Amendment claim and the Defendants' counterclaim because the First Amendment prevents the application of N.C. Gen. Stat. § 89C-23 to Wayne's written or oral testimony.

Dated: April 29, 2022.                    Respectfully submitted,

/s/ W. Cory Reiss                          /s/ Joseph Gay
W. Cory Reiss (NC Bar No. 41549)           Joseph Gay (D.C. Bar No. 1011079)*
REISS & NUTT, PLLC                         Robert J. McNamara (VA Bar No. 73208)*
1221 Floral Parkway, Ste 104               INSTITUTE FOR JUSTICE
Wilmington, NC 28403                       901 North Glebe Road, Suite 900
Phone: (910) 420-4674                      Arlington, VA 22203
Fax: (910) 420-4637                        Phone: (703) 682-9320
Email: wcreiss@reissnutt.com               Fax: (703) 682-9321
*Local Civil Rule 83.1(d)*                 E-mail: jgay@ij.org
*Counsel for Plaintiff*                             rmcnamara@ij.org
                                           *\* Special Appearance pursuant to*
                                           *Local Rule 83.1(e)*


                        *Attorneys for Plaintiff*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th of April, 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing and, pursuant to Local Civil Rule 5.1(e), shall constitute service upon, the following:

Douglas W. Hanna, NCSB #18225
M. Todd Sullivan, NCSB #24554
FIZGERALD HANNA & SULLIVAN, PLLC
3737 Glenwood Ave., Suite 375
Raleigh, NC 27612
Phone: (919) 863-9091
Fax: (919) 424-6409
dhanna@ghslawfirm.com
tsullivan@ghslawfirm.com

*Attorneys for Defendants*

/s/ Joseph Gay
Joseph Gay (D.C. Bar No. 1011079)

31