| | | |
|---|---|---|
| WAYNE NUTT, | ) | Case No. 7:21-CV-00106-M |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S STATEMENT** |
| v. | ) | **OF UNDISPUTED** |
| | ) | **MATERIAL FACTS** |
| ANDREW L. RITTER, in his official | ) | |
| capacity as Executive Director of the North | ) | |
| Carolina Board of Examiners for Engineers | ) | |
| and Surveyors, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Pursuant to Local Rule 56.1(a), Plaintiff Wayne Nutt asserts that the following material

facts are not subject to any genuine dispute:

## I. Plaintiff Wayne Nutt Is An Engineer Who Wants To Speak Publicly About Engineering Matters.

### A. Wayne Nutt Is An Engineer.

1. Plaintiff Wayne Nutt is an engineer. *See* Appendix Exhibit 1 (Declaration of

Wayne Nutt in Support of Summary Judgment ("Nutt Dec.") ¶ 2).

2. Wayne Nutt graduated from the University of Iowa with a Bachelor of Science in

Chemical Engineering in 1967 and spent the next forty-plus years working as a chemical

engineer. *Id.* ¶¶ 3–6. He spent most of his career at E.I. du Pont de Nemours (commonly called

DuPont), where he worked from 1967 until January 2002. *Id.* ¶ 4. DuPont assigned him to

various plants around the U.S. and internationally, but he spent the bulk of his time at a chemical

plant in Brunswick County, just outside Wilmington, North Carolina. *Id.* When DuPont sold the

1

Brunswick County facility, the new ownership asked Wayne[*] to work for them, which he did from 2002 until his eventual retirement in 2013. *Id.* ¶ 5.

3.     Wayne had a variety of responsibilities over his four decades as a chemical engineer, such as supervising a chemical laboratory and working as a research fellow. *Id.* ¶¶ 7–12.

4.     While his formal training is in "chemical engineering" and he calls himself a "chemical engineer," *id.* at ¶¶ 3–6, much of Wayne's career was spent designing things that were built in the physical world. *Id.* ¶¶ 7–10.

5.     Beginning in the late 1970s, Wayne began to take on more "hands on" engineering as he moved into Engineering and Technical Support roles at DuPont. In this capacity, he was responsible for a variety of designs and design changes. In addition to his own designs, he was also responsible for reviewing and approving work designed by other engineers. *Id.* ¶ 7.

6.     Wayne's professional duties included designing and overseeing the construction, installation, and repair of piping systems, such as between chemical processing equipment within a plant or for cooling systems or other utilities. *Id.* He also oversaw the design of similar systems by others and supervised the installation of the equipment and systems once they had been designed. *Id.* These duties required him to have and helped him develop expertise related to hydraulics, fluid flow, and piping systems. *Id.*

7.     Chemical plants are open to the weather, which meant Wayne was also frequently responsible for the design and operation of "Building Trench Systems" that were installed in

---

[*] Because the facts of this case involve both Wayne Nutt and his son, Kyle Nutt, this document, like Plaintiff's brief in support of summary judgment, refers to each by their first name for the sake of clarity.

2

these plants. *Id.* ¶ 9. These are systems of trenches and other features (such as weir walls) to manage both stormwater and potential chemical spills, as well as water from activated fire protection systems. *Id.* These systems were not called stormwater management systems, but they had the same function. *Id.*

8. In another instance, Wayne led a team that had been charged with correctly measuring the flow of fluid through a 14-mile pipeline that transported chemicals from the state port to the company's Brunswick County facility. *Id.* ¶ 10. The pipeline operator had been having difficulty measuring accurately, and Wayne's team ensured that the flow was accurately calculated. *Id.*

9. Over the course of his career, Wayne continued to lead teams of engineers and design projects and other items himself and in collaboration with others. *Id.* ¶¶ 11–12.

10. Although he is an engineer, Wayne has never been a licensed professional engineer. *Id.* ¶ 13. Wayne never needed a professional engineering license over his forty-year career because he worked for manufacturing companies, and thus was able to work as an engineer under what is commonly known as the "industrial exemption" to engineering licensure. *Id.*; *see also* N.C. Gen. Stat. § 89C-25(7a). In Wayne's experience, the vast majority of chemical engineers are not licensed professional engineers, either, for the same reason. Appendix Exhibit 1 (Nutt. Dec. ¶ 14).

11. Now that he is retired, Wayne certainly has no desire to obtain an engineering license. *Id.* ¶ 15. He does not, for example, want to design or oversee the installation of engineering projects anymore. *Id.* He does, however, want to publicly speak out about engineering matters. *Id.*

3

**B.**     **In Retirement, Wayne Nutt Wants To Talk About Engineering Matters.**

12.     Although Wayne retired in 2013, he continues to want to publicly speak his mind about engineering matters that come to his attention. *Id.* ¶ 16. This happens on a regular basis because Wayne is part of an informal network of community members who scrutinize local development proposals. *Id.* Through this network, neighborhood groups and others ask Wayne to look at, analyze, and in some cases speak about, the engineering-related issues that various development proposals may raise. *Id.*

13.     The record reflects that Wayne has consistently publicly testified about engineering matters since his retirement. *Id.* ¶¶ 16–23.

14.     For example, in 2015, Wayne was asked by a group called the Ogden Preservation Group to analyze a developer's proposal to build a shopping center at the intersection of Middle Sound Loop Road and Market Street. *Id.* ¶ 17.

15.     Wayne's review of the project included reviewing the Traffic Impact Analysis created by a traffic engineer to describe the project's impact. *Id.* ¶¶ 17–18. His review of the project and the traffic analysis revealed errors in the report, including that the traffic analysis had failed to account for other development in the area behind a planned grocery store, which meant the engineer's traffic analysis was substantially undercounting vehicles. *Id.* ¶ 18. Wayne also proposed several alternatives to the design of the project to help reduce traffic and preserve trees. *Id.*

16.     Wayne presented his work on the 2015 proposed development in various ways, including letters, PowerPoint slides, meetings with officials, and testimony before the Wilmington City Council. *Id.* ¶¶ 17–18. As a result of Wayne's work and advocacy, several of his criticisms and suggestions were reflected in the final project design. *Id.* ¶ 18.

4

17.     Separately, in 2018, Wayne submitted expert commentary to North Carolina Department of Environmental Quality about a proposal to use methyl bromide near the State Ports in New Hanover County. *Id.* ¶ 19. That letter drew on Wayne's experience running a massive chlorination facility in Texas, which gave him expertise in the transportation, storing, and use of methyl bromide, and accordingly informed his opinions about the dangers of methyl bromide and the structural requirements of a facility where methyl bromide would be used. *Id.*

18.     In 2020, again at the request of the Ogden Preservation Group, Wayne analyzed a stormwater engineering plan submitted in support of a proposed townhome development. *Id.* ¶ 20. Wayne prepared a presentation for the New Hanover County Commissioners in which he detailed several errors in the stormwater plan, including that the plan called for a large detention pond without accounting for the fact that water would fall directly into the pond when it rained and that the plan used out-of-date data to estimate the likelihood of large storms. *Id.* After Wayne's testimony, the stormwater report was withdrawn and replaced by a different, improved version that corrected the error regarding rainfall directly into the pond. *Id.*

19.     In Wayne's experience, it has been useful to draw on his engineering expertise in order to provide detailed comments in situations like these. He believes his speech would have been less effective had he spoken in vague generalities instead of providing rigorous analysis. *Id.* ¶ 21. He is also worried any decision that takes opinions into account will be vulnerable to legal challenge if he does not provide sufficient technical backing for his opinions. *Id.*; *see also* N.C. Gen. Stat. § 160D-1402(j)(3)(c) (decisions may not be based on lay opinion testimony about matters that generally require expert testimony).

20.     Stormwater management and flooding are a recurring issue with Wayne's post-retirement speech about engineering matters. Appendix Exhibit 1 (Nutt Dec. ¶ 22). For example,

5

Wayne disagrees with how New Hanover County (which includes Wilmington and the town of Ogden where Nutt lives) considers stormwater issues when it approves buildings and developments. *Id.* Among other things, he disagrees with the County's reliance on stormwater peak flow calculations based on detention ponds because Wayne believes the county does not properly account for the time it takes these ponds to reset. *Id.* He also believes the County improperly focuses on individual properties without accounting for how development changes where water leaves property. *Id.* Redirecting runoff from one point of a property to another, for instance, may change runoff for adjoining properties and possibly increase their risk of flooding. *Id.*

21.     Before the pandemic struck in early 2020, Wayne was in an ongoing debate with the New Hanover County Engineer about his concerns over these stormwater issues. *Id.* ¶ 23. The conversation went on hiatus during the pandemic, but Wayne County Engineer specifically told him that the pandemic made it impractical to continue this debate but that they could resume the discussion later. *Id.* Wayne continues to believe that New Hanover County does these things wrong, and he would, if permitted, like to continue this debate—including testifying about it publicly if he is ultimately unsuccessful in persuading the County Engineer. *Id.*

22.     These discussions will become even more important for Nutt because the former County Engineer that Wayne had these discussions with has been assigned to a new public utilities authority responsible for collecting fees and maintaining stormwater infrastructure (including areas related to the *Autry* litigation discussed below as well as the Brandywine neighborhood, which is next to Wayne's own neighborhood). *Id.* If allowed to do so, Wayne also wants to discuss his concerns with how the County addresses stormwater issues with the recently appointed County Engineer. *Id.*

**C.** **Wayne Nutt Expresses An Engineering Opinion About A Concrete Pipe In The *Autry* Litigation.**

23.     In 2020, Wayne agreed to help his son Kyle Nutt (who is an attorney) with a state-court lawsuit, *Autry v. Bill Clark Homes, LLC* (New Hanover Co. File No. 19-CVS-4520) (the *Autry* litigation). Appendix Exhibit 1 (Nutt Dec. ¶ 24).

24.     Kyle represents the plaintiff homeowners in the *Autry* litigation, who allege that flooding was caused by a stormwater management system during Hurricane Florence. *Id.*

25.     Wayne first helped Kyle with reviewing and understanding the documents received in discovery. *Id.* ¶ 25.

26.     At one point, Wayne learned that no one in the case was testifying about the specifics of a "diverter line" which had been added to the stormwater management system. *Id.* ¶ 26. The diverter line in question was a concrete pipe that, according to documents in the case, had been added to the system in about 2003 or later. *Id.*

27.     Wayne was aware that witnesses in the case had reported that the ditch this diverter line discharged into was obstructed and that they said they saw water spouting upward during the flooding. *Id.* ¶ 27.

28.     Wayne wanted to help his son by testifying, for free, about how the observed blockage of the diverter pipe could substantially reduce the pipe's fluid capacity, which could cause the backup of stormwater into the streets and the homes of the plaintiffs. *Id.* ¶ 28.

29.     As detailed above, Wayne has decades of experience relating to hydraulics, fluid flow and piping systems. *Id.* ¶ 29; *see also id.* ¶¶ 8–10.

30.     In Wayne's career as an engineer, he had often had to calculate the capacity of a pipe, and the concrete pipe at issue in the *Autry* case was the same kind of concrete pipe Wayne had worked with for decades. *Id.* ¶ 29.

7

31. By calculating the capacity of the pipe and simulating how that capacity would be affected by different blockages, Wayne believed he could provide insight into whether the observed blockage had contributed to the flooding. *Id.* ¶ 30.

32. Kyle did not ask Wayne and Wayne did not agree to evaluate the stormwater design system as a whole. *Id.* ¶ 31.

33. Instead, Wayne provided his results to and discussed his work with John F. Oglesby, PE, who is a licensed professional stormwater engineer. *Id.* Wayne's understanding was that he would focus on calculating the fluid flow capacity of the diverter line in light of the blockage and Oglesby would focus on the overall engineering of the stormwater system. *Id.*

34. Wayne believed he was probably more qualified than the typical stormwater engineer to answer the narrow question of the diverter line's fluid flow capacity. *Id.* ¶ 32. A lot of stormwater engineering work would involve calculations about pipes that were only partially full of fluid, and the calculation formulas are different for evaluating full versus partially full pipes. *Id.* In Wayne's career, though, he was normally designing piping systems that were meant to be full of fluid all the time. *Id.*

35. Nutt prepared a report dated January 29, 2021, entitled "Stormwater Flow Characteristics of a 36 " Reinforced Concrete Pipe," and subtitled, "Tidalholm Village Diverter Line." Appendix Exhibits 1–2 (Nutt Dec. ¶ 33 & Ex. A). The report showed the results of calculating the fluid-flow capacity of a 3-foot concrete pipe diverter line under different scenarios, including if it had been built according to the plans approved by the County, as well as the capacity with two types of obstructions. Appendix Exhibit 2 (Nutt Dec. Ex. A). The report concluded that the obstructions would reduce the fluid-flow capacity of the pipe and back up the

water level in a manner consistent both with the spouting observed by the county employee and with the water levels observed by one of the nearby homeowners. *Id.*

36.     Wayne prepared an updated report with a few minimal revisions dated March 2, 2021. The conclusions of both reports were the same. Appendix Exhibits 1, 3 (Nutt Dec. ¶ 34 & Ex. B).

37.     Kyle designated both Oglesby and Nutt as testifying expert witnesses, but only Oglesby was described as either a licensed professional or as a stormwater engineer. Appendix Exhibit 12 (Declaration of Joseph Gay in Support of Summary Judgment (Gay Dec.) Ex. 5 at 2–3).

38.     Oglesby testified in the *Autry* litigation that Nutt's report was "significant" to the opinions Oglesby reached in the case, although he did his own due diligence to vet and understand what Nutt did. Appendix Exhibit 13 (Gay Dec. Ex. 6 at 26:8–14, 27:3–10). Oglesby testified further that Wayne's report "was a very good academic analysis. It was something that I would expect to see in a learning situation to where you're demonstrating or teaching. It was very academic, very thorough, and it followed the basic principles of hydraulic engineering, which are not incredibly complex principles. But I thought the report and the analysis was put well together." *Id.* at 26:14–22. Oglesby explained that "it was almost like reviewing a textbook." *Id.* at 27:12–13.

39.     In his deposition testimony for the *Autry* litigation, Oglesby agreed with the opposing counsel's summary that Wayne's work showed "that a pipe that has blockage is not going to function as well as one that doesn't." *Id.* at 28:6–25.

40. Wayne Nutt was deposed in the *Autry* litigation on March 8, 2021. Appendix Exhibit 1 (Nutt Dec. ¶ 36). At that deposition, Wayne truthfully said that he was not a licensed professional engineer. *Id.*

41. Prior to his March 8, 2021, deposition, it had never occurred to Wayne that testifying about engineering could be improper or illegal under North Carolina law. *Id.* ¶ 37.

42. During the March 2021 deposition, counsel for the *Autry* defendants asserted that Wayne could not legally testify about his opinion about the fluid capacity of the diverter pipe because he was not a licensed professional engineer. *Id.* ¶ 38. The parties suspended the deposition so that Kyle and Wayne could find out about the issue. *Id.* ¶ 39.

43. Kyle was taken aback by the notion that Wayne could not legally testify about the fluid capacity of a pipe. Appendix Exhibit 11 (Gay Dec. Ex. 4, Deposition of Kyle Nutt ("K. Nutt Depo.") at 82:21–83:15). He viewed the allegation as an unprofessional attempt to gain a litigation advantage by intimidating Nutt into not testifying about his opinions about diverter line. *Id.* at 99:24–100:8, 113:20–114:6. Kyle immediately reached out to the Board for its position on the issue. *Id.* at 71:15–17, 71:25–72:2, 73:21–23.

## II. The Board Prohibits Testimony And Other Speech About Engineering Matters Without A License.

### A. The Board Prohibits Testimony About Engineering "In The Courtroom, In Arbitrations Or During Depositions" Without A License.

44. The Board has a "long standing position" of interpreting Section 89C-23's prohibition against the unlicensed practice of engineering as banning reports and testimony about engineering matters. Appendix Exhibit 35 (Gay Dec. Ex. 28 at 1). Over at least the last 15 years, the Board has received multiple inquiries from the public about the Board's position, and the Board's counsel has consistently expressed the Board's position that reports and testimony about engineering matters require a license. Appendix Exhibits 14–23 (Gay Dec. Exs. 7–16).

10

45. For example, in 2006, a law student asked the Board's counsel by email if "testifying as an expert in engineering (as in a trial)" requires a license in North Carolina. Appendix Exhibit 14 (Gay Dec. Ex. 7 at 2). The Board's counsel (David Tuttle) responded that "[o]ur Board has taken the position that giving testimony on engineering matters is within the definition of engineering." *Id.* at 1. As he explained: "Testimony is just another way of presenting the engineering service to the public." *Id.* The Board's counsel had given the same answer to several other attorneys over the previous few weeks and months of 2006. *Id.*

46. And the Board's counsel would continue to give the same answer over the next 15 years. Appendix Exhibit 18 (Gay Dec. Ex. 11 at 1 (explaining in 2012 that "[g]iving of engineering testimony is the practice of engineering in North Carolina")); Appendix Exhibit 19 (Gay Dec. Ex. 12 at 1 (explaining in 2017 that the "NC Board of Examiners for Engineers and Surveyors considers that any testimony that requires engineering knowledge to adequately provide and to protect the public requires a NC PE license")); Appendix Exhibit 21 (Gay Dec. Ex. 14 at 1 (explaining in 2020 that "[i]n North Carolina we treat providing engineering testimony as just another means of practicing engineering")).

47. Consistent with the explanation in 2006, the Board's counsel has explained many times over the years that this prohibition applies even to *trial* testimony. Appendix Exhibits 15–23 (Gay Dec. Exs. 8–16). When an attorney asked over email in June 2011 specifically about offering engineering testimony "at a North Carolina trial," the Board's counsel responded that "[g]iving expert witness testimony on engineering . . . matters in the courtroom or during investigative depositions falls within the defined professional practice." Appendix Exhibit 17 (Gay Dec. Ex. 10 at 1–2). Ten years later (and while this lawsuit was pending), when an engineer asked over email whether an unlicensed engineer (who was licensed in another state) could

11

"provide courtroom expert witness testimony in North Carolina," the Board's counsel provided a nearly identical response: "Giving expert witness testimony on engineering . . . in the courtroom, in arbitrations or during depositions falls within the defined professional practice" that requires a license. Appendix Exhibit 23 (Gay Dec. Ex. 16 at 2, 4). The Board provided this identical response over email to members of the public on many other occasions. Appendix Exhibits 15 (Gay Dec. Ex. 8 at 1); Appendix Exhibit 16 (Gay Dec. Ex. 9 at 1); Appendix Exhibit 18 (Gay Dec. Ex. 11 at 1); Appendix Exhibit 19 (Gay Dec. Ex. 12 at 1); Appendix Exhibit 20 (Gay Dec. Ex. 13 at 1); Appendix Exhibit 21 (Gay Dec. Ex. 14 at 1); Appendix Exhibit 22 (Gay Dec. Ex. 15 at 3).

48. The Board's counsel also explained many times that the Board's determination that someone illegally testified about engineering is separate from a court's determination that an expert opinion on engineering is admissible. As the Board's counsel explained in 2006, "courts are not prohibited from allowing testimony from unlicensed persons, even though an action may be pursued by the Board against the individual." Appendix Exhibit 14 (Gay Dec. Ex. 7 at 1). Fourteen years later, he continued to insist that the licensing requirement "does not prevent the Court from allowing the testimony, but the individual can be found by our Board to have engaged in unlicensed practice." Appendix Exhibit 21 (Gay Dec. Ex. 14 at 1). He has provided a similar explanation to members of the public many times over the years. *See* Appendix Exhibit 15 (Gay Dec. Ex. 8 at 1–2); Appendix Exhibit 16 (Gay Dec. Ex. 9 at 1–2); Appendix Exhibit 17 (Gay Dec. Ex. 10 at 1); Appendix Exhibit 18 (Gay Dec. Ex. 11 at 2); Appendix Exhibit 19 (Gay Dec. Ex. 12 at 1); Appendix Exhibit 20 (Gay Dec. Ex. 13 at 2); Appendix Exhibit 21 (Gay Dec. Ex. 14 at 2); Appendix Exhibit 22 (Gay Dec. Ex. 15 at 4); and Appendix Exhibit 23 (Gay Dec. Ex. 16 at 5) (nearly identical statements in 2008, 2011, 2012, 2017, 2020, and 2021 that with

12

"the separation of powers," the Board "cannot dictate what the judicial branch of government can do," but that "[a]ny action the Board takes does not negate what is done by the court")).

49.     Finally, the Board's counsel has explained that the Board's restriction on engineering testimony by non-licensees applies whether or not the testimony would ever impact the built environment. Appendix Exhibit 18 (Gay Dec. Ex. 11). When an attorney asked in 2012 whether his non-licensed expert witness (who was licensed out of state) could "simply opine" about why existing engineering work had failed, which would not be used "for actual construction or repair work," the Board's answer was the same. *Id.* at 1–2. The Board's counsel—citing how this issue had been addressed over the Board counsel's previous 18 years—still maintained that "[g]iving of engineering testimony is the practice of engineering in North Carolina." *Id.* at 1.

50.     As far as the Board is aware, it has "always" been its position that "giving testimony on engineering matters is within the definition of engineering as defined in [North Carolina General Statute] 89C-3(a)." Appendix Exhibit 9 (Gay Dec. Ex. 2 (30(b)(6) deposition of the Board through Andrew Ritter) ("Ritter Depo.") 30:16–31:9)).

**B.     The Board Has Proceeded Against Members Of The Public For Speaking About Engineering Without A License.**

51.     In about 2007, the City of Monroe, North Carolina, filed a claim against a company for allegedly damaging the shoulder of road. Appendix Exhibit 24 (Gay Dec. Ex. 17 at 3). An unlicensed engineer (a 73-year-old who had been a professional engineer for 45 years, who was licensed in other states but whose North Carolina license was inactive), interviewed a city employee, and issued a report disputing the claim. *Id.* at 3–4, 6. Based on the report, the Board investigated the engineer for the unlicensed practice of engineering. *Id.* at 1. Following the investigation, the Board's Review Committee (which decides in the first instance whether

13

violations have occurred and whether to take any action, *see* Appendix Exhibit 8 (Gay Dec. Ex. 1, Deposition of David Evans ("Evans Depo.") at 30:21–31:6)), determined that the engineer had violated N.C. Gen. Stat. § 89C-23 by practicing engineering without a license from the Board. Appendix Exhibit 25 (Gay Dec. Ex. 18 at 1). (The Committee also determined that he improperly used his "P.E." designation, because even though he was a licensed professional engineer with active licenses in Georgia and Alabama, his license in North Carolina was inactive. *Id.*; Appendix Exhibit 24 (Gay Dec. Ex. 17 at 4).) The full Board concurred with the Review Committee's determination and issued a letter telling the engineer "to cease and desist practicing or offering to practice engineering in North Carolina, to include, but not be limited to, expert testimony . . . until licensed with the Board." Appendix Exhibit 25 (Gay Dec. Ex. 18 at 1). The Board issued a substantially similar letter to the company the engineer was working for. Appendix Exhibit 26 (Gay Dec. Ex. 19).

52.     In 2009, an unlicensed engineer (who again was licensed in another state) was deposed in Kansas City, Missouri, for a case pending in state court in Mecklenburg County, North Carolina. Appendix Exhibit 27 (Gay Dec. Ex. 20 at 1–2). The dispute involved allegations that subcontractors were owed more compensation for extra work they had to perform due to deficient ductwork plans for the Bobcats Arena in Charlotte. *Id.* at 1. Based on the deposition testimony, the Board's Review Committee found that the engineer had practiced engineering without a license in violation of N.C. Gen. Stat. § 89C-23. Appendix Exhibit 28 (Gay Dec. Ex. 21 at 1). And again, the full Board concurred, and issued a letter telling the engineer "to cease and desist offering or practicing engineering in North Carolina, to include, but not be limited to, testimony, until such time as properly licensed by this Board . . . ." *Id.* The Board further

explained: "Testimony that provides engineering judgment, analysis or recommendations falls within the definition of the practice of engineering." *Id.*

53. In sum, the Board has an unbroken 15-year position of requiring a North Carlina professional engineering license to testify about engineering matters in North Carolina, and it has formally investigated unlicensed engineers and ordered them to cease and desist testifying about engineering matters when they are discovered. Appendix Exhibit 14–28 (Gay Dec. Exs. 7–21).

54. Indeed, there is no evidence that the Board has ever declined to act when it has learned that an unlicensed engineer has provided an expert report or testified about engineering matters in North Carolina.

## III. Consistent With Its "Long Standing Position," the Board Orders Wayne To Stop Speaking About Engineering Matters In Written Reports And Testimony.

### A. The Board Tells Wayne He Needs A License To Testify About Engineering.

55. Wayne's deposition on March 8, 2021, was suspended after the *Autry* opposing counsel questioned the legality of Nutt's testimony. Appendix Exhibit 1 (Nutt Dec. ¶ 39). Kyle then immediately called the Board to confirm its position. *Id.* ¶ 40; Appendix Exhibit 11 (K. Nutt Depo. at 71:15–17, 71:25–72:2, 73:21–23).

56. The Board's counsel responded by email that afternoon, first explaining that non-licensees are not "prohibit[ed]" from using the title "engineer" internally, such as for "job titles for personnel and payroll purposes." Appendix Exhibit 29 (Gay Dec. Ex. 22 at 5). But they cannot use the term publicly, such as for a resume or website, because that would then be "holding out engineering expertise," which non-licensees may not do. *Id.* With testimony (assuming a non-licensee does not improperly describe themselves as an engineer), the content must be "analyzed to determine if there is a holding our [sic] of engineering expertise" and if "a

reasonable member of the public would expect to be receiving engineering advice which can be relied upon as coming from a qualified (licensed) engineer[]." *Id.*

57.     The Board's counsel also attached "the explanation developed over the years" about engineering-related testimony. *Id.* The document is entitled "Expert Testimony in North Carolina" and is dated February 4, 2021. Appendix Exhibit 30 (Gay Dec. Ex. 23). It is substantially similar to explanations the Board had provided to members of the public since at least 2006 (*see* Appendix Exhibits 14–23 (Gay Dec. Exs. 7–16)) and is identical to explanations the Board has continued to provide after this lawsuit was filed. Appendix Exhibit 22 (Gay Dec. Ex. 15 at 3–4); Appendix Exhibit 23 (Gay Dec. Ex. 16 at 4–5).

58.     The "Expert Testimony in North Carolina" explanation is unequivocal: "The practice of engineering in North Carolina for projects or testimony impacting the public in North Carolina requires that the individual and company must be licensed in North Carolina." Appendix Exhibit 30 (Gay Dec. Ex. 23 at 1).

59.     As with prior and later explanations, "Expert Testimony in North Carolina" describes the *Board's* position: "*Our Board* considers that any testimony that requires engineering knowledge to adequately provide and to protect the public falls with the definition of the practice of engineering and requires a NC PE license." *Id.* (emphasis added); *see also, e.g.*, Appendix Exhibit 23 (Gay Dec. Ex. 16 at 4 (identical statement in September 2021)); Appendix Exhibit 14 (Gay Dec. Ex. 7 at 1 (explanation in 2006 that "[o]ur Board has taken the position that giving testimony on engineering matters is within the definition of engineering as defined in G.S. 89C-3(6)a")).

60.     The "Expert Testimony in North Carolina" document provided to Kyle Nutt on March 8, 2021, also explains that the Board's policy on engineering testimony applies no matter

16

the forum, including for "expert witness testimony on engineering . . . matters in the courtroom, in arbitrations or during depositions." Appendix Exhibit 30 (Gay Dec. Ex. 23 at 1). The document also explains that even if a court deems the testimony admissible, "[t]he Board addresses the practice engineering issues separate from a court determination of what is admissible." *Id.* Finally, there is a warning that "[t]he Board has proceeded against unlicensed individuals, including those licensed in other states but not in NC, for the unlicensed practice of engineering" relating to their testimony on engineering matters. *Id.* at 2.

61.     Kyle responded to the Board's counsel's email, disputing the Board's prohibition against non-licensees testifying about engineering matters on statutory and First Amendment grounds. Appendix Exhibit 29 (Gay Dec. Ex. 22 at 1–5). Kyle received no response, and the rest of Wayne's deposition took place on April 27, 2021. Appendix Exhibit 31 (Gay Dec. Ex. 24 at 2–3); Appendix Exhibit 11 (K. Nutt Depo. at 88:1–18, 91:3–10, 92:20–25).

62.     The morning after Wayne's April 27, 2021, deposition concluded, the *Autry* defendants' expert (a licensed engineer) called the Board's counsel about Wayne's testimony, then emailed attaching Wayne's expert report and promising to send Nutt's deposition transcript as soon as it was available. Appendix Exhibit 32 (Gay Dec. Ex. 25 at 1). The Board's counsel then emailed Kyle, explaining that he had just had the "first opportunity" to have the Board's Engineering Committee review and comment on Kyle's question about whether testimony is the practice of engineering. Appendix Exhibit 31 (Gay Dec. Ex. 24 at 2–3).

63.     The Engineering Committee (composed of 5 out of the 9 total Board members) develops policies and gives official interpretations about engineering-related matters. Appendix Exhibit 8 (Evans Depo. at 16:9–17:4); Appendix Exhibit 33 (Gay Dec. Ex. 26).

17

64.     The Engineering Committee considered the matter during their videoconference held on the afternoon of May 10, 2021. Appendix Exhibit 1 (Nutt Dec. ¶ 43); Appendix Exhibit 33 (Gay Dec. Ex. 26 at 1). Kyle and Wayne observed the discussion over videoconference but were not allowed to participate. Appendix Exhibit 1 (Nutt Dec. ¶ 43). The Board's attorney said that although the Board could not stop Wayne from testifying, they could fine him afterwards or threaten to fine him. *Id.* Wayne understood that to be the Board's recommended path if he persisted in testifying about engineering issues. *Id.* Without raising any concerns or objections to the Board counsel's interpretation, the Engineering Committee "concurred" with the previous response that the Board's counsel had provided to Nutt. *Id.* ¶ 44; Appendix Exhibit 33 (Gay Dec. Ex. 26 at 1). The Committee directed the Board's counsel to draft a response to Kyle that the Committee chair would review. Appendix Exhibit 33 (Gay Dec. Ex. 26 at 1).

65.     The full Board reviewed the Engineering Committee's decision during its May 13, 2021, meeting. Appendix Exhibit 34 (Gay Dec. Ex. 27 at 1–2). The Board approved the following response that was emailed to Kyle on May 18, 2021:

> The committee concurred with the response that had previously been given in my earlier emails to you that referred to the long standing position of the Board as further expressed in the attached "Expert Testimony in North Carolina." The committee members had reviewed the information that you submitted in your emails, and after statements by the Board members reinforcing the interpretation of the Board, confirmed that rendering opinions on engineering matters in testimony is the practice of engineering, recognizing that the Court makes its own determination of what testimony is allowed.

Appendix Exhibit 35 (Gay Dec. Ex. 28 at 1).

### B.     The Board Investigates Wayne For Speaking About Engineering Matters In Written Reports And Testimony.

66.     Meanwhile, the Board was already formally investigating Nutt's expert reports and deposition testimony. On May 12, 2021, the opposing expert from the *Autry* litigation submitted a formal complaint that Nutt was practicing engineering without a license. Appendix

18

Exhibit 36 (Gay Dec. Ex. 29). The Board then opened an investigation. Appendix Exhibit 8 (Evans Depo. at 61:10–62:4).

67.     On May 23, 2021, Wayne received a certified letter dated May 19, 2021, from the Board's assistant director. Appendix Exhibits 1, 5 (Nutt Dec. ¶ 45 & Ex. D). The letter informed Wayne that "[c]harges have been filed with the Board" alleging that he "may be in violation of G.S. 89C-23 for practicing, or offering to practice, engineering without a license." Appendix Exhibit 5 (Nutt Dec. Ex. D). According to the letter, the allegations pertained to Wayne's March 2, 2021, expert report and associated engineering calculations, as well as to "engineering testimony in depositions on March 8, 2021 and April 27, 2021." *Id.*

68.     Wayne interpreted the letter as an effort to intimidate him into silence. Appendix Exhibit 1 (Nutt Dec. ¶ 46). If not for the fact that Wayne has found pro bono counsel to file this lawsuit, Wayne believes it would have succeeded in intimidating him into silence. *Id.*

69.     As a law-abiding citizen who values his reputation for integrity, Wayne does not want to be branded as someone who has violated the law. *Id.*

70.     But Wayne wants to speak about engineering, to express his opinions, and to truthfully describe himself as an engineer when describing his background and training. *Id.* ¶ 47. He believes he has a right to do all these things. *Id.* He filed this lawsuit in an effort to vindicate that right. *Id.*

71.     When this lawsuit was filed, Wayne's most immediate concern was whether he could testify at the *Autry* trial, which was then scheduled for July 19, 2021. *Id.* ¶ 48. The *Autry* case was later dismissed by the trial court and is currently on appeal, though Wayne intends to testify at the trial if and when the case is set for trial after the appeal. *Id.*

19

72.     Besides the *Autry* case, Wayne continues to want to speak publicly, in testimony and otherwise, about engineering issues affecting the community. *Id.* ¶ 53.

**C.     After Wayne Files This Lawsuit, The Board Tells Nutt He Must Stop Speaking In The Future About Engineering Matters In Written Reports And Testimony.**

73.     After this lawsuit began, Wayne received a certified letter from the executive director of the Board (defendant Andrew Ritter) dated July 15, 2021. Appendix Exhibits 1, 6 (Nutt Dec. ¶ 49 & Ex. E). The letter informed Wayne that "after a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that you are practicing, or offering to practice, engineering in North Carolina . . . without being licensed with this Board. Appendix Exhibit 6 (Nutt Dec. Ex. E at 1). The Committee was therefore putting Nutt "on notice" that practicing engineering without a license "is a violation of G.S. 89C-23." *Id.* The letter added that the full Board concurred with the Review Committee and that it, too, was putting Wayne "on notice" that there was "sufficient evidence" that he was violating N.C. Gen. Stat. § 89C-23. *Id.* at 2.

74.     After quoting the language of Section 89C-23—including that violators "shall be guilty of a class 2 misdemeanor"—the letter warned Wayne that "further action may be pursued by the Board" if he did not "come into compliance" by "not participating in the activities that fall within the practice of engineering." *Id.* at 3. The Board's letter further explained that the prohibited "activities" included, but were not limited to, "producing a 'chemical engineering' report," holding himself out to the public as having "any engineering expertise" from "training and education as a 'chemical engineer' in providing findings and conclusions in the report," and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." *Id.*

75.     As with the May 19, 2021, letter, Wayne viewed this letter as an effort to intimidate him into silence. Appendix Exhibit 1 (Nutt Dec. ¶ 50). He also understood that the letter threatened "further action" should he provide an opinion to "a reasonable degree of engineering certainty . . . in testimony" at the *Autry* trial, as he intended. *Id.*

76.     Besides the letter, the Board published a notice of Wayne's "violation" in its newsletter, which is publicly available online. *Id.* ¶ 51; Appendix Exhibit 37 (Gay Dec. Ex. 30 at 15). Wayne's name and the Board's conclusion that he violated Section 89C-23 also remain publicly available in the Board's online "Violations Lookup" database. Appendix Exhibit 1 (Nutt Dec. ¶ 51); Appendix Exhibits 38–39 (Gay Dec. Exs. 31–32). Wayne is upset by this. Publicly identifying him as someone who violated the law related to his work as an expert witness in the *Autry* litigation disparages him and his work, and Wayne views this as yet another effort to intimidate him into not speaking in the future and to punish him for speaking in the past. Appendix Exhibit 1 (Nutt Dec. ¶ 51).

77.     While Wayne wants to continue his past practice of speaking out publicly about engineering matters, he is refraining from doing so because of the Board's repeated commands that he stop. *Id.* ¶ 53.

78.     Wayne testifies that he continues to hold opinions to a "degree of engineering certainty" because he is an engineer who pays a lot of attention to the world around him. *Id.* ¶ 54. But unless he is successful in this action, he will no longer share those opinions out loud because the Board has ordered him not to. *Id.*

79.     Wayne has consistently acted as if he takes the Board's warnings seriously. Even at his deposition in this case, he expressed concern that he might be breaking the law if he

answered technical questions posed by the Board's counsel. Appendix Exhibit 41 (Gay Dec. Ex. 34 (Deposition of Wayne Nutt) 89:10–91:8).

80.     Wayne does not want to obtain an engineering license at this stage of his life. Appendix Exhibit 1 (Nutt Dec. ¶ 15).

81.     Obtaining an engineering license takes some effort. Applicants must pass two examinations and provide five character references (three of whom must be licensed engineers). N.C. Gen. Stat. § 89C-13(a1). The applicant must also pay fees. N.C. Gen. Stat. § 89C-14. Once an applicant obtains a license, that license expires after only a year. N.C. Gen. Stat. § 89C-17. To renew, the applicant must have completed 15 hours of mandatory continuing education. 21 N.C. Admin. Code 56.1703.

### D.     After Wayne Files This Lawsuit, The Board Also Seeks A Declaratory Judgment That Nutt's Past Written Reports And Deposition Testimony About Engineering Matters Were Illegal.

82.     The Board has not just told Wayne that he may not write reports or testify about engineering matters *in the future*. They also have filed a counterclaim here seeking a declaration from this Court that Wayne broke the law in the past by speaking about engineering matters without a license. *See* ECF 25. They ask the Court to: (1) "declare that the work completed by Wayne Nutt in consultation with his clients in [the *Autry* litigation], engineering calculations performed by Wayne Nutt, analysis conducted by Wayne Nutt, and preparation of the expert report(s) in the [*Autry* litigation] constitutes the unauthorized practice of engineering"; and (2) "declare that the prior work of testifying at the discovery depositions in support of the work contained in the expert report prepared by Wayne Nutt in [the *Autry* litigation] constitutes the unauthorized practice of engineering." *Id.* at 38; *see also* Appendix Exhibit 1 (Nutt Dec. ¶ 52).

83.     The Board also designated an expert witness on engineering licensure. *See generally* Appendix Exhibit 40 (Gay Dec. Ex. 33). He reviewed Wayne's expert reports and

22

testimony in the *Autry* litigation and concluded that Wayne's reports and testimony violated N.C. Gen. Stat. § 89C-23. Appendix Exhibit 10 (Gay Dec. Ex. 3 (Deposition of Stacey A. Smith) ("Smith Depo.) 88:13–19).

84.     The Board's expert concluded that Wayne's testimony was the "practice of engineering," but he ran into difficulty explaining the boundaries of that concept. On the expert's telling, there is no definition of "practice of engineering" that does not itself use the word "engineering." Appendix Exhibit 10 (Smith Depo. 12:2–9).

85.     The Board's expert also opined that Wayne's testimony went beyond his area of expertise because, in the expert's view, Wayne's "intent" was to analyze more than just the one pipe. Appendix Exhibit 10 (Smith Depo. 91:2–7). In the Board's expert's view, it was inappropriate for Wayne to analyze a single pipe because the stormwater system at issue in the *Autry* case should have been analyzed by a stormwater engineer. Appendix Exhibit 10 (Smith Depo. 58:22–60:2). But the expert offered no explanation for why he disagreed with the conclusions of licensed engineer John Oglesby, who worked on the *Autry* case and found Wayne's work helpful. Appendix Exhibit 10 (Smith Depo. 60:3–14). Indeed, at deposition the Board's expert seemed confused about the nature of Oglesby's relationship with the *Autry* case and with Wayne's work. Appendix Exhibit 10 (Smith Depo. 60:17–61:6).

IV.     **The Board Has No Evidence That Prohibiting Testimony About Engineering Matters Without A License Is Narrowly Tailored To Serve A Compelling Interest.**

    A.     **The Board May Regulate Who Is Allowed To Stamp Building Plans And Cause Things To Be Built.**

86.     Licensed professional engineers in North Carolina are issued seals bearing their license number and the designation "professional engineer." N.C. Gen. Stat. § 89C-16. Certain things in North Carolina can be built only if their plans are stamped and sealed by a licensed professional engineer. *See, e.g.*, N.C. Gen. Stat. § 133-1.1 (requiring buildings that receive

23

specified public funding to be designed and sealed by an engineer or architect); N.C. Gen. Stat. § 160D-1110(b) (requiring stamped plans for certain building permits); N.C. Gen. Stat. § 130A-309.219 (authorizing requirement of engineer-stamped analysis for certain coal-combustion); N.C. Gen. Stat. § 130A-336.1 (engineer's stamp and seal required for more involved, larger capacity onsite wastewater treatment systems). In other instances, an engineer's stamp and seal will streamline regulatory approval to build something. *See* N.C. Gen. Stat. § 130A-336.1 (providing alternative process for wastewater system approvals if a licensed engineer prepares signed and sealed plans for the system); N.C. Gen. Stat. § 143-228.12 (mandating creation of informal review processes for regulatory submissions stamped by a licensed engineer but not already covered by a reviewing authority's existing procedures).

87. Licensed professional engineers are subject to the oversight and disciplinary power of the Board. The Board has enacted rules that licensed professional engineers must follow, and licensed engineers who violate those rules or perform incompetently face a range of Board sanctions, including reprimands, civil fines, and suspension or revocation of their license. N.C. Gen. Stat. §§ 89C-20–22. Only a licensed engineer may use a stamp and seal, and licensed engineers are subject to various disciplinary and regulatory restrictions in their work.

88. These restrictions all have something in common: They are regulations of what can be built in the physical environment. For instance, if North Carolina is paying to build a bridge or approving the construction of a bridge, it wants to assure itself and the public that the bridge will not collapse. *E.g.*, Appendix Exhibit 9 (Ritter Depo. 63:8–64:11 (discussing government interest in avoiding bridge collapse)).

**B.** **The Board Has No Evidence That Restricting Speech About Engineering Is Narrowly Tailored To Serve A Compelling Interest.**

89.     North Carolina, however, does not just require a professional engineer's license when building things. The Board's "long standing position" also prohibits testimony about engineering matters, including in related written reports. *Supra* ¶¶ 44–50.

90.     The Board prohibits unlicensed testimony out of a concern that "the public is getting competent services." Appendix Exhibit 9 (Ritter Depo. 26:18–27:16). The Board's asserted interest in prohibiting testimony about engineering matters without a license is that non-licensees may be more likely to provide incompetent or untruthful testimony, because they haven't demonstrated competence by meeting the licensing requirements and are not subject to punishment by the Board for dishonest or low-quality testimony. *Id.*; *see also id.* 46:3–15.

91.     In the Board's view, unlicensed testimony creates a risk, according to the Board, that "a decision is going to be made on not the best information, and a bad decision is going to be reached." *Id.* 46:16–21. The "Board doesn't want to see a decision reached based on incompetent information or untruthful information." *Id.* 46:22–25. Instead, the Board "want[s] the best decision to be reached" and "want[s] the public to have confidence that the best decision was reached based on competent information delivered." *Id.* 46:25–47:3. The Board also asserts that requiring a license to testify about engineering matters promotes are more general public trust in engineers and the engineering profession. *Id.* 41:11–24.

92.     There are no facts in the record beyond Defendants' own bare assertions to demonstrate that the prohibition on unlicensed testimony actually advances any government interest.

93. The Board's designated expert did not base his report on any evidence about the connection between the licensing requirement for engineering testimony and the protection of any government interest. Appendix Exhibit 10 (Smith Depo. 53:19–54:2).

94. The Board's designated expert cannot point to any studies or evidence demonstrating a connection between a licensing requirement for engineering testimony and the protection of any government interest. Appendix Exhibit 10 (Smith Depo. 46:20–47:15; 54:3–9; 65:16–66:2; 68:6–15; 71:9–20).

95. The Board has no evidence that its interests could not be equally well served simply by preventing people from falsely stating that they are a licensed engineer. Appendix Exhibit 9 (Ritter Depo. 47:4–16).

96. The Board's expert testified that licensed professional engineers usually stamp or seal their expert reports in order to signal to the public that the report was prepared by someone with a license whose opinions they should rely upon. Appendix Exhibit 10 (Smith Depo. 74:1–10).

97. The Board's expert testified that he would expect members of the public to rely on that stamp to know that an engineer had a certain level of qualifications and was accountable to the board. Appendix Exhibit 10 (Smith Depo. 74:11–18).

98. The Board has no evidence that its interests could not be equally well served simply by requiring unlicensed witnesses to affirmatively disclose that they are not professional engineers. Appendix Exhibit 9 (Ritter Depo. 47:4–16).

99. The Board's designated expert was unaware of any evidence regarding any alternatives to requiring a license to testify about engineering or whether those alternatives might protect the public. Appendix Exhibit 10 (Smith Depo. 48:8–17; 55:6–10; 66:12–16).

100.    The Board has no evidence of any worse outcomes in states that allow unlicensed individuals to testify about engineering. Appendix Exhibit 9 (Ritter Depo. 50:25–51:7).

101.    The Board's designated expert did not evaluate whether there is any difference in outcomes between states that require a license to testify about engineering and states that do not. Appendix Exhibit 10 (Smith Depo. 54:10–15; 66:3–7).

102.    The Board has no evidence about how its interests are served in technical fields where a license is not required to testify. Appendix Exhibit 9 (Ritter Depo. 51:8–14).

103.    The Board's designated expert did not look at other fields where licensure is not required for testimony to see if the licensure requirement made any difference. Appendix Exhibit 10 (Smith Depo. 54:16–21; 63:1–5; 66:8–11).

104.    The Board has been unable to identify any evidence that anyone has ever been harmed by unlicensed engineering testimony. Appendix Exhibit 9 (Ritter Depo. 22:5–13; 26:8–11; 48:4–10).

105.    The Board's designated expert has been unable to identify any evidence that anyone has ever been harmed by unlicensed engineering testimony. Appendix Exhibit 10 (Smith Depo. 71:5–8).

106.    Not all states require an engineering license to testify about engineering matters, and some states expressly exclude testimony from their definition of the practice of engineering. *See, e.g.*, *Lance v. Luzerne County Mfrs. Ass'n*, 77 A.2d 386, 388 (Pa. 1951) (holding testimony not "practice of engineering" under state law); *accord S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 410 A.2d 1359, 1367 (Vt. 1980) (noting trial court's "incorrect" ruling that expert testimony could constitute the "practice of engineering"); Mo. Rev. Stat. § 327.076(1) (the practice of engineering in Missouri "shall not include the rendering of

opinions or giving of testimony in a civil or criminal proceeding by a licensed professional"); Tex. Occ. Code Ann. § 1001.004(e) (engineering licensure "does not . . . prohibit or otherwise restrict a person from giving testimony or preparing an exhibit or document for the sole purpose of being placed in evidence before an administrative or judicial tribunal").

107.    Not all technical fields require a government license to testify. *See, e.g.*, *Geophysical Sys. Corp. v. Seismograph Serv. Corp.*, 738 F. Supp. 348, 349 (C.D. Cal. 1990) (finding testimony not the "practice" of geophysics under California law); *Wright v. Las Vegas Hacienda, Inc.*, 720 P.2d 696, 263 (Nev. 1986) ("[C]ontrary to the district court's conclusion, a person does not unlawfully engage in the unlicensed practice of psychology or engineering when he testifies his knowledge of the subject in a court of law.").

Dated: April 29, 2022                              Respectfully submitted,

/s/ W. Cory Reiss                                  /s/ Joseph Gay
W. Cory Reiss (NC Bar No. 41549)                   Joseph Gay (D.C. Bar No. 1011079)*
REISS & NUTT, PLLC                                 Robert J. McNamara (VA Bar No. 73208)*
1221 Floral Parkway, Ste 104                       INSTITUTE FOR JUSTICE
Wilmington, NC 28403                               901 North Glebe Road, Suite 900
Phone: (910) 420-4674                              Arlington, VA 22203
Fax: (910) 420-4637                                Phone: (703) 682-9320
Email: wcreiss@reissnutt.com                       Fax: (703) 682-9321
*Local Civil Rule 83.1(d)*                         E-mail: jgay@ij.org
*Counsel for Plaintiff*                                     rmcnamara@ij.org
                                                   *\* Special Appearance pursuant to*
                                                   *  Local Rule 83.1(e)*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th of April, 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing and, pursuant to Local Civil Rule 5.1(e), shall constitute service upon, the following:

Douglas W. Hanna, NCSB #18225
M. Todd Sullivan, NCSB #24554
FIZGERALD HANNA & SULLIVAN, PLLC
3737 Glenwood Ave., Suite 375
Raleigh, NC 27612
Phone: (919) 863-9091
Fax: (919) 424-6409
dhanna@ghslawfirm.com
tsullivan@ghslawfirm.com

*Attorneys for Defendants*

/s/ Joseph Gay
Joseph Gay (D.C. Bar No. 1011079)