IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:21-cv-00106-M

| | | |
|---|---|---|
| WAYNE NUTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' OPPOSITION TO** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| ANDREW L. RITTER, in his official | ) | **SUMMARY JUDGMENT** |
| capacity as Executive Director of the | ) | |
| North Carolina Board of Examiners for | ) | |
| Engineers and Surveyors; and JOHN | ) | |
| M. LOGSDON, JONATHAN S. CARE, | ) | |
| DENNIS K. HOYLE, RICHARD M. | ) | |
| BENTON, CARL M. ELLINGTON, JR., | ) | |
| CEDRIC D. FAIRBANKS, BRENDA L. | ) | |
| MOORE, CAROL SALLOUM and | ) | |
| ANDREW G. ZOUTWELLE, in their | ) | |
| official capacities as members of the | ) | |
| North Carolina Board of Examiners for | ) | |
| Engineers and Surveyors, | ) | |
| | ) | |
| Defendants. | ) | |

# **TABLE OF CONTENTS**

NATURE OF THE CASE ............................................................... 1

ARGUMENT ................................................................................ 3

THE STATUTORY FRAMEWORK FOR
LICENSING PROFESSIONAL ENGINEERS IS
NOT SUBJECT TO STRICT SCRUTINY ......................... 3

The Act regulates conduct not protected speech .......... 3

Plaintiff Nutt's work as a designated expert witness
on behalf of North Carolina homeowners does not
involve protected speech .................................................. 10

The Act is content-neutral and seeks to establish
minimum qualifications for someone to practice the
profession of engineering ................................................. 14

THE ACT PASSES CONSTITUTIONAL
SCRUTINY ...................................................................... 16

In the context of regulating professional conduct,
incidental burdens on speech are treated differently
than restrictions on speech ............................................ 16

North Carolina's interest in regulating the profession
of engineering is at least substantial ............................. 17

The Act is sufficiently drawn to protect the
substantial state interests ............................................. 20

CONCLUSION ......................................................................... 31

Case 7:21-cv-00106-M   Document 50   Filed 05/20/22   Page 2 of 37

# TABLE OF AUTHORITIES

Cases and Statutes                                                                    Page(s)

N.C.G.S. § 89C-1, *et seq.* .................................................................. 1

N.C.G.S. § 89C-2 ............................................... 1, 4, 16, 18, 19, 21

N.C.G.S. § 89C-3(6) ........................................................................ 3

N.C.G.S. § 89C-23 .................................................................... 3, 16

N.C.G.S. § 89C-25(7a) ................................................................... 30

*Billups v. City of Charleston,* 922 F.3d 198 (4th Cir. 2020)
.................................................................... 11, 12, 17

*Capital Associated Indus. v. Stein,* 922 F.3d 198 (4th Cir.
2019) ................................... 12, 13, 16, 17, 20, 21, 26

*Cornelius v. NAACP Legal Def. & Educ.* Fund, 473 U.S. 788
(1985) ...................................................................... 6

*Fields v. City of Philadelphia,* 862 F.3d 353 (3rd Cir. 2017)
.................................................................... 14

*Goldfarb v. State Bar,* 421 U.S. 773 (1975) .................... 4, 18, 21

*Hickory Fire Fighters Ass'n, Loc. 2653 v. City of Hickory,*
656 F.2d 917 (4th Cir. 1981) ............................... 8, 9

*Holder v. Humanitarian Law Proj,* 561 U.S. 1 (2010) ............. 12

*Hoover v. Morales,* 164 F.3d 221 (5th Cir. 1998) .................... 7, 8

*Lane v. Franks,* 573 U.S. 228 (2014) ........................................ 7, 8

*McCullen v. Coakley,* 573 U.S. 464, 480, 134 S. Ct. 2518,
189 L. Ed. 2d 502 (2014) ........................................... 10, 11, 15

*Nat'l Inst. Of Family & Life Advocates v. Becerra (NIFLA),*
138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018) . 6, 11, 13-15, 17, 20

ii

*Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 98 S. Ct. 1912, 56 L. Ed. 2d. 444 (1978) ............................................. 18

*People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547 (M.D.N.C. June 12, 2020) ..................... 19

*Recht v. Morrisey*, No. 21-1684 (4th Cir. Apr. 27, 2022) ..... 11, 20

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ........................... 15

*Reynolds v. Middleton,* 779 F.3d 222 (4th Cir. 2015) .......... 17, 20

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ..................... 13

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) ...................... 16

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............ 20

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................. 16

Defendants, through counsel, respectfully submit this Opposition to Plaintiff's Motion for Summary Judgment.

## NATURE OF THE CASE

For over 100 years, North Carolina has regulated the profession of engineering through its Engineering and Land Surveying Act (the "Act"). *See* N.C.G.S. § 89C-1, *et seq.* The Act prohibits any person from practicing engineering in North Carolina without first being licensed by the Board. *See* N.C.G.S. § 89C-2. This case involves the unauthorized practice of engineering in North Carolina. Specifically, whether the expert engineering report prepared by Plaintiff Wayne Nutt ("Nutt") for a group of homeowners constitutes the practice of engineering.

Nutt agreed to act as a retained expert for a group of North Carolina homeowners in a lawsuit filed in New Hanover County Superior Court (the "*Autry* lawsuit"). According to Nutt, the issue in the *Autry* lawsuit involved flooding and related design issues with the stormwater system – a system "designed by licensed professional engineers." [SOF ¶ 33]. Nutt was asked by Plaintiffs in the *Autry* lawsuit to inspect the stormwater system and to provide opinions critical of the design of the stormwater management system. [SOF ¶¶ 10 and 35].

Nutt prepared an expert engineering report with the following title: "Stormwater Flow Characteristics of a 36" Reinforced Concrete Pipe." [SOF ¶¶ 3 and 10]. During his work as a designated expert, Nutt conducted a fluid flow analysis of a section of a stormwater collection system identified as the "diverter line," including fluid flow calculations to support his expert opinions in the field of engineering. [SOF

1

¶ 24]. Nutt prepared engineering calculations. [SOF ¶¶ 15-16]. Nutt prepared theoretical cases and charts to support his opinions. [SOF ¶ 19]. Nutt's expert report was critical of the design of the stormwater management system notwithstanding the fact that he admitted he was not qualified to analyze the system. [SOF ¶ 36].

The expert witness on the other side of the *Autry* lawsuit filed a complaint with the Board that Nutt's expert report was the unauthorized practice of engineering. The Board sent Nutt a letter notifying him of the complaint and asking that he cooperate with the investigation. In response, Nutt filed this lawsuit asserting a constitutional right to practice engineering without a license.

The controversy is limited to the engineering work completed by Nutt on behalf of his clients (Plaintiffs in the *Autry* lawsuit). As to any future in-court testimony by Nutt, there is no case or controversy. Plaintiff's summary judgment brief attempts to frame the issue as one involving testimony – "Wayne claims that prohibiting him from testifying about engineering issues violates the First Amendment." [Doc. 47 at p. 24 of 38]. On this issue, the Board has not cautioned Plaintiff nor seeks to interfere with any such testimony. [Doc. 28 (Affidavit of Andrew Ritter) at ¶ 5]. The decision to allow Nutt to testify is left up to the trial judge. Indeed, Defendants have agreed that any such in-court testimony will not subject Plaintiff Nutt to any action by the Board nor will the Board seek any punishment for the in-court testimony allowed by the trial court. [Doc. 28 (Affidavit of Andrew Ritter) at ¶ 6].

This case has nothing to do with Nutt's prior public advocacy as a concerned citizen in New Hanover County. Plaintiff spends a great deal of time discussing his

prior advocacy, prior testimony as a concerned citizen at public hearings, and prior debates with the New Hanover County Engineer on stormwater issues. At no time was Plaintiff cautioned by the Board or anyone else regarding these activities. Nutt testified that he has never been cautioned about speaking at a public hearing as a concerned citizen. [Doc. 29-1 at p. 83]. Simply put, none of the prior advocacy is relevant, nor has it anything to do with the controversy with the Board. [Doc. 29-1 at p.84].

Instead, Nutt's request for relief seeks a "judgment declaring that North Carolina General Statutes sections 89C-3(6) (definition of 'practice of engineering') and 89C-23 (prohibition on unauthorized practice of engineering and use of the word 'engineer') . . . , violate the Speech Clause of the First Amendment of the United States Constitution, both on their face and as applied to Plaintiff and others similarly situated[.]"[1] In short, Nutt asserts a constitutional right to practice engineering without a license. Thus, Plaintiff is challenging the regulation of engineering in North Carolina and the state legislature's authority to pass laws governing the practice of engineering within the state's boundaries.

## ARGUMENT

I. **THE STATUTORY FRAMEWORK FOR LICENSING PROFESSIONAL ENGINEERS IS NOT SUBJECT TO STRICT SCRUTINY**

A. **The Act regulates conduct not protected speech**

---

[1] ECF Doc. 1, Complaint (Request for Relief, paragraph A).

The Legislature designated the practice of engineering as a profession in 1921. [SOF ¶ 1]. The Act prohibits any person from practicing engineering in North Carolina without first being licensed by the Board. *See* N.C.G.S. § 89C-2. The Supreme Court has long recognized "that the States have . . . broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. State Bar*, 421 U.S. 773, 792 (1975). Consistent with the authority in *Goldfarb*, the North Carolina Legislature declared that the practice of engineering is "subject to regulation in the public interest." *See* N.C.G.S. § 89C-2 (the purpose of the Act is to "*safeguard life, health, and property, and to promote the public welfare.*").

On the key point of "practicing" engineering, Plaintiff's brief works to obfuscate the issue. Instead, Plaintiff says he "wants to talk about engineering,"[2] he wants to "express his opinions,"[3] he wants "to speak publicly about engineering matters,"[4] he "continues to want to publicly speak his mind about engineering matters that come to his attention,"[5] and he believes his self-proclaimed "engineering expertise" will aid "his ongoing advocacy and communications about the engineering issues implicated by development in his community."[6] The controversy in this case has nothing to do with public advocacy. The controversy between Nutt and the Board is limited to his work as a designated expert witness.[7]

---

[2] Doc. 47 at p. 8 of 38.
[3] *Id.*
[4] Doc. 47 at p. 9 of 38.
[5] Doc. 47 at p. 10 of 38.
[6] Doc. 47 at p. 11 of 38.
[7] Nutt Depo part II at p. 6 (Appendix Exhibit 2).

4

Nutt agreed to serve as an engineering expert in support of the Plaintiffs' case-in-chief in the *Autry* lawsuit. In this role, Nutt prepared an expert report with the following title: "Stormwater Flow Characteristics of a 36" Reinforced Concrete Pipe." [ECF Doc. 25-1]. It is undisputed that the expert report is an engineering report:

> Q. And the report that you created in this case is based in part on your experience in chemical engineering; correct?
> A. Yes.
> Q. And it includes mathematical calculations and the application of your background in chemical engineering in doing so; correct?
> A. Yes. I gained it in chemical engineering. It's not necessarily all chemical engineering, but that's where - - that where I gained it.

[Doc. 29-1 at p. 77].

In this role as an expert, Nutt performed the following engineering services:

1. Nutt reviewed documents concerning the stormwater permit and reviewed documents regarding the stormwater system at issue. [SOF ¶ 23].
2. Nutt inspected the stormwater system at issue in the *Autry* lawsuit. [SOF ¶ 10].
3. The calculations performed by Nutt were engineering calculations. [SOF ¶ 16].
4. Nutt relied upon engineering literature to perform his calculations. [SOF ¶ 17].
5. Nutt not only performed engineering calculations, but also worked on theoretical cases and charts to support the opinions set forth in his report [SOF ¶ 19].
6. Nutt published an expert report in the *Autry* lawsuit critical of the design of the stormwater management system. [SOF ¶ 35].
7. Nutt testified that he made engineering judgments in the underlying lawsuit by preparing an engineering report. [SOF ¶ 38].
8. Nutt expected that his engineering judgments would be used by others in the *Autry* lawsuit. [SOF ¶ 39].
9. Nutt's role as a designated expert was to "provide opinion testimony in support of the Plaintiff's case in chief". [SOF ¶ 37].

5

The issue is whether this work constitutes the unauthorized practice of engineering as defined by North Carolina statute. "States may regulate professional conduct even though that conduct incidentally involves speech." *Nat'l Inst. Of Family & Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2372, 201 L. Ed. 2d 835 (2018).

Plaintiff advances a two-step strategy to trigger a heightened standard of review known as strict scrutiny. First, Plaintiff argues that Nutt's "engineering-related" work is protected speech. [Doc. 47 at p. 26 of 38]. Second, Plaintiff labels the Act as content-based to trigger a strict scrutiny review of the professional licensing laws in North Carolina. Plaintiffs' legal strategy has no merit and strict scrutiny does not apply.

Plaintiffs bear the burden of establishing that the Act burdens speech, not conduct. *Cornelius v. NAACP Legal Def. & Educ.* Fund, 473 U.S. 788, 797 (1985). Recognizing the obvious – that the creation of an engineering report is conduct that meets the definition of the practice of engineering – Plaintiff attempts to frame the issue as one of in-court testimony about engineering. Plaintiff's brief states that Nutt is concerned about his ability to testify at the *Autry* trial (*in the future*). [Doc. 47 at pp. 19 and 20 of 38]. Plaintiff argues that the Board's prohibition extends to trial testimony. [Doc. 47 at p. 14 of 38]. Plaintiff also argues that the "Board has also explained many times that its determination that someone illegally testified about engineering is separate from a court's determination that an expert opinion on engineering is admissible." [Doc. 47 at p. 15 of 38]. Notwithstanding the fact that the *Autry* lawsuit was dismissed, Nutt asserts that he wants to testify if the decision

is reversed on appeal. [Doc. 47 at p. 19 of 38]. Plaintiff claims that the dispute involves the Board's restriction on testimony and does not target "consulting with clients" or "performing calculations." [Doc. 47 at p. 28 of 38]. This is not so.

First, the controversy directly involves Nutt's engineering work in his expert report, including the engineering calculations performed to support his engineering judgments. The report was submitted in support of legal claims made by a group of homeowners – Nutt's clients.

Second, the engineering services completed by Nutt for his clients contained engineering judgment based on engineering calculations. None of this is in dispute.

Third, the Board has not threatened to take any action as to any future trial testimony in the *Autry* litigation. On the issue of in-court testimony, there is no case or controversy under the Declaratory Judgment Act. As to this issue, the Board has stated that any decision to allow such testimony is within the authority of the trial court. [Doc. 28 (Affidavit of Andrew Ritter) at ¶ 6]. Moreover, the Board has agreed that it will not investigate or seek any punishment in the event the Court allows the testimony of Nutt at the trial in the *Autry* litigation. [Doc. 28 (Affidavit of Andrew Ritter) at ¶ 6].

This case involves the work and services performed by Nutt as a designated expert. There is no dispute regarding trial testimony. Notwithstanding this fact, Plaintiff argues that his future trial testimony is protected speech and cites *Lane v. Franks*, 573 U.S. 228 (2014) and *Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998). These cases do not apply to the facts of this case, do not involve professional licensing

laws, and are easily distinguishable. Both cases involve public employees and related speech restrictions, issues that are not applicable in this case.

In *Lane*, the witness at issue was a government employee that was compelled to testify via a subpoena. The witness (Lane) had conducted an audit and was called as a fact witness to testify about the results of the audit. The issue in the case was "whether the <u>First Amendment</u> protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities." *Lane* at 238. This case is easily distinguishable. First, Nutt is serving as a designated expert witness, not a fact witness. Second, Nutt is not a public employee. Third, Nutt will not be compelled to testify via a subpoena. Instead, Nutt agreed to perform engineering services for his clients (North Carolina homeowners) and further agreed to act as a designated expert in support of his clients' lawsuit. [Exhibit 1 at p. 15]. The *Lane* case does not apply.

In *Hoover*, the issue involved a state law prohibiting university professors from serving as expert witnesses in litigation against the State. The underlying case in *Hoover* involved a matter of public concern that is not present in this case. More importantly, *Hoover* does not involve licensing. Finally, the state statute in Hoover did not prohibit professors from acting as expert witnesses unless it was in a case adverse to the State. Such a content-based restriction found in *Hoover* is not present in this case. The *Hoover* case does not apply.

Finally, Plaintiff cites *Hickory Fire Fighters Ass'n, Loc. 2653 v. City of Hickory*, 656 F.2d 917 (4th Cir. 1981), yet another case involving public employees and

restrictions from speaking at city council meetings due to employment status. Nutt is not a public employee and has not been prohibited from speaking at public meetings. Nutt spends a great deal of time talking about his desire for public advocacy, but these issues are not related to the controversy with the Board. Because the *Hickory* case involved an attempt to restrict speech at a public meeting, the Court considered whether the law contained reasonable time, place, and manner restrictions. Again, this is not our case. Time, place, and manner restrictions are not relevant to the issue of whether the expert engineering report prepared by Nutt is considered to be the practice of engineering under the Act.

In a transparent attempt at triggering the "protected speech" standard, Plaintiff spends a great deal of time discussing his public advocacy goals.

- "Although Wayne retired in 2013, he continues to want to publicly speak his mind about engineering matters that come to his attention." [Doc. 47 at p. 10 of 38].

- As a member of the community, Nutt has in the past spoke "the engineering-related issues that various development proposals may raise." [*Id*.].

- In the past, Nutt spoke at a public meeting in front of the Wilmington City Council on a development proposal. [*Id*.].

- As a concerned citizen, Nutt has engaged in debate with the New Hanover County Engineer on development issues and would be open to speaking publicly on these issues. [*Id*. at pp. 10-11].

- Nutt "wants to explain why New Hanover County's approach to evaluating how new developments impact stormwater issues is misguided." [*Id*. at p. 26].

- Nutt believes his engineering experience aids his advocacy against certain local government projects. [*Id*. at p. 11].

- In the future, Nutt "wants to help people in nearby neighborhoods by pointing out issues with the stormwater management plans for new development proposals." [*Id.*].

- The development decisions that Nutt would like to speak about as a concerned citizen often occur before local government bodies. [*Id.* at p. 27].

All of this may be true, but none of this is relevant to the dispute between Nutt and the Board.

**B.    Plaintiff Nutt's work as a designated expert witness on behalf of North Carolina homeowners does not involve protected speech**

At issue in this case is whether the conduct of investigating and preparing an engineering report, as a designated expert, is considered the practice of engineering under the Act. The case does not involve fundamental First Amendment activities such as public protesting or public street preaching. Such activities strike at the core of First Amendment speech, are non-commercial, and require access to public ways and sidewalks, places that have traditionally been open for speech activities and that the Supreme Court has accordingly labeled 'traditional public fora." *See McCullen v. Coakley*, 573 U.S. 464, 465 (2014). Even these fundamental First Amendment activities may be limited by government if the restrictions are reasonable as to time, place, or manner of the protected speech. *Id.* In such cases, Courts consider whether the restrictions of protected speech "are narrowly tailored" and whether the restrictions "leave open ample alternative channels for communication of the information." *Id.* This case, however, does not involve protected speech. Here, the dispute involves engineering work on behalf of clients in a lawsuit. Arguably, the proscribed activity is commercial in nature. If characterized as commercial, any

10

government regulation would invoke "lessened First Amendment concerns." *Id.* at p. 3. *See Recht v.* Morrisey, NO. 21-1684 at p. 3 (4th Cir. April 27, 2022, a copy of which is attached hereto as **Exhibit A**). Strict scrutiny is not the proper standard when reviewing laws that regulate commercial speech. *Id.* at p. 9. Ultimately, the commercial speech analysis is not determinative because this case involves the regulation of a profession. In the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on speech. *See Nat'l Inst. Of Family & Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2372, 201 L. Ed. 2d 835 (2018) ("States may regulate professional conduct even though that conduct incidentally involves speech.").

Recognizing that this is a case about licensure, Plaintiffs turn to *Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) – a case about tour guide licensing in Charleston. First, it is important to note that the *Billups* case did not involve the regulation of a profession. Second, what made the *Billups* case unique was the fact that the government wanted to restrict traditional speech in a public forum by imposing a license requirement for tour guides. Plaintiffs cite to the *Billups* case for the proposition that the licensing restrictions burdens protected speech because "the business of leading tours depnds on the expression of ideas" and "the [challenged ordinance forbade] unlicensed tour guides for hire from expressing those ideas on public thoroughfares." [Doc. 47 at p. 26 of 38]. The critical fact in *Billups* involved public speaking on city sidewalks – not the preparation of an engineering report on behalf of North Carolina homeowners. The *Billups* case is not analogous to this case.

11

Plaintiff is not the first person to assert a challenge to the unauthorized practice of a profession in North Carolina. Plaintiff's brief completely ignores the Fourth Circuit case analogous to the present challenge to the State's authority to license the practice of engineering. *See Capital Associated Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019) (holding that North Carolina's unauthorized practice of law ("UPL") statutes was a regulation of conduct and not the communicative aspects of practicing law). It is generally understood that most occupational licensing laws regulate conduct rather than speech. *Id.* at 208. Citing *Holder*, Plaintiffs' brief appears to acknowledge that the Act generally functions as a regulation of conduct. [Doc. 47 at p. 26 of 38]. This acknowledgment makes sense when you consider that the lawyer representing Plaintiff Nutt is the lawyer that represented the Plaintiffs in the *Billups* case. In *Billups*, the City of Charleston argued that a traditional First Amendment speech analysis on the tour guide licensing law might jeopardize other occupational licensing laws such as nurses, doctors, and lawyers. In response, Plaintiffs in *Billups* cited *Capital Associated Indus.* and argued that the Court had nothing to worry about since the Billups case involved protected speech, not conduct.

> Most occupational licenses, of course, largely regulate *conduct*, not simply the sale of speech. *Cf. Capital Associated Indus., Inc. v. Smith*, __ F.3d __, No. 17-2218, 2019 WL 1746945 (4th Cir. April 19, 2019) (holding that regulation of the practice of law, as applied in that case, was a regulation of conduct rather than of the communicative aspects of law). And this Court has proven more than capable of applying the First Amendment to licensing laws when they are applied to restrict protected speech.

*See* Response Brief of Appellees at pp. 31-32 a copy of which is attached hereto as **Exhibit B**.

The decision by Plaintiff to ignore the Fourth Circuit case in *Capital Associated Indus.* is telling. In *Capital Associated Indus.*, the Fourth Circuit correctly noted that the UPL statutes focused on the question of who may conduct themselves as a lawyer:

> The UPL statues don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of who may conduct themselves as a lawyer. Licensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession.

*Id.* "North Carolina's ban on the practice of law by corporations fits within *NIFLA's* exception for professional regulations that incidentally affect speech." *Id.* at 207. As with the UPL statutes in *Capital Associated Indus.*, the Act focuses on the question of who can practice engineering in North Carolina.

To evaluate whether someone is practicing engineering without a license, the Board must evaluate the conduct or work product at issue. This common-sense approach is ultimately recognized by Nutt when he shifts his argument from one of protected speech to one involving the "creation" of speech. However, Nutt does not cite an analogous case because, likely, one does not exist. Instead, he simply cites a few random First Amendment cases that mention the creation of protected material. By way of example, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) involved a Vermont Law limiting the use of consumers' medical information for marketing purposes. The purpose behind the Law was to shut down marketing by the

13

pharmaceutical manufacturers – a form of speech disfavored by the lawmakers. "The law on its face burdens disfavored speech by disfavored speakers." *Id.* at 564. The *Sorrell* case is not analogous. Next, Plaintiff cites *Fields v. City of Philadelphia*, 862 F.3d 353 (3rd Cir. 2017) for the proposition that the act of recording video is protected because recordings are protected. This oversimplification leaves out key facts in the case – namely that video was taken on a public sidewalk of the police officers performing their official duties. In this context, the Court noted that access to information regarding police activities "is particularly important because it leads to citizen discourse on public issues." *Id.* at 359. Notwithstanding the summary provided by Plaintiff, the Court did not conclude that "all recording is protected" but simply noted that "in public places these restrictions are restrained." The *Fields* case is not analogous or helpful to this case.

The Act generally functions as a regulation of conduct. The issue is whether the conduct (work product) of Nutt meets the definition of the practice of engineering. The Act prohibits any person from practicing engineering without first being licensed by the Board. [SOF ¶ 1]. The prohibition on the unauthorized practice of engineering by the North Carolina legislature fits within *NIFLA's* exception for professional regulations that incidentally affect speech. *Id.* at 207.

C.  **The Act is content-neutral and seeks to establish minimum qualifications for someone to practice the profession of engineering**

Plaintiff ignores the actual language of the Act and fails to conduct a proper First Amendment analysis to determine whether the Act is content-neutral. Under

14

the proper First Amendment analysis, courts are required to determine whether a regulation "on its face" draws a distinction "based on the message a speaker conveys." *Id.* The Act draws no such distinction and does not target the communicative aspects of practicing engineering.

Plaintiff argues that, as applied, the Act is content based because it is used as the standard to evaluate whether Nutt is practicing engineering without a license. One argument is that Nutt's work as an expert subjects him to oversight as opposed to a fact witness who simply reports what he or she saw regarding the pipe at issue. [Doc. 47 at p. 30 of 38]. Nutt is not a fact witness and has instead prepared a detailed engineering report. Plaintiff's arguments are nonsensical and simply highlight the fact that the Act is a reasonable regulation on the practice of engineering that is generally applicable to all who seek to practice engineering in North Carolina.

A law that does not "target speech based on its communicative content" is content neutral. *NIFLA* at 2371. The Acts seeks to establish minimum qualifications for someone to practice the profession of engineering. On its face, the Act's regulation of engineering has nothing to do with any message or speech.

If the law is content-neutral on its face, the analysis next requires a court to consider the law's justification or purpose. *Reed v. Town of Gilbert,* 576 U.S. 155, 166 (2015). "[A] regulation that serves purposes unrelated to the context of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *McCullen v. Coakley*, 573 U.S. 464, 480, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014) (quoting *Ward*, 491 U.S. at 791). The Act passes this test.

The purpose of the Act is to "safeguard life, health, and property, and to promote the public welfare." N.C.G.S. § 89C-2. This is a "practice act." The Legislature declared that the practice of engineering is "subject to regulation in the public interest." N.C.G.S. § 89C-2. Only persons duly licensed by the Board are authorized to practice engineering. N.C.G.S. § 89C-23. Such a purpose reflects conduct (the practice of engineering), not the expression of a particular message. *See McCullen*, 573 U.S. at 480. The Act applies equally to all who seek to offer engineering services. This would be the same for offering legal services without being licensed to practice law. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A determination that the Act is content-neutral will result in a lower standard of scrutiny. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) (content and viewpoint neutral laws are reviewed under an intermediate scrutiny standard). Assuming the regulation of the profession is a substantial state interest, all that is required is that the regulation is "sufficiently drawn" to protect that interest. NIFLA, 138 S. Ct. at 2375; *see also Capital Associated Indus.*, 922 F.3d at 209.

## II. THE ACT PASSES CONSTITUTIONAL SCRUTINY

### A. In the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on speech

Context is important and the proper standard of review is critical. *See Recht* at pp. 10-11. Plaintiff argues that the Defendants cannot meet its burden under any level of First Amendment scrutiny. Plaintiff seeks to impose a "narrowly tailored"

16

requirement under the strict scrutiny analysis: "Content-based restrictions like the one challenged here are subject to strict scrutiny, which means the government must show that they are narrowly tailored to promote a compelling government interest." [Doc. 47 at p. 33 of 38]. As argued above, strict scrutiny does not apply.

Recognizing that the strict scrutiny standard is not applicable, Plaintiff next cites *Billups* for the proposition that the Defendants must show that the Act is "narrowly tailored to serve a significant government interest and that it leaves open ample alternate channels for communication of the information." [Doc. 47 at p. 33 of 38]. The *Billups* case is not analogous to this case. Because this case does not involve restrictions on speech in a traditional public forum, the time, place, and manner analysis of intermediate scrutiny is not applicable.

In a case involving the regulation and licensing of a profession, the proper standard is whether the Act is "**sufficiently drawn**" to protect a substantial state interest. *Capital Associated Indus.*, 922 F.3d at 209 (citing *NIFLA*, 138 S. Ct. at 2375). To be clear, this is intermediate scrutiny in the context of regulating the practice of professions.

## B. North Carolina's interest in regulating the profession of engineering is at least substantial

In this case, the defendants must show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest. *Id*. at 209 (citing *NIFLA*, 138 S. Ct. at 2375). This standard may be met by looking at the language of the Act, by reviewing prior case law on the issue, and by the application of common sense. *See Reynolds v. Middleton*, 779 F.3d 222, 227 (4th Cir. 2015). Plaintiff argues that the

Board "has no legitimate, let alone significant or compelling", interest in prohibiting Nutt from the practice of engineering in North Carolina. [Doc. 47 at p. 34 of 38]. Courts have consistently held that "States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb*, 421 U.S. at 792.

The Legislature declared that the practice of engineering is "subject to regulation in the public interest." *See* N.C.G.S. § 89C-2. Specifically, the Legislature declared that the purpose of the Act was "to safeguard life, health, and property, and to promote the public welfare". *Id.* In *Ohralik*, the Supreme Court noted that the state interests implicated in regulating the practice of law was particularly strong. "In additional to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions." *See Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460 (1978).

In addition to the self-declared purpose set forth in the Act, prior case law, and common sense, the record evidence identifies why the State of North Carolina has a substantial interest in regulating the profession of engineering. First, the regulation and licensing of engineering in North Carolina works to establish a minimum level of competence (education, exam, and experience). [SOF ¶ 49]. Second, the minimum level of competency works to protect the health, safety, and welfare of the public.

18

[*Id.*].  Third, the regulation and licensing of engineering provides a system of accountability[8].  [SOF ¶ 51].  Fourth, the regulation and licensing of engineering works to safeguard property[9].  [SOF ¶ 54].  Fifth, the regulation and licensing of engineering in North Carolina works to ensure that the professional engineer follows the professional rules of conduct, including ethics and practicing within the licensee's area of competence.  [SOF ¶ 55].  Sixth, the regulation and licensing of engineering works to safeguard life and health.  [SOF ¶ 57].  Finally, Defendants' designated expert witness, Stacey A. Smith, provided the following testimony that summarized the multiple significant interests advanced by the Act:

> Q.  And does the Act further substantial government interests?
> A.  I believe so.
> Q.  Okay.  And what government interests are furthered by the regulation of engineering in North Carolina?
> A.  Primarily the protection of life, health, and property, the protection of that and public welfare.  Other, as outlined in my letter, is protecting the public of misrepresentation, providing public confidence in the profession, maintaining the minimum level of competency to become licensed, maintaining the continuing education of the licensees, and then accountability for all of these things.

[SOF ¶ 58].  Clearly, North Carolina has a substantial state interest in regulating the profession of engineering.  Such regulation, however, is meaningless without a prohibition against the unauthorized practice of engineering.  *See* N.C.G.S. § 89C-2.

---

[8] "[T]he public is protected by the accountability under our statute that, if the person is licensed and he does not provide competent work, we have jurisdictional authority over that person.  We're able to discipline him.  The public is protected there." [SOF ¶ 51].].

[9] "The Supreme Court in *McCullen* recognized that protecting property rights is a legitimate government interest."  *People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547, 577 (M.D.N.C. June 12, 2020).

The Legislature made it unlawful to practice engineering in North Carolina, such as performing engineering services for a group of North Carolina homeowners, unless the person as been duly licensed. This prohibition, and the related accountability, is an important component of the regulatory framework and, by logic and common sense, works to safeguard life, health, and property in North Carolina.

### C. The Act is sufficiently drawn to protect the substantial state interests

In a case involving the regulation and licensing of a profession, the Act must be sufficiently drawn to protect the state interests identified above. *Capital Associated Indus.* 922 F.3d at 209 (citing *NIFLA*, 138 S. Ct. at 2375). The appropriate level of constitutional scrutiny requires only a "reasonable fit between the challenged 'regulation' and the state's interest – not the least restrictive means." *Id.* at 209-210 (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010). Plaintiff argues that Defendants have offered no evidence that the statutory prohibition of the unauthorized practice of engineering passes intermediate scrutiny. [Doc. 47 at p. 35 of 38 ("They possess no evidence that their prohibition achieves anything"). This is not so. In evaluating this claim, Defendants may rely upon (1) "common sense"; (2) prior case law; (3) history and consensus on the regulation of professional conduct; (4) the intent of the legislature as set forth in the Act; (5) testimony in support of the contention that the Act serves a substantial state interest; and (6) expert testimony on the matter. *Reynolds*, 779 F.3d at 226; *see also Recht* at pp. 20-22; *see also Capital Associated Indus.*, 922 F.3d at 209.

First, States have "broad power to establish standards for licensing practitioners and regulating the practice of professions." *Capital Associated Indus.* at 207 (citing *Goldfarb*, 421 U.S. at 792). In this case, the standards are set forth in the Act and includes a declaration that the purpose of the Act, and the related prohibition, is "to safeguard life, health, and property, and to promote the public welfare". *See* N.C.G.S. § 89C-2.

Second, the regulation and licensing of engineering in North Carolina works to establish a minimum level of competence (education, exam, and experience) in the person's practice area. In this case, Nutt agreed to serve as a designated expert for a group of North Carolina homeowners. In this role, Nutt agreed to inspect the stormwater system at issue and provide opinions and analysis critical of the stormwater system design. The Act, if followed, would ensure that only engineers that meet minimum levels of competency are licensed. The Act not only protects the clients (North Carolina homeowners) but others who might use and rely upon the published findings of Plaintiff Nutt. In this regard, Nutt testified that his report contained engineering judgment and he prepared his report with the understanding that it would be used by others in the case, including his clients. [SOF ¶¶ 38-39].

Third, the regulation and licensing of engineering provides a system of accountability. Because Nutt is not a licensed engineer, he is not accountable to the Board for any mistakes made in his published report or any violations of the Professional Rules of Conduct. [SOF ¶¶ 51-53]. The Act is sufficiently drawn to allow for accountability of licensed professional engineers.

21

Fourth, the Act is sufficiently drawn to ensure that the professional engineer follows the Professional Rules of Conduct, including limiting his or her practicing within the licensee's area of competence. In this case, Nutt argues that he is competent to perform chemical engineering notwithstanding the fact that he is not licensed. Nutt's prior work experience is limited to the field of chemical engineering. [SOF ¶ 7]. Nutt does not claim to be a civil engineer or a stormwater management engineer. [SOF ¶ 8]. However, the published report ventures far outside the area of chemical engineering and is better described as stormwater engineering[10]. In so doing, Nutt performed engineering work outside his self-proclaimed area of competence. [Stacey A. Smith Deposition at p. 89 (Appendix Exhibit 4)].

In support of his constitutional right to practice engineering without a license, Plaintiff argues that the prohibition is overbroad because Nutt "has frequently expressed opinions about engineering matters in the past" and "those opinions have often been *right*." [Doc. 47 at p. 35 of 38]. This argument that Nutt is "often" right in his engineering opinions is troubling in the context of this dispute and leads one to question the following:

1. Does Nutt possess the minimum level of competence to perform the engineering work in *Autry* litigation?

2. What accountability exists if Nutt's work (and related opinions) is wrong?

3. What are the risks associated with mistakes in Nutt's work?

---

[10] The practice of stormwater design is a recognized area under the umbrella of civil engineering. [Appendix Exhibit 4 (Stacey A. Smith Deposition) at p. 84].

22

On the first question, Nutt testified that he made engineering judgments in the *Autry* lawsuit by preparing an engineering report. [SOF ¶ 38]. Nutt testified that he was offering his opinions as an engineer. [Doc. 25-2 at p. 32, lines 5-8]. Nutt was asked by Plaintiffs in the *Autry* litigation to inspect the stormwater system at issue in the case and provide opinions in hydraulics, piping, and fluid flow mechanics. [SOF ¶ 10]. Nutt's role as a designated expert was to "provide opinion testimony in support of the Plaintiff's case in chief". [SOF ¶ 37].

> Q.    Okay.  The plaintiffs in the lawsuit that you were acting as an expert witness, they were complaining that the stormwater management system didn't function properly, correct?
> A.    Yes.  Failed.  Failed and backed up.[11]

Nutt reviewed documents concerning the stormwater permit, reviewed documents regarding the stormwater system at issue, and performed a site inspection. [SOF ¶ 23]. Nutt testified that the opinions he provided were engineering opinions. [SOF ¶ 11]. Nutt offered those opinions to a reasonable degree of engineering certainty. [SOF ¶ 12]. The opinions offered by Wayne Nutt were based on engineering calculations. [SOF ¶ 13]. Nutt not only performed engineering calculations, but also worked on theoretical cases and charts to support the opinions set forth in his report. [SOF ¶ 19]. Nutt testified that the issue in the *Autry* lawsuit involved flooding and related design issues with the stormwater system – a system "designed by licensed professional engineers." [SOF ¶ 33]. Nutt's published expert report is critical of the design of the stormwater system. [SOF ¶ 35]. Nutt is not a

---

[11]  Doc. 44-2 at p. 69, lines 1-5 (Appendix Exhibit 2).

licensed engineer in North Carolina or any other state. [SOF ¶ 5]. Nutt does not claim to be a stormwater management engineer. [Doc. 44-2 at p. 55 ("I'm not a stormwater engineer."). Nutt has never designed a stormwater system. [Doc. 25-2 at p. 29, lines 20-23 and p. 30, lines 3-7]. More specifically, Nutt has never designed or permitted stormwater plans in North Carolina. [Doc. 25-3 at p. 81, lines 17-20]. More broadly, Nutt has never worked on a stormwater management system. [Doc. 44-2 at p. 57, lines 3-5].

The regulation and licensing of engineering in North Carolina works to ensure that the professional engineer follows the professional rules of conduct, including ethics and practicing within the licensee's area of competence. [SOF ¶ 55]. An engineer's area of competence "is based on a combination of the three E's, combination of your exam, experience, and education." [SOF ¶ 55]. Nutt's prior work experience is limited to chemical engineering. [SOF ¶ 7]. Nutt does not claim to be a civil engineer or a stormwater management engineer. [SOF ¶ 8]. Nutt does not claim to be competent in the field of stormwater management engineering. [SOF ¶ 9]. In his work as a designated expert, Nutt studied the design of certain components of the stormwater system at issue in the *Autry* lawsuit. [Doc. 44-2 at p. 50, lines 4-7]. Nutt also studied the discharge location known as the ditch and noted in his report that "[a] properly functioning ditch is required to avoid obstructing the discharge water flow from the outfall location." [Doc. 1-1 at p. 2].

> Q. And again, though, just so we're clear, when you looked at the diverter box or the diverter system, you were also looking at the ditch, correct?

> A. I'm looking at that, yes, that is correct. The first segment of ditch is especially important.
>
> Q. And you're taking into consideration the operation of the ditch and the elevation of the ditch?
>
> A. Exactly.[12]

Nutt's expert report opined that "[a] larger ditch and/or greater slope would have improved the performance of the system." [Doc. 1-1 at p. 3]. This potential fix to the design was included in the report due to the ongoing problems experienced by Nutt's clients:

> Q. The lawsuit you were involved in as an expert witness, what was the problem?
>
> A. The problem was the residents had been flooded out twice. And both times that they were flooded out, the systems were designed by licensed professional engineers. In both cases, the licensed professional engineers and the people who built the facility said, we ain't going to tell you how this works. Don't worry about it. We're licensed professionals. It's a certified approved stormwater management plan, and now they've been flooded out twice. And Florence was the second time these people had been flooded out. No one has shown them any numbers. All they get is the "We'll fix it."
>
> Q. So the issue in the case –
>
> A. As far as I've been able to find, I'm the only person that published any information about how this diverter line would perform.[13]

Nutt published an expert report critical of the design of the stormwater management system notwithstanding the fact that he admitted he was not qualified to analyze the system. [SOF ¶ 36]. This type of engineering work may be used to both assess damages in the case and provide support for remediation. In short, the

---

[12] Doc. 44-2 at p. 64, lines 9-18 (Appendix Exhibit 2).
[13] Doc. 44-2 at pp. 65-66, lines 21-17 (Appendix Exhibit 2).

prohibition against the unauthorized practice of engineering is sufficiently drawn to ensure that Nutt is competent to provide services in the field of stormwater management engineering.

On the second question, the Act is sufficiently drawn to ensure accountability in the event Nutt is not competent to practice stormwater management engineering. The regulation and licensing of engineering provides a system of accountability. [SOF ¶ 51]. The Board testified that "the public is protected by the accountability under our statute that, if the person is licensed and he does not provide competent work, we have jurisdictional authority over that person. We're able to discipline him. The public is protected there." [SOF ¶ 51]. Unlicensed persons such as Nutt do not fall under the jurisdiction of the Board and cannot be disciplined. [SOF ¶ 53].

On the third question, Nutt opined that the system was not working. [Doc. 44-2 at p. 99, lines 11-14 ("I know - - what I do know is that the diverter system wasn't working."). Nutt expected that his report would be used by his clients. [Doc. 44-2 at p. 75, lines 5-8 (Appendix Exhibit 2). If Nutt's work in the field of stormwater management engineering is wrong, his engineering work may be used by his clients to remedy a problem that does not exist.

In the analogous case involving the unauthorized practice of law, the Fourth Circuit concluded that "[b]arring corporations from practicing law is sufficiently drawn to protect" the state interests involved in the case. *Capital Associated Indus.* at 209. One example cited by the Fourth Circuit was the fact that professional integrity "could suffer if the state allows lawyers to practice on behalf of organizations

owned and run by nonlawyers". It is important to note that the court looked at possible adverse outcomes related to the protection of state interests. Plaintiff argues that such an inquiry is "doomed" in this case because such concerns are speculative. [Doc. 47 at p. 33 of 38]. This argument has no merit based on the record evidence in this case.

Plaintiff's Statement of Undisputed Material Facts negates any argument that such concerns are speculative. Nutt claims his formal training is limted to the field of chemical engineering. [Doc. 48 at ¶ 4]. Following his retirement, Nutt took it upon himself as a concerned citizen to begin analyzing stormwater engineering plans. [Doc. 48 at ¶ 18]. "Stormwater management and flooding are a recurring issue with Wayne's post-retirement speech about engineering matters." [Doc. 48 at ¶ 20]. As a concerned citizen[14], Nutt has engaged in debate with the New Hanover County Engineer about stormwater issues. [Doc. 48 at ¶ 21]. What Nutt does as a concerned citizen is much different than what Nutt does a retained expert in the field of engineering. Nutt agreed to help his son Kyle Nutt with the *Autry* lawsuit. [Doc. 48 at ¶ 23]. Kyle Nutt represents a group of North Carolina homeowners in the Autry litigation, who allege that flooding was caused by a stormwater management system during Hurricane Florence. [Doc. 48 at ¶ 24]. Nutt agreed to help his son by testifying as a designated expert about how the observed blockage of the diverter pipe could substantially reduce the pipe's fluid capacity, which could cause the backup of stormwater into the streets and the homes of the plaintiffs. [Doc. 48 at ¶¶ 28 and

---

[14] Nutt is a citizen of New Hanover County. [Doc. 48 at ¶ 22].

37]. Nutt "believed he was probably more qualified than the typical stormwater engineer to answer the narrow question of the diverter line's fluid flow capacity." [Doc. 48 at ¶ 34]. Nutt prepared an expert report entitled "Stormwater Flow Characteristics of a 36" Reinforced Concrete Pipe." [Doc. 48 at ¶ 35]. Plaintiff's own set of facts clearly establish that Nutt was providing engineering services outside of his self-proclaimed area and could not be held accountable as a non-licensee.

Moreover, Nutt does not claim to be competent in the field of stormwater management engineering [SOF ¶ 9]:

> Q. So you're not competent to analyze a stormwater engineering system or water system?
> A. That is correct.[15]

The concern over competency is not speculative. Moreover, Defendants' expert offered the opinion that Nutt was practicing outside of his self-proclaimed area:

> Q. And so it look like, again, in order to analyze the pipe itself, he's trying to understand how it operates within the context of the entire stormwater system, correct?
> A. Yes.
> Q. In your view, is this work product, is this the practice of engineering?
> A. Yes.
> Q. Is this the practice of engineering or stormwater engineering in your view?
> A. Yes.
> Q. And do you believe that, based on what you reviewed, do you believe that this stormwater engineering performed by Mr. Nutt is outside of his area of competence?
> A. Yes.

---

[15] Nutt Depo part II at p. 37 (Appendix Exhibit 2).

[Appendix Exhibit 4 (Stacey A. Smith Deposition) at p. 106]. Plaintiff argues that a disclaimer would somehow solve the problem. This argument is advanced by the fact that an engineering seal is required for licensed engineering work. [Doc. 47 at p. 36 of 38]. No disclaimer, however, would change the fact that Nutt was not competent to perform stormwater management engineering services. No disclaimer would prevent the public from relying upon engineering work prepared by Nutt in the *Autry* litigation. No disclaimer would prevent his clients from using the report to remedy the problems in the system identified by Nutt. In short, the Act is sufficiently drawn to establish a minimum level of competence for licensing professional engineers and to ensure the licensees practice within their area of competence.

Plaintiff next argues that the Act does not leave open "ample alternative methods of communication." [Doc. 47 at p. 36 of 38]. Because this case does not involve restrictions on speech in a traditional public forum, the time, place, and manner analysis of intermediate scrutiny is not applicable. As such, the issue of "ample alternative methods of communication" is even relevant in this case. Regardless, this argument ignores Plaintiff's own record evidence and the fact that Nutt has an extensive history of speaking publicly on engineering matters. Nutt may not practice engineering without a license but, as a concerned citizen, Nutt has engaged in public advocacy in the past. There is no dispute over such public advocacy and Nutt was not precluded from the following:

- As a member of the community, Nutt has in the past spoke "the engineering-related issues that various development proposals may raise." [Doc. 47 at p. 10 of 38].

- In the past, Nutt spoke at a public meeting in front of the Wilmington City Council on a development proposal. [*Id.*].

- As a concerned citizen, Nutt has engaged in debate with the New Hanover County Engineer on development issues and would be open to speaking publicly on these issues. [*Id.* at pp. 10-11].

As to the performance of engineering services, the Act provides for an industrial exception to allow individuals to perform engineering services for a company. *See* N.C.G.S. § 89C-25(7a). During his career, Nutt worked as an engineer for manufacturing companies without being licensed under the industrial exception. [Doc. 48 at ¶ 10]. Nutt is no longer employed by a manufacturing company and does not want to obtain an engineering license. [Doc. 48 at ¶ 11]. Instead, Nutt wants to now perform engineering services for his clients in *Autry* lawsuit. The Board outlined a path forward under the Act for Nutt to become licensed in North Carolina. "*Based upon your experience, you may be eligible for a waiver of the Fundamentals of Engineering Examination and be able to take the Principles and Practice Engineering Examination in order to seek licensure.*" [Doc. 49-6 at p. 3]. Nutt chose not to get licensed. Nutt does, however, want to publicly speak out about engineering matters and has done so in the past without interference from the Board. The Act is narrowly tailored to engineering services and does not preclude Nutt from engaging in public advocacy as a concerned citizen.

Nutt claims he does not want to become licensed because he does not want to practice engineering. [Doc. 1 at Introduction on p. 1]. However, the record evidence supports the logical conclusion that Nutt was practicing engineering in the field of stormwater management. As such, Nutt needs to be licensed to perform this work

30

and provide opinions on design defects with a stormwater system in a New Hanover County neighborhood.

In the present case, there is sufficient evidence that the prohibition against the unauthorized practice of engineering is both narrowly tailored and sufficiently drawn to protect the many significant interests identified.

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants hereby request that the Court deny Plaintiff's motion for summary judgment.

Respectfully submitted this the 20th day of May 2022.

FITZGERALD HANNA & SULLIVAN, PLLC


<u>/s/ Douglas W. Hanna</u>
Douglas W. Hanna, NCSB #18225
M. Todd Sullivan, NCSB #24554
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 863-9095
*Attorneys for Defendants*

31

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1(f)

I hereby certify that this brief, excluding the case caption, table of contents, table of authorities and the certificate of service, is in compliance with the limit of 8400 words.

This the 20th day of May, 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing **DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** with
the Clerk of the Court using the CM/ECF system which will send notification of such
filing to the following:

W. Cory Reiss, Reiss & Nutt, PLLC, wcreiss@reissnutt.com

Robert J. McNamara, Institute for Justice, rmcnamara@ij.org

Joseph Gay, Institute for Justice, jgay@ij.org

This the 20th day of May, 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225