**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| WAYNE NUTT, | ) | Case No. 7:21-CV-00106-M |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S MEMORANDUM** |
| v. | ) | **IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION FOR** |
| ANDREW L. RITTER, in his official | ) | **SUMMARY JUDGMENT** |
| capacity as Executive Director of the North | ) | |
| Carolina Board of Examiners for Engineers | ) | |
| and Surveyors, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

W. Cory Reiss (NC Bar No. 41549)
REISS & NUTT, PLLC
1221 Floral Parkway, Ste 104
Wilmington, NC 28403
Phone: (910) 420-4674
Fax: (910) 420-4637
E-mail: wcreiss@reissnutt.com
*Local Civil Rule 83.1(d)*
*Counsel for Plaintiff*

Joseph Gay (D.C. Bar No. 1011079)*
Robert J. McNamara (VA Bar No. 73208)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: jgay@ij.org
        rmcnamara@ij.org
*\* Special Appearance pursuant to
  Local Rule 83.1(e)*

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 1

    I.    Wayne Nutt Has Long Expressed Public Opinions About Engineering .......................... 1

    II.    The Board Prohibits Unlicensed Engineering Testimony. .............................. 5

    III.    The Board Orders Wayne To Stop Testifying About Engineering .................................. 6

    IV.    The Board Has No Evidence That Prohibiting Testimony About Engineering Matters Without A License Achieves Anything. ........................................ 9

STANDARD OF REVIEW ...................................................................................... 12

ARGUMENT ......................................................................................................... 13

    I.    The Ban On Unlicensed Engineering Testimony Is A Restriction On Speech .............. 13

        A.    Defendants misunderstand the difference between speech and conduct ............ 14

        B.    The First Amendment applies to licensing laws. ................................ 15

        C.    The prohibition on engineering testimony is a prohibition on speech. .............. 17

    II.    The Ban On Engineering Testimony Fails First Amendment Scrutiny. ........................ 19

        A.    The ban on engineering testimony is subject to strict scrutiny. .......................... 20

        B.    The ban on engineering testimony fails under any level of First Amendment scrutiny. .................................................................. 21

        C.    The Court should decline Defendants' invitation to invent a new, evidence-free standard of First Amendment scrutiny. ........................................ 23

    III.    The Testimony Ban Is Facially Unconstitutional. ......................................... 26

    IV.    Wayne Seeks Relief Beyond The *Autry* Case. ............................................. 27

CONCLUSION ....................................................................................................... 29

CERTIFICATE OF SERVICE ................................................................................. 30

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) ........................................................................................ 25

*Austin v. Univ. of Fla. Bd. of Trs.*,
    No. 1:21-cv-00184, 2022 WL 195612 (N.D. Fla. Jan. 21, 2022) ......................... 18

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020) ........................................................... *passim*

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011) ........................................................................................ 19

*Buehrle v. City of Key West*,
    813 F.3d 973 (11th Cir. 2015) ........................................................................ 19

*Cap. Associated Indus., Inc. v. Stein*,
    922 F.3d 198 (4th Cir. 2019) ............................................... 16, 17, 23, 24

*Castillo v. Sec'y of Fla., Dep't of Health*,
    26 F.4th 1214 (11th Cir. 2022) ...................................................................... 16

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ................................................................................ 26, 27

*Cohen v. California*,
    403 U.S. 15 (1971) .......................................................................................... 18

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) .......................................................................... 17

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) .......................................................................... 28

*Davis v. Davis*,
    124 S.E.2d 130 (N.C. 1962) ........................................................................... 16

*Draego v. City of Charlottesville*,
    No. 3:16-cv-00057, 2016 WL 6834025 (W.D. Va. Nov. 18, 2016) ................... 25

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ........................................................................................ 25

*FEC v. Wis. Right to Life, Inc.*,
    551 U.S. 449 (2007) ........................................................................................ 27

*Fields v. City of Philadelphia,*
862 F.3d 353 (3d Cir. 2017) ............................................................ 19

*Geophysical Sys. Corp. v. Seismograph Serv. Corp.,*
738 F. Supp. 348 (C.D. Cal. 1990) .................................................. 12

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ........................................................... 14, 16, 18, 20

*Lance v. Luzerne County Mfrs. Ass'n,*
77 A.2d 386 (Pa. 1951) ................................................................... 11

*Lane v. Franks,*
573 U.S. 228 (2014) ........................................................................ 25

*Lowe v. SEC,*
472 U.S. 181 (1985) ........................................................................ 15

*McCullen v. Coakley,*
573 U.S. 464 (2014) ................................................... 21, 22, 23, 25

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ........................................................................ 24

*Moore-King v. County of Chesterfield,*
708 F.3d 560 (4th Cir. 2013) .......................................................... 15

*NIFLA v. Becerra,*
138 S. Ct. 2361 (2018) ................................................... 15, 16, 18, 24

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447 (1978) ................................................................... 24, 25

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer,*
961 F.3d 1062 (9th Cir. 2020) ........................................................ 15

*Pickup v. Brown,*
740 F.3d 1208 (9th Cir. 2014) ........................................................ 18

*Planned Parenthood of Se. Pa. v. Casey,*
505 U.S. 833 (1992) ........................................................................ 24

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ........................................................................ 20

*Regal Cinemas, Inc. v. Town of Culpeper,*
No. 3:21-cv-00004, 2021 WL 2953679 (W.D. Va. July 14, 2021) ........................ 28

*Reynolds v. Middleton*,
    779 F.3d 222 (4th Cir. 2015) ................................................................ 23, 24, 25

*S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*,
    410 A.2d 1359 (Vt. 1980) ................................................................................ 11

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .................................................................................... 19, 26

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) .......................................................................................... 23

*T-Mobile Ne. LLC v. City Council of Newport News*,
    674 F.3d 380 (4th Cir. 2012) ........................................................................... 12

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017) ........................................................................... 19

*Vizaline, LLC v. Tracy*,
    949 F.3d 927 (5th Cir. 2020) ........................................................................... 15

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) .......................................................................................... 20

*Wright v. Las Vegas Hacienda, Inc.*,
    720 P.2d 696 (Nev. 1986) ................................................................................ 12

## RULES

Local Rule 56.1(c) ...................................................................................................... 1

## STATUTES

Mo. Rev. Stat. § 327.076(1) .................................................................................... 11

N.C. Gen. Stat. § 15A-1340.23 ................................................................................. 5

N.C. Gen. Stat. § 89C-3(6) ....................................................................................... 5

N.C. Gen. Stat. § 89C-16 ........................................................................................ 10

N.C. Gen. Stat. § 89C-23 ....................................................................................... 5, 8

N.C. Gen. Stat. § 89C-25(7a) ................................................................................... 2

N.C. Gen. Stat. § 130A-309.219 ............................................................................. 10

N.C. Gen. Stat. § 130A-336.1 ................................................................................. 10

N.C. Gen. Stat. § 133-1.1 ............................................................................. 10

N.C. Gen. Stat. § 143-228.12 ....................................................................... 10

N.C. Gen. Stat. § 160A-300.1 ....................................................................... 10

N.C. Gen. Stat. § 160D-1110(b) ................................................................... 10

N.C. Gen. Stat. § 160D-1402(j)(3)(c) ............................................................. 3

Tex. Occ. Code Ann. § 1001.004(e) ............................................................. 11

**INTRODUCTION**

This case seeks to vindicate Wayne Nutt's First Amendment right to publicly offer his opinions based on his four-decade career as an engineer. Defendants (the members of the North Carolina Board of Examiners for Engineers and Surveyors, sued in their official capacities) have told him that offering these opinions is a crime. But their motion for summary judgment reveals that they have no evidence to support their position that Wayne's[1] speech can be constitutionally prohibited. It should therefore be denied, and Wayne's cross-motion for summary judgment should be granted.

**STATEMENT OF FACTS**

**I.    Wayne Nutt Has Long Expressed Public Opinions About Engineering.**

Plaintiff Wayne Nutt is an engineer. (Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment ([ECF 48](#)) ("SUMF") ¶ 1).[2] He has a degree in chemical engineering and for some four decades worked as a practicing engineer, mostly in North Carolina. (*Id.* ¶¶ 2–3). Much of his career was spent designing things that were actually built in the physical world, including designing fluid-carrying pipes and systems of trenches to manage stormwater and potential chemical spills. (*Id.* ¶¶ 4, 6–7). Over the course of his career, he developed particular expertise in hydraulics, fluid flow, and piping systems. (*Id.* ¶ 6).

Although he is an engineer by training, experience, and competence, Wayne has never been a licensed professional engineer. (*Id.* ¶ 10). Wayne never needed a professional engineering

---

[1] Because the facts of this case involve both Wayne Nutt and his son, Kyle Nutt, this memorandum refers to each by their first name.

[2] In keeping with this Court's local rules and to avoid duplicative filings, Plaintiff relies on the undisputed facts submitted in connection with his own motion for summary judgment without re-filing the document or supporting evidence. Local Rule 56.1(c).

license over his forty-year career because he worked for manufacturing companies, and thus (like most everyone else in his field) could work as an engineer under what is commonly known as the "industrial exemption" to engineering licensure. (*Id.*); *see also* N.C. Gen. Stat. § 89C-25(7a). And now that he is retired, Wayne certainly has no desire to undergo the burdens of obtaining an engineering license. ([SUMF](SUMF) ¶ 11). But he does want to continue to publicly speak about engineering matters. (*Id.*).

In his retirement, Wayne has on many occasions found himself publicly speaking about engineering matters that have come to his attention. In part, this is because Wayne belongs to an informal network of community members who scrutinize local development proposals. (*Id.* ¶¶ 12–18). Through this network, neighborhood groups and others have asked Wayne to look at, analyze, and in some cases testify about, the engineering-related issues that various development proposals may raise. (*Id.*). On more than one occasion, Wayne's examination of engineering reports supporting proposed developments has revealed errors, and Wayne's ability to point these engineering errors out in testimony has resulted in substantial changes (and improvements) to those proposals. (*Id.* ¶¶ 14–18).

But Wayne's advocacy has extended beyond this. He has testified to state boards and debated with county engineers as well. (*Id.* ¶¶ 17, 20–22). And, in his experience, his engineering expertise is a crucial part of his ongoing public advocacy. (*Id.* ¶ 19). He relies on his engineering education, experience, and expertise to review and to discover possible errors in nearby development proposals. (*Id.* ¶¶ 14–22). And he believes that criticism and comments about building projects will be more persuasive if they are supported by rigorous analysis and calculations. (*Id.* ¶ 19). Indeed, he understands that critiques of local projects that are not based on such analyses could even be counterproductive, because government decisions that rely on

qualitative opinions offered by laypersons could be subject to legal challenge. (*Id.*); *see also* N.C. Gen. Stat. § 160D-1402(j)(3)(c) (decisions may not be based on lay opinion testimony about matters that generally require expert testimony).

This public advocacy got him into trouble, though, after Wayne volunteered to help his son Kyle Nutt (who is an attorney) with a state-court lawsuit, *Autry v. Bill Clark Homes, LLC* (New Hanover Co. File No. 19-CVS-4520) (the *Autry* litigation). Kyle represents the plaintiff homeowners, who allege that flooding was caused by a stormwater management system during Hurricane Florence. ([SUMF](#) ¶¶ 23–24). Initially, Wayne helped Kyle with reviewing and understanding the documents received in discovery. (*Id.* ¶ 25). At one point, Wayne learned that no one in the case was testifying about a particular diverter pipe's fluid capacity and the consequences that an observed blockage would be expected to have on that capacity. (*Id.* ¶¶ 26–27). Wayne offered to help by testifying—for free—as an expert witness about that pipe. (*Id.* ¶ 28).

This type of question fell squarely within Wayne's wheelhouse. He had decades of experience relating to hydraulics, fluid flow, and piping systems. (*Id.* ¶ 29). The diverter line at issue in the *Autry* litigation was basically the same type of concrete pipe that Wayne had worked with his entire career. (*Id.* ¶ 30). Wayne was therefore perfectly qualified to calculate the fluid capacity of the diverter line and simulate how that capacity would be impacted by different sizes of blockages in the ditch at the end of the pipe, which might help clarify whether a blockage had contributed to or caused the flooding. (*Id.* ¶¶ 29–30, 34).

Wayne prepared a report that showed the results of calculating the fluid-flow capacity of a 3-foot concrete pipe diverter line under different scenarios, depending on how the pipe had been built and how it was obstructed. (*Id.* ¶ 35). The report concluded that the obstructions

would reduce the fluid-flow capacity of the pipe and back up the water level in a manner consistent with the observations of first-hand witnesses. (*Id.*).[3]

Kyle did not ask Wayne to opine about the overall stormwater system design. (*Id.* ¶ 32). Instead, Wayne's narrow task was to opine about the effect of a blockage on the fluid capacity of a single diverter line. (*Id.* ¶ 33; *see also id.* ¶ 39). Another testifying expert—John Oglesby, who was a licensed professional stormwater engineer—would then incorporate Wayne's opinions into his own opinion testimony from a broader stormwater-engineering perspective. (*Id.* ¶ 33). Kyle designated both Oglesby and Wayne as testifying expert witnesses, but only Oglesby was described as either a licensed professional or as a stormwater engineer. (*Id.* ¶ 37).

Much of Defendants' brief is devoted to suggesting that something was wrong with Wayne's testimony or that he was testifying about areas he did not understand. *See* Mem. in Supp. of Defs.' Mot. for Summ. J. (ECF 45) ("Defs.' Mem.") 9–12; 27. But the topics Wayne addressed were well within his direct professional expertise and experience. (SUMF ¶¶ 4, 6–7, 30). And the people Wayne was working with, including the licensed engineer John Oglesby, seemed perfectly happy with his work. Oglesby testified that Wayne's report was "significant" to the opinions Oglesby reached in the case, and that Wayne's report "was very academic, very thorough, and it followed the basic principles of hydraulic engineering, which are not incredibly complex principles." (*Id.* ¶ 38). For Oglesby it was "almost like reviewing a textbook." (*Id.*).

While Oglesby was happy with Wayne's work, the team defending the lawsuit was not. During Wayne's deposition in that case, counsel for the *Autry* defendants asserted that Wayne could not legally testify about his opinion about the fluid capacity of the diverter pipe because he was not a licensed professional engineer. (*Id.* ¶ 42).

---

[3] Wayne later prepared an updated report with a few minimal revisions. (*Id.* ¶ 36).

**II.    The Board Prohibits Unlicensed Engineering Testimony.**

As it turns out, the Board agrees that Wayne's testimony in *Autry* was a crime.

First, some background. In North Carolina, "[a]ny person who shall practice, or offer to practice, engineering . . . without first being licensed . . . shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 89C-23. Violators face as much as 60 days in jail and a fine. *Id.* § 15A-1340.23. The scope of that prohibition is vast: The "[p]ractice of engineering" includes, in part, "[a]ny service or creative work, the adequate performance of which requires engineering education, training, and experience, in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems . . . ." *Id.* § 89C-3(6). Obtaining a license requires passing examinations and paying fees; retaining a license requires fees and regular continuing education. ([SUMF](#) ¶ 81).

And the Board has consistently—for at least 15 years, as memorialized in many different documents—taken the position that the prohibition on the unlicensed practice of engineering includes unlicensed testimony about engineering. (*Id.* ¶¶ 44–50). Indeed, it has "always" been the Board's position that unlicensed engineering testimony is illegal in North Carolina. (*Id.* ¶ 50). It does not matter whether engineering testimony is connected to anything that will actually be built in the real world: The Board's position is that it is a crime to "simply opine" about engineering. (*Id.* ¶ 49).

And the Board takes this prohibition on testimony seriously—when it learns about unlicensed engineers issuing reports or testifying about engineering matters, it acts. Over the years, it has sent several cease-and-desist letters commanding people who lacked a North Carolina license to stop testifying about engineering matters. (*Id.* ¶¶ 51–52). These letters, like the Board's longstanding legal position, distinguish between unlicensed individuals falsely using

the designation "Professional Engineer" and unlicensed individuals offering testimony the Board views as being about engineering, each of which is separately illegal. (*Id.*). And there is no evidence that the Board has ever declined to act when it has learned that an unlicensed engineer has provided an expert report or testified about engineering matters in North Carolina. (*Id.* ¶¶ 53–54).

## III. The Board Orders Wayne To Stop Testifying About Engineering.

Wayne's initial deposition was suspended after the *Autry* opposing counsel questioned the legality of his testimony. ([SUMF](SUMF) ¶ 55). Kyle then immediately called the Board to confirm its position. (*Id.*). The *Autry* defendant's expert also contacted the Board. (*Id.* ¶ 62).

The Board's counsel (David Tuttle) responded to Kyle by email that afternoon, laying out the Board's longstanding position that unlicensed individuals can neither publicly call themselves "engineers" (even if they are engineers) nor give any testimony whose content involves "a holding [out] of engineering expertise" or "engineering advice." (*Id.* ¶ 56).

Tuttle also attached "the explanation developed over the years" about engineering-related testimony. (*Id.* ¶ 57). The document, entitled "Expert Testimony in North Carolina" and dated February 2, 2021, is substantively identical to the explanations the Board had long provided to the public. (*Id.* ¶ 59). And the document is unequivocal: "The practice of engineering in North Carolina for projects or testimony impacting the public in North Carolina requires that the individual and company must be licensed in North Carolina." (*Id.* ¶ 58). And, like all the Board's other public explanations, "Expert Testimony in North Carolina" makes clear that the prohibition on testimony applies no matter the forum, including for "expert witness testimony on engineering . . . matters in the courtroom, in arbitrations or during depositions." (*Id.* ¶ 60). There is also the standard caveat that even if a court deems the testimony admissible, "[t]he Board addresses the practice engineering issues separate from a court determination of what is

admissible." (*Id.*). Finally, there is a warning that "[t]he Board has proceeded against unlicensed individuals, including those licensed in other states but not in NC, for the unlicensed practice of engineering" relating to their testimony on engineering matters. (*Id.*).

Kyle responded to Tuttle's email, disputing the Board's prohibition against non-licensees' testifying about engineering matters on statutory and First Amendment grounds. Kyle received no response, and the rest of Wayne's deposition took place on April 27, 2021. (*Id.* ¶ 61).

The morning after Wayne's deposition concluded, the *Autry* defendants' expert (an engineer licensed in North Carolina) again contacted the Board's counsel to complain about Wayne's unlicensed testimony. (*Id.* ¶ 62). The Board's counsel then emailed Kyle, explaining that the Board's counsel had just had the "first opportunity" to have the Board's Engineering Committee (composed of 5 out of the 9 total Board members) review and comment on Kyle's question about whether testimony is the practice of engineering. (*Id.*).

At a meeting a few days later, the Engineering Committee met to consider the matter in-depth and, following a lengthy discussion, concurred with the legal position the Board's counsel had sent to Kyle. (*Id.* ¶ 64). Ultimately, the Board ratified the following response that was emailed to Kyle:

> The committee concurred with the response that had previously been given in my earlier emails to you that referred to the long standing position of the Board as further expressed in the attached "Expert Testimony in North Carolina." The committee members had reviewed the information that you submitted in your emails, and after statements by the Board members reinforcing the interpretation of the Board, confirmed that rendering opinions on engineering matters in testimony is the practice of engineering, recognizing that the Court makes its own determination of what testimony is allowed.

(*Id.* ¶ 65).

That email was the second time the Board had warned Wayne that his engineering testimony was illegal. But it would not be the last.

Just a few weeks later, Wayne received a certified letter informing him that "[c]harges have been filed with the Board"[4] alleging that he "may be in violation of G.S. 89C-23 for practicing, or offering to practice, engineering without a license." (*Id.* ¶ 67). According to the letter, the "[c]harges" pertained to Wayne's expert report and associated engineering calculations, as well as to "engineering testimony in depositions on March 8, 2021 and April 27, 2021." (*Id.*).

Wayne interpreted the letter as an effort to intimidate him into silence. (*Id.* ¶ 68). And Wayne believes that, but for the fact that he found pro bono counsel, that effort would have succeeded. Wayne does not want to break the law, and he plans to obey the Board's commands to stop talking about engineering unless he succeeds in this action. (*Id.* ¶ 69). But Wayne wants to speak about engineering, and so he filed this lawsuit to protect his right to do so, both in the *Autry* case itself and more broadly. (*Id.* ¶ 70; *see also* Verified Compl., ECF 1).[5] Through this action, Wayne intends to vindicate his right to continue to speak publicly, in testimony and otherwise, about engineering issues affecting his community. (SUMF ¶¶ 70–72, 77–78).

But after Wayne sued, the Board continued its campaign to silence him. First, Wayne received a certified letter from the executive director of the Board (Defendant Andrew Ritter). (*Id.* ¶ 73). The letter informed Wayne that the Board had determined his testimony in *Autry* was the unlicensed practice of engineering—and it ordered Wayne not to do it again. It warned Wayne that "further action may be pursued by the Board" if he did not "come into compliance" by "not participating in the activities that fall within the practice of engineering." (*Id.* ¶ 74). The

---

[4] "Charges" refers to a formal complaint filed with the board by the expert retained by the defendants in *Autry*. (*Id.* ¶ 66).
[5] After this case was filed, the state trial court dismissed the *Autry* case for reasons unrelated to Wayne's testimony. (*Id.* ¶ 71). That matter remains on appeal, and Wayne still wants to testify at trial when and if it is remanded. (*Id.*).

"activities" prohibited by the letter included "producing a 'chemical engineering' report," holding himself out to the public as having "any engineering expertise" from "training and education as a 'chemical engineer' in providing findings and conclusions in the report," and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." (*Id.*). At this point, the Board had told Wayne at least four different times that his testimony about engineering was a crime. And, as with the earlier communications, Wayne viewed this letter as an effort to intimidate him into silence. (*Id.* ¶ 75). He also understood that he might face consequences if he provided an opinion to "'a reasonable degree of engineering certainty' . . . in testimony" ever again. (*Id.*).

And it is not just letters. The Board has also filed a counterclaim in this action, asking this Court to declare that Wayne committed a crime by expressing his opinions about engineering in the *Autry* case. *See* Defendants' Answer and Counterclaim (ECF 25). They ask the Court to: (1) "declare that the work completed by Wayne Nutt in consultation with his clients in [the *Autry* litigation], engineering calculations performed by Wayne Nutt, analysis conducted by Wayne Nutt, and preparation of the expert report(s) in the [*Autry* litigation] constitutes the unauthorized practice of engineering"; and (2) "declare that the prior work of testifying at the discovery depositions in support of the work contained in the expert report prepared by Wayne Nutt in [the *Autry* litigation] constitutes the unauthorized practice of engineering." (*Id.*).

## IV. The Board Has No Evidence That Prohibiting Testimony About Engineering Matters Without A License Achieves Anything.

The Board's summary of the facts in its motion for summary is devoid of any evidence that it is preventing any harm or achieving any public good by preventing unlicensed people from talking about engineering. This is because the Board has none.

To begin: Much of North Carolina's engineering-licensing law seems plausibly tied to

public health and safety. Licensed professional engineers in North Carolina are issued seals bearing their license number and the designation "professional engineer." N.C. Gen. Stat. § 89C-16; (SUMF ¶¶ 86–87). And certain things in North Carolina can be built only if their plans are stamped and sealed by a licensed professional engineer. *See, e.g.*, N.C. Gen. Stat. § 133-1.1 (requiring buildings that receive specified public funding to be designed and sealed by an engineer or architect); N.C. Gen. Stat. § 160D-1110(b) (requiring engineer-stamped plans for certain building permits); N.C. Gen. Stat. § 130A-309.219 (authorizing requirement of engineer-stamped analysis for certain coal-combustion facilities); N.C. Gen. Stat. § 160A-300.1 (authorizing use of traffic-control photographic systems only where yellow-light timing conforms to a traffic plan sealed by a licensed engineer). In other instances, an engineer's stamp and seal will streamline regulatory approval to build something. *See* N.C. Gen. Stat. § 130A-336.1 (providing alternative process for wastewater system approvals if a licensed engineer prepares signed and sealed plans for the system); N.C. Gen. Stat. § 143-228.12 (mandating creation of informal review processes for regulatory submissions stamped by a licensed engineer but not already covered by a reviewing authority's existing procedures). Only a licensed engineer may use a stamp and seal, and licensed engineers are subject to various disciplinary and regulatory restrictions in their work. (SUMF ¶ 87).

Things are different, though, when it comes to North Carolina's prohibition on unlicensed testimony, which is distinct from its regulations on who may stamp plans. On that front, the record is devoid of anything that would justify a criminal prohibition on simply offering one's opinion. (*Id.* ¶ 92).

The Board's asserted interest in prohibiting testimony about engineering matters without a license is that non-licensees are more likely to provide incompetent or untruthful testimony

because they haven't demonstrated competence by meeting the licensing requirements and are not subject to punishment by the Board for dishonest or low-quality testimony. (*Id.* ¶ 90). That testimony therefore creates a risk, according to the Board, that "a decision is going to be made on not the best information, and a bad decision is going to be reached." (*Id.* ¶ 91). The "Board doesn't want to see a decision reached based on incompetent information or untruthful information." (*Id.*). Instead, the Board "want[s] the best decision to be reached" and "want[s] the public to have confidence that the best decision was reached based on competent information delivered." (*Id.*). The Board also asserts that requiring a license to testify about engineering matters promotes more general public trust in engineers and the engineering profession. (*Id.*).

There are no facts in the record, however, supporting the idea that the Board's prohibition on unlicensed testimony actually achieves any of this—or anything at all. (*Id.* ¶ 92). Neither the Board nor its expert could point to any evidence or studies suggesting that prohibiting unlicensed engineering testimony protects the public health or safety—nor could they identify any instance in which anyone had ever been harmed by unlicensed engineering testimony. (*Id.* ¶¶ 92–105). Nothing in the Board's motion for summary judgment contends otherwise.

Not only is there no evidence that North Carolina is achieving anything by banning unlicensed testimony, there is no evidence that states adopting less-restrictive regimes have suffered for it. After all, not all states require an engineering license to testify about engineering.[6]

---

[6] *See, e.g.*, *Lance v. Luzerne County Mfrs. Ass'n*, 77 A.2d 386, 388 (Pa. 1951) (holding testimony not "practice of engineering" under state law); *S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 410 A.2d 1359, 1367 (Vt. 1980) (noting trial court's "incorrect" ruling that expert testimony could constitute the "practice of engineering"); Mo. Rev. Stat. § 327.076(1) (the practice of engineering in Missouri "shall not include the rendering of opinions or giving of testimony in a civil or criminal proceeding by a licensed professional"); Tex. Occ. Code Ann. § 1001.004(e) (engineering licensure "does not . . . prohibit or otherwise restrict a person from giving testimony or preparing an exhibit or document for the sole purpose of being placed in evidence before an administrative or judicial tribunal").

Do these states see more "bad decision[s]" or less public confidence in engineers? Not so far as the record here shows. (*Id.* ¶¶ 100–01). Again, nothing in the Board's motion contends otherwise.

Similarly, not all technical fields require a government license to testify. *See, e.g.*, *Geophysical Sys. Corp. v. Seismograph Serv. Corp.*, 738 F. Supp. 348, 349 (C.D. Cal. 1990) (finding testimony not the "practice" of geophysics under California law); *Wright v. Las Vegas Hacienda, Inc.*, 720 P.2d 696, 697 (Nev. 1986) ("[C]ontrary to the district court's conclusion, a person does not unlawfully engage in the unlicensed practice of psychology or engineering when he testifies to his knowledge of the subject in a court of law."). Yet, again, the record reveals no evidence that the public has been harmed in any way by the testimony of unlicensed physicists. (SUMF ¶¶ 102–03). And nothing in the Board's motion contends otherwise.

Finally, there is no evidence that less restrictive alternatives to outright banning non-licensees from testifying about engineering have ever been considered, let alone tried, even though other states have actually adopted these alternatives. (*Id.* ¶¶ 98–99). The Board's motion, again, does not disagree.

## STANDARD OF REVIEW

Summary judgment is appropriate if, "viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party . . . the movant [has shown] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *T-Mobile Northeast LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012) (quotation marks omitted).

**ARGUMENT**

There are two claims in this case, but only one legal issue. Wayne has filed a suit for declaratory and injunctive relief, arguing that North Carolina's engineering-licensing requirements violate the First Amendment to the extent they prohibit honest testimony about his background and opinions about engineering. Defendants have filed a counterclaim asking the Court to declare that Wayne's prior testimony violates North Carolina law, to which Wayne has asserted a First Amendment affirmative defense. As such, both claims turn on the same legal argument: If Wayne's First Amendment arguments are right, he wins on both scores.

This brief proceeds in four parts. First, it establishes that the prohibition on unlicensed engineering testimony is a restriction on speech, not conduct. Second, it demonstrates that this prohibition fails under any level of First Amendment scrutiny—indeed, Defendants do not even argue that the ban could survive either strict or intermediate scrutiny. Third, it explains the scope of Wayne's as-applied challenge to North Carolina's engineering-licensing law. And finally, it explains the basis for this Court's jurisdiction over Wayne's claims for forward-looking relief.

**I.      The Ban On Unlicensed Engineering Testimony Is A Restriction On Speech.**

Defendants contend that their ban on testimony restricts only conduct, not protected speech. This is incorrect. First, Defendants' discussion of the difference between speech and conduct fails because they have ignored the Supreme Court's cases that explain the difference between speech and conduct. Second, Defendants' suggestion that the First Amendment analysis here must be different because this restriction on speech comes in the form of an occupational license is squarely at odds with binding caselaw. Third, applying the law to these facts makes clear that Defendants' prohibition on unlicensed engineering testimony is a restriction on speech.

**A.      Defendants misunderstand the difference between speech and conduct.**

If there is a single idea pervading Defendants' brief, it is that they believe the only thing at issue in this case is unprotected conduct, not speech. *See, e.g.*, Defs.' Mem. 6, 14–22. But, beyond their repeated assertion that Wayne engaged in "conduct," Defendants nowhere explain how courts should go about distinguishing speech from conduct for purposes of constitutional analysis.

Fortunately, the Supreme Court has been far clearer. The controlling case here is *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). The plaintiffs in that case challenged a federal law that forbade the provision of "material support or resources" to designated foreign terrorist organizations, arguing that it violated the First Amendment insofar as it prevented them from providing those groups with training, advice, and legal expertise. *Id.* at 15. The government contended that the First Amendment did not apply because the law "*generally* function[ed] as a regulation of conduct." *Id.* at 27. And so it did—after all, plenty of "material support" to terrorist groups would indisputably take the form of conduct. *Id.* at 26. But the Supreme Court rejected that argument, holding that though "[t]he law [there] may be described as directed at conduct . . . as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. In other words, the relevant question is not the overall sweep of a statute or the government's aims in regulating. The question is what triggers the law's application to a particular person—and, says *Humanitarian Law Project*, when laws are "trigger[ed by] communicating a message[,]" they are treated as restrictions on speech, not conduct. *Id.*

The Fourth Circuit follows the rule in *Humanitarian Law Project*. *See, e.g.*, *Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020) (relying on *Humanitarian Law Project* for proposition that "a law aimed at regulating businesses can be subject to First Amendment

scrutiny even though it does not directly regulate speech"). But Defendants' brief does not even acknowledge *Billups*, much less attempt to explain how its holding squares with their vision of the law.

**B.    The First Amendment applies to licensing laws.**

In the absence of cases about the distinction between speech and conduct, Defendants lean heavily into the idea that First Amendment challenges to occupational-licensing laws are somehow disfavored. The rule advanced by Defendants is the same as the one articulated by Justice White in *Lowe v. SEC*: The First Amendment does not limit the government's ability to restrict the practice of professions, and "[o]ne who takes the affairs of a client personally in hand and purports to exercise[ ] judgment on behalf of the client in light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession." Defs.' Mem. 15–16 (quoting *Lowe v. SEC*, 472 U.S. 181, 211 (1985) (White, J., concurring)).

The problem with Defendants' argument is that Justice White's concurrence in *Lowe v. SEC.* is not the law. It used to be: There was a time when courts, including the Fourth Circuit, relied on Justice White's concurrence to permit greater restrictions on so-called "professional speech." *See, e.g.*, *Moore-King v. County of Chesterfield*, 708 F.3d 560, 568 (4th Cir. 2013). But the Supreme Court expressly disapproved that line of cases in *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (citing *Moore-King* with disapproval). Defendants provide no explanation for why this Court should (or could) revive the doctrine here.

Indeed, as courts across the country have recognized in the wake of *NIFLA*, the Supreme Court's ordinary First Amendment jurisprudence, including the speech/conduct holding in *Holder*, applies with full force to occupational licensing laws. *See Billups*, 961 F.3d at 683; *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069–70 (9th Cir. 2020); *accord Vizaline, LLC v. Tracy*, 949 F.3d 927, 931 (5th Cir. 2020) ("*NIFLA* makes clear that

occupational-licensing provisions are entitled to no special exception from otherwise-applicable First Amendment protections.").[7]

Capital Associated Industries, Inc. v. Stein, 922 F.3d 198 (4th Cir. 2019), on which Defendants rely heavily, is not to the contrary. Cf. Defs.' Mem. 18–20. The plaintiff in Stein was a trade association that challenged North Carolina's prohibition on corporations engaging in the practice of law. 922 F.3d at 202. While it disclaimed any desire to appear in court, it otherwise openly asked for the right to "practice law" including by "draft[ing] legal documents (such as contracts or employee handbooks)[.]" Id.

The Fourth Circuit in Stein did not apply Humanitarian Law Project because the regulations there were not "trigger[ed] by the communication of a message." Humanitarian Law Proj., 561 U.S. at 28. Instead, as the plaintiff in that case expressly recognized, "the practice of law has communicative and non-communicative aspects." Stein, 922 F.3d at 208. And the plaintiff wanted to do both aspects. It wanted to "answer questions about labor and employment law," true, but it also wanted to "draft legal documents (such as contracts or employee handbooks)." Id. at 202. And, while drafting a contract for a client involves writing words on paper, it does not necessarily involve "communicating a message" to the client. After all, a contract is a binding legal instrument whether its signatories read it or not. Davis v. Davis, 124 S.E.2d 130, 133 (N.C. 1962).

In other words, a prohibition on "drafting contracts" is not triggered by communicating a message; it is triggered by the creation of a legally binding document. Similarly, a prohibition on a doctor prescribing marijuana would be triggered by the legal effect of a prescription, not on the

<hr>

[7] Only the Eleventh Circuit has said otherwise, recently holding that its pre-*NIFLA* precedent remains good law and requires it to reject First Amendment challenges to licensing laws so long as those laws are generally aimed at conduct. *Castillo v. Sec'y of Fla., Dep't of Health*, 26 F.4th 1214, 1225 (11th Cir. 2022).

communication of a message—even though a prohibition on a doctor *recommending* marijuana would be a restriction on speech and likely unconstitutional. *Cf. Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (holding prohibition on doctors' recommending marijuana unconstitutional under the First Amendment). So too with an engineer's stamp: North Carolina's restriction on who may stamp project plans is triggered by the legal effect of the stamp—but a restriction on expressing opinions about those project plans would be (and is) a restriction on speech.

In short, *Stein* would apply here if Wayne were truly mounting a frontal attack on engineering licensing—if he wanted to both stamp plans *and* publicly express his opinions. But, Defendants' caricature of his arguments to one side, Wayne asks for no such thing. He wants only to express his opinions based on his extensive engineering experience. (*See* Declaration of Wayne Nutt in Support of Motion for Summary Judgment (ECF 49-1) ("Nutt Dec.") ¶ 15; Verified Compl. (ECF 1) at 14–15 (request for relief)). Defendants have told him that under North Carolina law he may not legally express those opinions. That takes this case outside of *Stein* and, as explained more fully below, makes the prohibition on Wayne's testimony a restriction on speech subject to First Amendment scrutiny.

### C. The prohibition on engineering testimony is a prohibition on speech.

Applying these principles to this case is straightforward. The prohibition on Wayne's testimony, as defined by Defendants' own letters to Wayne, forbids him from "producing a 'chemical engineering' report" or claiming to have "any engineering expertise" or "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." (SUMF ¶ 74). Each of those consists of communicating a message. Defendants' prohibition on engineering testimony is therefore a prohibition on speech.

Defendants cite no case holding that a prohibition on testimony is anything other than a restriction on protected speech.[8] Instead, they point to a series of things Wayne did that seem (to them) like conduct. He visited a site. He "considered engineering methodologies." He even "performed engineering calculations." Defs.' Mem. 1. But Defendants have not prohibited Wayne from doing any of these things; they do not claim that North Carolina law forbids Wayne from visiting a site or quietly doing math in his home. Instead, they have instructed him to stop *talking about* these things—to refrain from, for example, expressing an opinion "to a degree of engineering certainty." (SUMF ¶ 74).

Defendants' arguments illustrate the point of the test articulated in *Humanitarian Law Project*. Courts must ask what "trigger[s]" coverage under a regulation because it is impossible to engage in speech without also engaging in some related conduct. The petitioner in *Cohen v. California* physically put on a jacket, but the Supreme Court had no difficulty discerning that he was punished for the words he used rather than the physical conduct of jacket-wearing. 403 U.S. 15, 18 (1971); *accord Humanitarian Law Proj.*, 561 U.S. at 28. As Judge O'Scannlain has noted, allowing the government to characterize some communications as "conduct" allows it to "nullify the First Amendment's protections for speech by playing [a] labeling game." *Pickup v. Brown*, 740 F.3d 1208, 1218 (9th Cir. 2014) (O'Scannlain, J., dissenting from denial of rehearing en banc) (citing *Humanitarian Law Proj.*).[9]

---

[8] This is not a failure of Defendants' research; it is simply a reflection of the caselaw. Counsel for plaintiff can also find no authority suggesting that testimony is not protected speech. *Cf. Austin v. Univ. of Fla. Bd. of Trs.*, No. 1:21-cv-00184, 2022 WL 195612, at *15 (N.D. Fla. Jan. 21, 2022) (describing the government's refusal to concede that there is "a First Amendment right to testify about topics related to [one's] expertise" as "remarkable").

[9] Judge O'Scannlain's *Pickup* dissent was eventually vindicated when the Supreme Court specifically rejected *Pickup* in its *NIFLA* decision. *NIFLA*, 138 S. Ct. at 2371.

Moreover, Defendants are hardly the first government officials to try to escape First Amendment scrutiny by arguing that they are not prohibiting speech but instead only prohibiting the conduct that went into *creating* the speech. And each time this argument has been made, it has failed. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he *creation* and dissemination of information are speech within the meaning of the First Amendment." (emphasis added)); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) (rejecting "distinction between the process of creating a form of speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded"); *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) (holding that physical act of recording video is protected by the First Amendment because recordings are protected); *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015) ("A regulation limiting the creation of [speech] curtails expression as effectively as a regulation limiting its display."). Defendants' arguments should meet the same fate here.

## II.  The Ban On Engineering Testimony Fails First Amendment Scrutiny.

Part A demonstrates that Defendants' ban on unlicensed engineering testimony is a content-based restriction on speech that is subject to strict scrutiny. Part B shows that Defendants have failed to present evidence sufficient to survive under any level of First Amendment scrutiny. And Part C addresses Defendants' argument that their ban on testimony should only be required to pass a nebulous, evidence-free "constitutional review" that is neither strict nor intermediate scrutiny.

**A.      The ban on engineering testimony is subject to strict scrutiny.**

The ban on engineering testimony is subject to strict scrutiny because it is a content-based restriction on speech—it is, after all, a ban on *engineering* testimony. Wayne may visit a site, take measurements, and report the basic facts about what he's seen. But once he expresses an *engineering* opinion about those facts, he violates the law. That is a content-based restriction on speech.

Again, this case is on all fours with *Humanitarian Law Project*. The law in that case was subject to strict scrutiny[10] because the plaintiffs' speech was "not barred if it impart[ed] only general or unspecialized knowledge" but was prohibited if it "impart[ed] a 'specific skill' or communicate[d] advice derived from 'specialized knowledge[.]'" 561 U.S. at 27. So too here: Wayne is barred from testifying based on his "specialized knowledge" but not based on his general knowledge, and the prohibition on his testimony is therefore subject to strict scrutiny. *Id.*

The law is also subject to strict scrutiny because it "cannot be justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 164 (2015) (cleaned up). Defendants here point to a series of government interests they say are advanced by the restriction on Wayne's testimony. Defs.' Mem. 22–24. The ban on testimony "works to establish a minimum level of competence . . . [which] works to protect the health, safety, and welfare of the public." *Id.* at 22. It provides that anyone testifying about engineering can be "discipline[d]" by the Board for misconduct. *Id.* at 23. It "safeguard[s] property." *Id.* It makes sure that anyone testifying about engineering "follows the professional rules of conduct[.]" *Id.* at 23–24. And it also, they say, "works to safeguard life and health." *Id.* at 24.

---

[10] *Humanitarian Law Project* does not use the phrase "strict scrutiny," but the Court has subsequently clarified that it was a strict-scrutiny case. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).

But how would any of these interests be hindered by permitting unlicensed people to testify about engineering? Defendants' brief does not say.[11] But Defendants' 30(b)(6) designee was more forthcoming: The danger posed by unlicensed testimony, in Defendants' view, is that an unlicensed person might provide "not the best information" and that "a bad decision is going to be reached" as a result. (SUMF ¶ 91).

The Board's forthrightness at its 30(b)(6) deposition is understandable. Indeed, it is difficult to imagine any other justification for the prohibition on testimony. If Wayne Nutt testifies about engineering but is roundly ignored, his testimony cannot possibly cause any harm. The only danger Wayne's testimony poses is if someone listens to it and believes him. In other words, the dangers Defendants are worried about are "undesirable effects that arise from 'the direct impact of speech on its audience[,]'" which means definitionally that the prohibition on Wayne's testimony is "not content neutral." *McCullen v. Coakley*, 573 U.S. 464, 478, 481 (2014).

### B. The ban on engineering testimony fails under any level of First Amendment scrutiny.

In the alternative, the Court may wish to assume without deciding that the ban on engineering testimony is subject to—and fails—intermediate scrutiny because it is not narrowly tailored. This is the approach taken by the Fourth Circuit in *Billups*, 961 F.3d at 685, and it may be appropriate here because the record here has roughly the same deficiencies as in *Billups*.

Here, just as in *Billups*, the government is unable to "demonstrate that it actually tried or considered less speech-restrictive alternatives [than prohibiting unlicensed speech] and that such alternatives were inadequate to address the government's interest." 961 F.3d at 688 (citing

---

[11] In part, their brief does not say because Defendants have conceded they have no evidence anyone, anywhere, has ever been harmed by unlicensed engineering testimony. (SUMF ¶ 93).

*McCullen*, 574 U.S. at 494 (2014)). And it fails for the same reason the government failed in that case: It cannot "present[ ] 'actual evidence supporting its assertion[s].'" *Id.*

In *Billups*, the Fourth Circuit held that the government failed to carry its intermediate-scrutiny burden because no record evidence demonstrated that it could not meet its objectives by enforcing laws already on the books. *Id.* (describing existing laws as "readily available, less-speech-restrictive alternatives"). So too here. It is already illegal for unlicensed individuals to use a professional engineer's stamp. ([SUMF](#) ¶ 87). And licensed professional engineers put their stamp on testimonial reports to provide a signal to the public that their testimony can be relied upon. (*Id.* ¶ 96). Why is this insufficient to address Defendants' interest in making sure people do not unwittingly heed unqualified testimony? Defendants have no answer. Just as in *Billups*, Defendants can present no record evidence to show that it "seriously undertook" to address its interests by enforcing these existing laws. 961 F.3d at 689. Indeed, the record here is weaker than in *Billups*. There, the government at least presented "testimony from its officials regarding the predicted ineffectiveness of the suggested alternatives." *Id.* at 688; *see also id.* at 689 (rejecting government's "myriad post-hoc justifications" as insufficient to carry the government's burden). Here, as far as the record reveals, no one in North Carolina has ever even thought about how less-restrictive laws might serve its interests here. ([SUMF](#) ¶¶ 92–107).

Similarly, the Fourth Circuit in *Billups* held that the government failed to provide sufficient evidence explaining why "different methods that other jurisdictions have found effective" would not work there. 961 F.3d at 690. And, again, the same holds true here. Other states do not require a license to simply testify about engineering matters. ([SUMF](#) ¶ 106). So far as the record reveals—so far as Defendants have bothered to investigate—these jurisdictions have suffered no harm as a result of their less-restrictive regulatory schemes. (*Id.* ¶¶ 100–01).

22

The Fourth Circuit's ruling in *Billups* was not an outlier; it was expressly premised on that court's earlier ruling in *Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015), which itself distilled the rule from the Supreme Court's holding in *McCullen*. *Billups*, 961 F.3d at 687–88 (citing *Reynolds* and *McCullen*). And those cases impose a serious burden on the government in intermediate-scrutiny cases for a reason: because "[i]f the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). "Yet here it seems to have been the first strategy the Government thought to try." *Id.* The ban on unlicensed engineering testimony therefore fails under any level of First Amendment scrutiny.

### C. The Court should decline Defendants' invitation to invent a new, evidence-free standard of First Amendment scrutiny.

Defendants do not contend that the prohibition on Wayne's testimony survives either strict or intermediate scrutiny. Defs.' Mem. 24. Instead, they assert that their ban on testimony survives "constitutional scrutiny"—though what level of constitutional scrutiny they contend applies is unclear. Defendants appear to believe that the testimony ban survives so long as their prohibition is "sufficiently drawn" to protect their asserted government interest. Defs.' Mem. 24–29. In Defendants' view, this level of scrutiny—which they emphasize does not include narrow tailoring or the availability of alternative channels for communication—is neither strict nor intermediate scrutiny, and it appears to not require them to present any evidence.

The difficulty for Defendants' position is that their new standard of review has no basis in the caselaw. In support of it, they muster exactly three cases, none of which does what Defendants need it to do.

First up is *Stein*, which Defendants cite for the proposition that the state need not use "the least restrictive means" to advance its interests here. Defs.' Mem. 25 (quoting *Stein,* 922

F.3d at 683). True enough—the Fourth Circuit, following the Supreme Court, has always been clear that intermediate scrutiny does not require the "least restrictive or least intrusive means of" advancing the government's interest. *Billups*, 961 F.3d at 686. But beyond that truism, *Stein* is of little use here because—as explained above—the plaintiffs in *Stein* sought the right to practice law generally rather than challenging a regulation that was triggered by the communication of a message. *See supra* 16–17. *Stein* does not discuss, much less purport to alter, the intermediate-scrutiny test described in cases like *Billups* or *Reynolds*. Still less does *Stein* hold that the government can carry any kind of First Amendment burden without providing record evidence. *Cf. McCutcheon v. FEC*, 572 U.S. 185, 210 (2014) (noting that conjecture is insufficient under any First Amendment standard).

Next, Defendants cite *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992) for the proposition that "the regulation of medicine is subject to reasonable licensing and regulation by the State." Defs.' Mem. 25. Again, true enough. But the fact that the State may generally license medicine or engineering says little about whether the State may license *talking about* medicine or engineering. *Casey* stands for the simple proposition that the government may require "a doctor [to] give certain specific information about [a] medical procedure" before performing it. 505 U.S. at 884 (plurality opinion). That is, of course, a regulation triggered by the performance of the medical procedure rather than by the communication of a message. *See, e.g.*, *NIFLA*, 138 S. Ct. at 2373–74 (distinguishing *Casey* because the regulation in *NIFLA* applied "regardless of whether a medical procedure [was] ever sought, offered, or performed").

Finally, Defendants cite *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 467 (1978). Defs.' Mem. 25. But *Ohralik* was a case about commercial speech (attorney advertising), which

is subject to reduced First Amendment protections. 436 U.S. at 455–56. Even if it had not been, however, the Supreme Court has already rejected the idea that *Ohralik* is meant to leave states with a free hand to squelch speech in areas where the state has imposed a licensing requirement. *Edenfield v. Fane*, 507 U.S. 761, 774 (1993) ("*Ohralik*'s holding was narrow and depended upon certain 'unique features of in-person solicitation by lawyers' . . . .").

The weakness of Defendants' own cases is underscored by their failure to meaningfully address the intermediate-scrutiny test used in *McCullen* or *Billups* or *Reynolds.* Indeed, their brief does not cite *Billups* or *Reynolds* at all, and its attempt to distinguish *McCullen* begins and ends with the assertion that *McCullen* involved "traditional speech" in "traditionally public areas like sidewalks." Defs.' Mem. 25. That much is true, but Defendants decline to explain why this should matter. Nothing about the licensing requirement here hinges on where someone speaks— Defendants do not, for example, suggest that Wayne may testify about engineering matters so long as he does so from the sidewalk. Neither can Defendants explain how forum analysis should affect the First Amendment question before this Court. To be sure, some of the places Wayne wants to testify might not be traditional public forums; others might be.[12] But this makes no difference to the analysis: Forum doctrine deals with the government as property owner, dictating the level of First Amendment protection a would-be speaker has on "government properties" depending on how the government has used those properties in the past. *E.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998) (summarizing doctrine). For this reason, the Supreme Court has had no difficulty applying the First Amendment to protect speech far beyond the sidewalk. *See, e.g., Lane v. Franks*, 573 U.S. 228, 238 (2014) (applying

---

[12] What type of forum a given city-council meeting is for First Amendment purposes will vary based on the circumstances. *See, e.g.*, *Draego v. City of Charlottesville*, No. 3:16-cv-00057, 2016 WL 6834025 (W.D. Va. Nov. 18, 2016).

First Amendment to courtroom testimony); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011) (applying First Amendment to private sale of pharmacy records). Simply put, Defendants do not claim any ownership interest in any of the courtrooms, city halls, or state agencies where Wayne may testify in the future; they instead claim that his speech would be a crime anywhere in the state. Forum doctrine therefore plays no role in the analysis.

In sum, the Fourth Circuit has clearly articulated the intermediate-scrutiny test that (at a minimum) applies to burdens on speech like the one here. Defendants do not argue that they can survive that test, and their motion for summary judgment should therefore be denied.

## III. The Testimony Ban Is Facially Unconstitutional.

Defendants only briefly address Wayne's facial challenge, contending that it must fail because facial challenges are "disfavored." Defs.' Mem. 29. But "[t]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court[.]" *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). That is a question for the Court that is not controlled by the pleadings or the parties' arguments. *Id.* If the Court finds that Defendants' prohibition on unlicensed engineering testimony is unconstitutional only as applied to Wayne, it can enter declaratory and injunctive relief saying so. If the Court finds that Defendants' sweeping ban—which prohibits unlicensed testimony no matter how qualified and experienced the unlicensed speaker is, and which is unsupported by any record evidence—would also violate the Constitution as applied to any other unlicensed speaker, then it should enter declaratory and injunctive relief saying so.

That said, the Court should make the latter finding and hold the testimony ban unconstitutional across the board. Like in *Billups*, the government has failed to meet its evidentiary obligation under the First Amendment—not just failing to prove that it has a good reason to silence Wayne, but failing to prove it has a good reason to silence any unlicensed

person whom a court or other tribunal deems competent to testify *See supra* 19–23. Therefore, like in *Billups*, the conclusion that follows is that the law is "unconstitutional" across the board rather than that this particular plaintiff is entitled to special relief. *Billups*, 961 F.3d at 690 & n.11.

And facial relief is particularly important here because of the breadth and vagueness of Defendants' prohibition on unlicensed testimony. Consider just this case: Here, Defendants have asked this Court to find that Wayne committed a crime by doing "engineering calculations" and "engineering work" in the course of his testimony. Defs.' Mem. 30– 31. But what makes a "calculation" an "engineering calculation" or transforms "work" into "engineering work"? Defendants have not explained. What is the line between legal testimony and criminal testimony? Defendants again cannot quite say, beyond the fact that the engineering testimony is about "engineering." (SUMF ¶ 84). The upshot is that would-be speakers in North Carolina are left with a nebulous zone of censorship, unsure when their mathematics will grow so complicated that they become a crime. *Cf. Citizens United*, 558 U.S. at 333–34 (concluding it was necessary to consider facial validity of restriction on speech to avoid future uncertainty and chilling effects). But to the extent it is hard to tell the difference between lawful and prohibited speech, "the tie goes to the speaker, not the censor." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 474 (2007) (plurality opinion). The Court should therefore enter an order declaring the prohibition on testimony unconstitutional across the board, not merely as applied to Wayne.

## IV. Wayne Seeks Relief Beyond The *Autry* Case.

Defendants suggest that this case is only about Wayne's testimony in the *Autry* case— that, in their words, "the controversy is limited to Nutt's role as a designated expert." Defs.' Mem. 16. On the Board's view, apparently, this case is about (and only about) the lawfulness of

Wayne's past testimony in the *Autry* case because that is the only thing the Board has ever formally pronounced illegal. *Id.* This is backwards.

To begin, if the only thing at issue in this case were the lawfulness of Wayne's past speech, the Court would lack jurisdiction. *See, e.g.*, *Regal Cinemas, Inc. v. Town of Culpeper*, No. 3:21-cv-00004, 2021 WL 2953679 (W.D. Va. July 14, 2021). Fortunately, this case is not purely retrospective: Instead, Wayne seeks a declaratory judgment clarifying his legal rights going forward.[13] (Verified Compl. ([ECF 1](#)) at 14–15). To be sure, Wayne's past testimony in the *Autry* case is what first brought him to the Board's attention, but the Board's letters do not warn him not to testify in the *Autry* case. They warn him to refrain from, among other things, offering any opinions "to a degree to engineering certainty" lest he be subject to criminal penalties.

And the record establishes both that Wayne has regularly offered opinions like that in the past and that his reasonable fear of punishment is the only thing that would prevent him from doing so again in the future. (*E.g.*, [Nutt Dec](#). ¶¶ 46, 53–54). The Fourth Circuit has squarely held that threat letters like the Board's would chill a reasonable person from engaging in the prohibited speech, and so Wayne has standing to seek forward-looking relief in this action.

The most analogous case here is *Cooksey v. Futrell*, 721 F.3d 226, 236–37 (4th Cir. 2013). In that case, a North Carolina licensing board sent the plaintiff a letter informing him that it had opened an investigation into his website, instructed him to change or stop saying certain things on that site, and indicated that it would continue to monitor his compliance. *Id.* at 231–32. The Fourth Circuit held that those statements from a government board created an "objectively reasonable chilling effect" on the plaintiff's future speech. *Id.* at 236. So too here. Wayne wants to (among other things) express opinions to a "degree of engineering certainty" and tell people

---

[13] To the extent they assert the Court has jurisdiction over their counterclaim, Defendants appear to seek the same thing. *Cf.* [Defs.' Mem.](#) 30–31.

about his experience as an engineer. He has received multiple letters from a government board telling him this would be a crime, which creates an "objectively reasonable chilling effect" that can and should be dispelled by an order of this Court.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied, and Plaintiff's cross-motion for summary judgment should be granted.

Dated: May 20, 2022.                    Respectfully submitted,

/s/ W. Cory Reiss                        /s/ Joseph Gay
W. Cory Reiss (NC Bar No. 41549)         Joseph Gay (D.C. Bar No. 1011079)*
REISS & NUTT, PLLC                       Robert J. McNamara (VA Bar No. 73208)*
1221 Floral Parkway, Ste 104             INSTITUTE FOR JUSTICE
Wilmington, NC 28403                     901 North Glebe Road, Suite 900
Phone: (910) 420-4674                    Arlington, VA 22203
Fax: (910) 420-4637                      Phone: (703) 682-9320
E-mail: wcreiss@reissnutt.com            Fax: (703) 682-9321
*Local Civil Rule 83.1(d)*               E-mail: jgay@ij.org
*Counsel for Plaintiff*                          rmcnamara@ij.org
                                         * *Special Appearance pursuant to*
                                           *Local Rule 83.1(e)*

                                         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2022, a true and correct copy of the

foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing and, pursuant to Local Civil Rule 5.1(e), shall constitute service upon,

the following:

Douglas W. Hanna, NCSB #18225
M. Todd Sullivan, NCSB #24554
FIZGERALD HANNA & SULLIVAN, PLLC
3737 Glenwood Ave., Suite 375
Raleigh, NC 27612
Phone: (919) 863-9091
Fax: (919) 424-6409
dhanna@ghslawfirm.com
tsullivan@ghslawfirm.com

*Attorneys for Defendants*

/s/ Joseph Gay
Joseph Gay (D.C. Bar No. 1011079)