IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:21-cv-00106-M

WAYNE NUTT,

        Plaintiff,

v.

ANDREW L. RITTER, *et al.*,

        Defendants.

OPINION
AND ORDER

This matter comes before the court on the parties' cross-motions for summary judgment [DE 42, 46]. Plaintiff Wayne Nutt ("Nutt") seeks summary judgment as to his claim for a declaration that certain provisions of the North Carolina Engineering and Land Surveying Act (the "Act"), as interpreted and enforced, violate the First Amendment as applied to expert testimony. He also seeks a permanent injunction allowing him and others similarly situated to testify on engineering matters without a license.

Defendants Andrew Ritter and other members of the North Carolina Board of Examiners for Engineers and Surveyors (collectively, the "Board") disavow the notion that the Board has targeted or will target expert testimony under the Act. Rather, the Board seeks a counter-declaration that Nutt's expert reports submitted on behalf of a group of plaintiffs in a state lawsuit violates the Act's prohibition against the unlicensed practice of engineering. Whereas Nutt seeks to protect engineering speech, the Board seeks to prohibit the work underlying that speech. For the following reasons, the court grants in part and denies in part Nutt's motion and denies in toto the Board's motion.

# I. Background

## A. Factual Background[1]

### i. *Engineering Experience and Advocacy Efforts*

Nutt worked as a chemical engineer from 1967 to 2013. He never obtained a professional engineering license because he qualified to practice engineering under the industrial exception of the licensing requirement in North Carolina. A portion of his responsibilities involved overseeing the design, construction, and repair of building trench systems to manage both stormwater and potential chemical spills at his work facility. As a result, he developed expertise in hydraulics, fluid flow, and piping systems.

Since his retirement, he has continued using his expertise to support the efforts of various local interest groups. He has testified to the Wilmington City Council regarding the flaws he identified in a development proposal's traffic impact study. He has also testified about an error he discovered in a development plan's calculation of the capacity of a stormwater detention pond. His opinion and recommendations led to meaningful changes in the design of those projects.

In 2020, he agreed to offer expert testimony in a state action (the "state lawsuit" or "*Autry* litigation") on behalf of a group of homeowners alleging that a stormwater management system that had flooded during Hurricane Florence was negligently designed. Nutt planned to offer in-court testimony about the consequences of an observed blockage on the fluid-flow capacity of a diverter pipe within the contested stormwater management system. To this end, he prepared a

---

[1] Unless otherwise stated, the court has derived and relies on the following facts from the uncontested and admitted portions of the parties' statements of undisputed material facts. *See* Defs.' Stmt. Of Undisputed Material Facts, DE 43 [hereinafter Defs.' SOF]; Pl.'s Resp. to Defs.' SOF, DE 53; Pl.'s Stmt. of Undisputed Material Facts, DE 48 [hereinafter Pl.'s SOF]; Defs.' Resp. to Pl.'s SOF, DE 51. The court has deemed as admitted any facts that a party claims to dispute but fails to specifically controvert with citation to admissible evidence in their response to the other's statement of undisputed facts. *See* Local Civil Rules 56.1(a)(2)–(4); Fed. R. Civ. P. 56(c)(1).

report that showed the fluid-flow capacity of the diverter under different scenarios. His report required him to perform fluid-flow calculations, reference engineering literature and methodologies, and prepare visual representations, charts, and tables to offer an opinion within a reasonable degree of engineering certainty. For example, his report included the below visuals to help illustrate the hypothetical scenarios he used to assess the diverter's performance.



*Figure 1 - Section View of Diverter System, Nutt Preliminary Draft Expert Report, DE 1-1 at 5.*

In his report, he concluded that the county-designed obstructions would reduce the diverter's capacity and result in spouting from the diverter and overflowing of the system. The *Autry* litigation plaintiffs' other designated expert was a licensed professional stormwater engineer, and he found Nutt's report to be helpful for his own analysis. He also found it useful to support his own prospective testimony, which concerned the design and performance of the stormwater management system as a whole. In contrast, Nutt would have offered testimony regarding the specific characteristics of the diverter, as a specific component within the system.

3

On March 8, 2021, Nutt appeared for a deposition to offer this opinion. Opposing counsel in the *Autry* litigation suggested that his testimony about the fluid-flow capacity of the diverter would constitute the unauthorized practice of engineering under the relevant statutory authority. The parties continued the deposition for a later day to contact the Board for its position on Nutt's prospective deposition testimony.

### ii. *Regulation of the Engineering Profession*

The North Carolina Engineering and Land Surveying Act (the "Act") sets out the relevant licensing regime for the engineering profession. Under the Act, the "practice of engineering" means the "application of special [mathematical and scientific] knowledge" to "any service or creative work," such as the consultation or evaluation "of engineering works and systems," to the extent that application "requires engineering education, training, and experience" to adequately perform. N.C. Gen. Stat. § 89C-3(6). The practice of engineering also includes the act of "represent[ing] [oneself] to be a professional engineer" or "hold[ing] [oneself] out as able to perform . . . any engineering service or work." *Id.* Practicing engineering without a license constitutes a Class 2 misdemeanor. *Id.* § 89C-23. The Act promises "to safeguard life, health, and property, and to promote the public welfare." *See id.* § 89C-2.[2]

The Board is the administrative agency responsible for interpreting and enforcing the Act. The Board has authority to enforce the rules of professional conduct, adopt an official seal for licensees to certify their reports, and investigate nonlicensees for the unauthorized practice of engineering. N.C. Gen. Stat. §§ 89C-4, -10(a). Pursuant to this authority, the Board has long

---

[2] The Act does not define what "engineering" means. However, it does define the term "engineer" as one who "is qualified to practice engineering" because of their "special knowledge" and "use mathematical, physical and engineering science and the principles and methods of engineering analysis and design" as "acquired by engineering education and engineering experience." *Id.* § 89C-3(2).

4

maintained that unlicensed testimony and reports containing engineering opinions violate the Act. Pursuant to this interpretation and enforcement position, the Board has charged at least two individuals for engaging in unlicensed engineering testimony.

### iii. Board's Correspondences and Investigation

Counsel for the *Autry* litigation plaintiffs (Kyle Nutt) contacted the Board about the opposing counsel's apparent accusation. Nutt then received several correspondences from the Board regarding his inability to testify in the *Autry* litigation without a license. The Board sent an email, explaining that an unlicensed individual cannot publicly use the term "engineer" in their descriptive title or offer testimony likely to be perceived by the public as "engineering advice." Email from David Tuttle to Kyle Nutt (Mar. 8, 2021), DE 49-29. The Board also provided a position statement—the focus of Nutt's claim—warning that "testimony impacting the public," including "expert witness testimony on engineering . . . matters in the courtroom . . . or during depositions" and testimony based on "engineering education, training or experience," requires licensing. Position Stmt., DE 1-2 at 1. The statement also indicated that expert reports are also "evidence of the practice of the profession." *Id.* The Board stated that it "has proceeded against unlicensed individuals . . . for the unlicensed practice of engineering." *Id.*

Despite the Board's explanation, Nutt proceeded to testify at a deposition on April 27, 2021. As a result, an expert witness for the defendants in the *Autry* litigation complained to the Board regarding Nutt's unlicensed deposition testimony. Nutt received another email stating that the Board's Engineering Committee "concurred with the response" initially provided and agreed that "rendering opinions on engineering matters in testimony is the practice of engineering." Email from David Tuttle to Kyle Nutt (May 18, 2021), DE 49-35.

On May 12, 2021, the expert witness for the defendants in the *Autry* litigation submitted a formal complaint to the Board alleging that Nutt was engaging in the unauthorized practice of

5

engineering by testifying in the litigation. The Board notified Nutt in a letter dated May 19, 2021 that he was charged with "violation[s] of G.S. 89C-23 for practicing, or offering to practice, engineering without a license" in connection with his expert report concerning the diverter's fluid-flow capacity and his deposition testimony on March 8, 2021 and April 27, 2021. Charging Letter, DE 1-2. Nutt did not participate in the investigation.

In a letter dated July 15, 2021, the Board informed Nutt that it found "sufficient evidence to support the charge that [he] [was] practicing, or offering to practice, engineering in North Carolina, as defined in G.S. 89C-3(6)," in "violation of G.S. 89C-23." Findings Letter, DE 49-39 at 1. The letter explained that those who violate the statute are "guilty of a Class 2 misdemeanor." *Id.* at 3. The Board warned him that "further action may be taken by the Board" if he did not "come into compliance" with the Act. *Id.* The Board instructed Nutt to cease "participating in the activities that fall within the practice of engineering," including "producing a 'chemical engineering' report," holding himself out to the public as having "any engineering expertise," and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." *Id.*

**B. Procedural Background**

On June 9, 2021, after Nutt received the letter of investigation and before the Board issued its investigative finding, Nutt filed a verified complaint [DE 1], seeking a judgment declaring that the Act, as interpreted and enforced by the Board,[3] violates the First Amendment on its face and as applied to him and those similarly situated. Pl.'s Verified Compl., DE 1 at 14–15. Nutt also seeks a permanent injunction prohibiting the Board from enforcing the Act against himself and

---

[3] Specifically, Nutt's claim implicates N.C. Gen. Stat. § 89C-3(6) (defining "practice of engineering"), N.C. Gen. Stat. § 89C-23 (prohibition on unauthorized practice of engineering and use of the word "engineer"), and the Board's policies and practices enforcing those statutes as embodied in the Board's position statement regarding unlicensed expert testimony and reports, *see* Position Stmt., DE 1-2.

6

others similarly situated "for speaking or testifying about topics that require engineering knowledge without first obtaining an engineering license." *Id.* at 15.

On July 27, 2021, the Board answered Nutt's complaint and asserted a counterclaim [DE 25]. The Board seeks a counter-declaration that Nutt's engineering work for the plaintiffs in the *Autry* litigation, including his engineering calculations, analysis, and resulting expert report, constituted the unauthorized practice of engineering. The Board also seeks the same declaration regarding "testifying at the discovery depositions in support of the work contained in the expert report prepared by Wayne Nutt." *Id.* On August 17, 2021, Nutt answered the Board's counterclaim [DE 26]. The parties completed discovery on March 29, 2022.

On April 28, 2022, the Board filed its motion for summary judgment [DE 42] and accompanying materials [DE 43 (statement of facts); DE 44 (appendix); DE 45 (supporting memorandum)]. Nutt timely responded with his opposing brief [DE 52] and factual objections [DE 53]. The Board timely replied [DE 55].

On April 29, 2022, Nutt filed his motion for summary judgment [DE 46], along with his accompanying materials [DE 47 (supporting memorandum); DE 48 (statement of facts); DE 49 (appendix)]. The Board timely filed its opposing brief [DE 50] and factual objections [DE 51]. Nutt timely replied [DE 54].

The Board later informed the court that the dismissal of the state lawsuit was affirmed on appeal. Defs.' Notice of Filing, DE 57. Nutt then notified the court that the Fourth Circuit may have issued subsequently-decided controlling authority. Pl.'s Notice of Controlling Auth., DE 58; *People for the Ethical Treatment of Animals, Inc. ("PETA") v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023), *cert. denied*, No. 22-1148, 2023 WL 6797724 (U.S. Oct. 16, 2023), *and cert. denied*, No. 22-1150, 2023 WL 6797726 (U.S. Oct. 16, 2023). The Board did the same as to

certain other authority. *See* Defs.' Notice of Controlling Auth., DE 60. The court heard argument on Thursday, October 19, 2023. The court is now fully apprised.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also* Fed. R. Civ. P. 56(c).

"A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Courts must view the evidence in the light most favorable to the nonmovant. *See id.*

When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant does so, the burden shifts to the nonmovant to point out "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In doing so, "the [nonmovant] must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support their assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(l); *Celotex Corp.,* 477 U.S. at 324.

## III. Discussion

### A. Justiciability

#### i.    *Standing*

The Board states that the "controversy" between the parties concerns only Nutt's work as a designated expert witness in the state lawsuit, including his analysis, reports, and deposition testimony, rather than expert trial testimony in the state litigation. *See* Answer & Countercl., DE 25 at 19, 24–25; Mem. in Supp. of Defs.' Mot. for Summ. J., DE 45 at 20–21 [hereinafter Defs.' Mem.]; Defs.' Opp'n to Pl.'s Mot., DE 50 at 6 [hereinafter Defs.' Resp.], 11–14; Reply Br. in Supp. of Defs.' Mot. for Summ. J., DE 55 at 2–3 [hereinafter Defs.' Reply]. In support of this claim, the Board states that it has not "threated [sic] to take any action against Nutt relating to trial testimony in the [state] lawsuit." Defs.' Reply, DE 55 at 2–3. The Board's position calls into question whether Nutt has suffered a sufficient injury-in-fact to maintain suit for declaratory and injunctive relief vindicating his right to testify on engineering matters without a license.[4]

Nutt argues that the Board's past actions have provided a sufficient injury-in-fact to support his claim. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., DE 52 at 33–35 [hereinafter Pl.'s Opp'n]; Pl.'s Reply in Supp. of Mot. for Summ. J., DE 54 at 5–7 [hereinafter Pl.'s Reply]. In support, Nutt points to the Board's letters prohibiting him from offering any opinions "'to a degree of engineering certainty' lest he be subject to criminal penalties." Pl.'s Opp'n, DE 52 at 34. In his view, the threat of criminal penalties for offering engineering opinions created a reasonable

---

[4] In addition to challenging Nutt's standing to maintain suit, the Board has suggested that the parties' dispute may be moot because the Board would not have sought "to interfere with any [expert] testimony" and has agreed "not to subject [Nutt] to any action" or punishment for duly admitted expert testimony. Defs.' Reply, DE 55 at 2–3. The Board expanded its disclaimer at oral argument, when it indicated that it currently has no interest in targeting any expert testimony. Standing and mootness "differ in respects critical to the proper resolution of this case, so [this court] address[es] them separately." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

chilling effect that now motivates Nutt's claim under the First Amendment. *See* Pl.'s Opp'n, DE 52 at 34; Pl.'s Reply, DE 54 at 6.

"'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). A plaintiff may establish standing by demonstrating an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 409.

A plaintiff has a sufficient injury-in-fact to support a "pre-enforcement challenge" when the plaintiff experiences "a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the [board]" or "faces a credible threat of prosecution" under the statute. *Cooksey v. Futrell*, 721 F.3d 226, 235–37 (4th Cir. 2013) (citation omitted); *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). The board's "action[s] will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 236 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). In contrast, a "threat of prosecution" exists where "[a] non-moribund statute . . . facially restricts expressive activity by the class to which the plaintiff belongs." *Id.* at 237 (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)).

*Cooksey* illustrates both of these principles. There, the claimant had trouble losing weight due to diabetes but found success following a low-carbohydrate, high-fat diet. *Id.* at 230. He wanted to coach others on losing weight and started a website to answer dietary questions and advise readers on nutritional and lifestyle changes. *Id.* The state dietetics board received a complaint about his unlicensed practice of dietetics and issued several correspondences explaining that his activities were illegal under the dietetics licensing statute. *Id.* at 230–33.

10

The Fourth Circuit held that the health coach "experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board." *Id.* at 236. He received a warning call from the "highest executive official of a state agency," "a red-pen mark-up of his website," a request that he "make any necessary changes to [his] site, and . . . align [his] [future] practices with the guidance provided." *Id.* "A person of ordinary firmness," the court concluded, "would surely feel a chilling effect." *Id.* at 236–37.

To further bolster its finding that a sufficient injury existed upon filing suit, the court also found that the health coach demonstrated a credible threat of prosecution. *Id.* at 238. On its face, the challenged statute criminalized providing "nutrition counseling," establishing "priorities, goals, and objectives that meet nutrition needs," and assessing "the nutritional needs of individuals and groups." *Id.* Because the health coach alleged that he had engaged in speech falling under each of those statutorily proscribed categories of dietetic practice, the court concluded that he sufficiently demonstrated that he faced a "'credible threat' of criminal penalties set forth in the [statute]." *See id.* (quoting *Bartlett*, 168 F.3d at 710).

    *a.*    *Objective Chilling Effect*

Nutt has received several letters from the Board articulating its position broadly prohibiting unlicensed expert reports and testimony. *See, e.g.*, Pl.'s SOF, DE 48 ¶¶ 65, 73–74. For example, the Board's Executive Director issued a findings letter explaining that he violated the Act when he provided his expert report and "engineering testimony in depositions" for the plaintiffs in the state lawsuit. Findings Letter, DE 49-39 at 1. The letter instructed Nutt to refrain from writing a chemical engineering report, holding himself out as having "any engineering expertise" when presenting the report, and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." *Id.* at 3. The letter warned that "further action may be pursued by the Board" if Nutt did not "come into compliance" and instead continued "participating in the

11

activities that fall within the practice of engineering" without a license. *Id.* To a reasonable person, the Board's letter effectively read like a "red-pen mark-up" striking Nutt's reports and testimony from the marketplace of ideas. *Cf. Cooksey*, 721 F.3d at 232–33, 236–37 (holding that the Board's "red-pen mark-up of his [activities]" surely triggered the same trepidation we have all experienced upon receiving such markings on a high school term paper").

The Board has also identified Nutt for violating the Act in its public newsletter. Pl.'s SOF, DE 48 ¶ 76. Publicly identifying Nutt for violating the Act would reasonably engender at least "the same trepidation" one would experience from a nonpublic letter explaining the violation. *See Cooksey*, 721 F.3d at 236. The newsletter, the Board stated at oral argument, merely provided "notice" that Nutt violated the Act; it was not an "action" that would have deepened any existing chilling effect. But notice is prejudicial action in this context. A call and a letter provided direct notice in *Cooksey*, but it also objectively chilled the health coach's speech because both of the dietetics board's actions informed him that his expressive activities exposed him to criminal liability and may be monitored for future compliance. *See id.* at 236–37. Here, as noted above, the Board's findings letter had the same effect. *See* Findings Letter, DE 49-39. The newsletter simply went further and provided notice to the public that unlicensed persons should refrain from writing engineering reports and testifying on engineering matters as a designated expert witness. *See* Newsletter, DE 49-37 at 4, 10, 15. Otherwise, the Board would publicly identify the apparent offender as a criminal, subject to "Board Actions" such as a findings letter that could very well support prosecution and penalty. *See id.* The Board's past actions are sufficiently chilling.

   b.   *Credible Threat of Prosecution*

The Board has also engendered a credible threat of prosecution. Nutt is an unlicensed engineer belonging to the group of professionals subject to the force of the challenged provisions contained in the Act. Nutt has engaged, and seeks to continue engaging, in expert report writing

and testimony on engineering matters. *See, e.g.*, Pl.'s Verified Compl., DE 1 ¶ 60; Pl.'s SOF, DE 48 ¶ 72. But the Act sets out categories of activity that the Board uses to proscribe Nutt's speech.[5] And the Board has used those statutory categories to prevent others from engaging in the same kinds of speech. Nutt thus faces a credible threat of prosecution for engaging in the expressive activities he seeks to vindicate. *See Cooksey*, 721 F.3d at 238; *Bartlett*, 168 F.3d at 710.

    *c.*   *Causation and Redressability*

Two elements of the standing requirement remain for the court's consideration. "First, causation is satisfied where a causal connection between the injury and the conduct complained of that is fairly traceable, and not the result of the independent action of some third party not before the court. Second, the redressability requirement is satisfied where there is a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." *Cooksey*, 721 F.3d at 238 (cleaned up). Nutt has refrained from testifying about engineering matters because of the Board's letters. And he instituted this action to vindicate his ability to offer his expert reports and

---

[5] *Compare* N.C. Gen. Stat. § 89C-3(6) ("Any service or creative work, the adequate performance of which requires engineering education, training, and experience, in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems. . . .") *and* Position Stmt., DE 1-2 (explaining that the Board considers "any testimony that requires engineering knowledge . . . falls with the definition of the practice of engineering"), *with* Pl.'s SOF, DE 48 ¶ 15 ("[Nutt] presented his [traffic impact evaluation] in various ways, including letters, PowerPoint slides, meetings with officials, and testimony before the Wilmington City Council"); *id.* ¶ 17 ("[I]n 2018, Wayne submitted expert commentary to North Carolina Department of Environmental Quality about a proposal to use methyl bromide . . . ."); *id.* ¶ 18 ("[Nutt] prepared a presentation [evaluating a stormwater engineering plan] for the New Hanover County Commissioners in which he detailed several errors in the stormwater plan . . . ."); *id.* ¶ 35 (stating that Nutt "prepared a report" that "showed the results of calculating the fluid-flow capacity of a 3-foot concrete pipe diverter line under different scenarios" and "concluded that the obstructions would reduce the fluid-flow capacity of the pipe and back up the water level in a manner consistent both with the spouting observed by the county employee and with the water levels observed by one of the nearby homeowners"); *id.* ¶ 40 ("Nutt was deposed in the *Autry* litigation . . . .").

13

testimony. If he obtains a favorable ruling, he will find "full redress" for his speech. *See id.*[6] Nutt has standing to maintain suit.

### ii. *Mootness*

Since the Constitution limits federal-court jurisdiction to "cases" and "controversies," the court must ensure that "an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (citations omitted). After Nutt filed the instant complaint, the state appellate court unanimously affirmed the dismissal of the *Autry* litigation. Defs.' Notice of Filing, DE 57; *see also Autry v. Bill Clark Homes, LLC*, 882 S.E.2d 698, 700 (2022). Further, the Board stated at oral argument it currently has no interest in targeting expert testimony under the Act—just expert reports. These intervening circumstances call into question whether the dispute is moot.

A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald*, 577 U.S. at 161 (quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012)). "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit[]' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* at 160–61 (quoting *Genesis Healthcare Corp.*

---

[6] There is also a minor justiciability question regarding the Board's counterclaim. Nutt points out that the court will lack jurisdiction if the Board seeks a declaration solely regarding the legality of his work thus far completed, rather than its impact regarding the parties' future conduct in relation to each other. DE 47 at 18 n.6. Declaratory judgment is "unavailable in situations where . . . claims and rights asserted have fully matured, and the alleged wrongs have already been suffered." *AvePoint, Inc. v. Knickerbocker*, 475 F. Supp. 3d 483, 488 (E.D. Va. 2020) (citing *Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 695 (E.D. Va. 2010), *aff'd*, 441 Fed. App'x 166 (4th Cir. 2011) (per curiam), for the proposition that declaratory judgments are inappropriate "if the questionable conduct has already occurred or damages have already accrued"). To the extent that the Board's counterclaim, like Nutt's claim, has the prospective capacity "to steer" the parties' conduct away from future litigation, jurisdiction to hear the Board's counterclaim is proper. *Id.* To the extent the Board's counterclaim seeks only retroactive relief, jurisdiction is improper. *Id.*

*v. Symczyk*, 569 U.S. 66, 72 (2013)). But when the parties' dispute is "capable of repetition, yet evading review," the "law should not be [so] rigid" so as to deny judicial review. *Roe v. Wade*, 410 U.S. 113, 125, (1973), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (quoting *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911) (citing *inter alia Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 178–179 (1968)). "To fall within this exception, it must be the case that 'the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and . . . there is a reasonable expectation that the same complaining party will be subjected to the same action again.'" *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) (quoting *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018)). The complaining party may reasonably expect the controversy to recur, even if the defendant terminates the allegedly unlawful conduct after the lawsuit has been filed, as long as the defendant remains "free to return to [its] old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

The *Carroll* decision illustrates why a speaker may continue challenging a time-limited injunction on free speech grounds, even after its expiration. *See* 393 U.S. at 177–78. *Carroll* concerned a group of white supremacy activists who wanted to rally on the steps of the county courthouse during the course of a controversial trial. *Id.* at 177. The county obtained a ten-day injunction prohibiting the activists from doing so due to the risk they presented to the public. *Id.* The activists claimed the injunction violated the First Amendment, even after that injunction had expired. *See id.* The Court held that the activists' challenge against the expired ten-day injunction was still live because the activists "have sought to continue their activities, including the holding of rallies in [the county], and it appears that the decision of the Maryland Court of Appeals

15

[affirming the injunction] continues to play a substantial role in the response of officials to their activities." *Id.* In short, "[t]he underlying question persist[ed] and [was] agitated by the continuing activities and program of [the speakers]." *Id.* at 179. *Carroll* shows that the expiration of a defendant's challenged practice does not necessarily moot the dispute.

Another instructive case is *Globe Newspaper Company v. Superior Court for Norfolk County*, 457 U.S. 596, 602 (1982). There, a Bostonian newspaper challenged a court order that implemented a state law excluding the press and public from trials of sex offenses against minors. *See id.* at 602. Although that order had "expired with the completion of the rape trial," the Supreme Court observed that the newspaper serviced the Boston metropolitan area and therefore "reasonably assumed" that the newspaper "will someday be subjected to another order relying on" the same statute. *Id.* at 602–03. Moreover, criminal trials are typically of "short duration," so the Court believed the dispute was capable of eluding jurisdiction. *Id.* at 603 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 (1980)); *see also Gannett Co. v. DePasquale*, 443 U.S. 368, 377 (1979) (holding that an "order closing a pretrial hearing is too short" to permit appellate review); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976) (holding that orders restricting pretrial publicity "are by nature short-lived"). Thus, the Supreme Court maintained jurisdiction to consider the merits of the parties' dispute. *Id.* at 603.

As *Carroll* and *Globe Newspaper* illustrate, the instant dispute is capable of repetition, yet evading review. Nutt seeks "to continue [his] activities," i.e., writing engineering reports to support trial testimony and testifying as an expert witness on engineering matters. *See Carroll*, 393 U.S. at 178. The statutory provisions preventing his expressive activities remain live. Under the Act, the Board has long prohibited others' reports and testimony and has repeatedly stated that Nutt cannot provide reports and testimony containing engineering opinions in the *Autry* litigation.

16

Nutt may reasonably expect that the Board's enforcement position preventing unlicensed engineering reports and testimony will "play a substantial [adverse] role in the response of officials to [his] activities" if the parties do not now settle their dispute. *See id.*

At oral argument, the Board argued that Nutt should no longer reasonably expect prosecution for providing engineering testimony as an expert witness because it has not tried, and will not try, to prohibit Nutt from testifying as an expert witness. But the Board *has* tried to prohibit Nutt's speech. *See, e.g.*, Findings Letter, DE 49–39; Newsletter, DE 49-37 at 4, 15. Moreover, renouncing its pre-filing enforcement position, while denying the true nature of its past practices, does not "make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See Friends of the Earth*, 528 U.S. at 189. Despite the dismissal of the *Autry* litigation and the Board's post-filing enforcement position, the parties' dispute is reasonably capable of repetition.

The dispute is also reasonably capable of evading review. Like criminal cases, civil cases can have exceedingly short durations.[7] In fact, the actual duration of the parties' dispute—from the moment it became viable to the moment the state lawsuit's dismissal was affirmed—was nineteen months. *Compare* Charging Letter, DE 1-3 (issued May 19, 2021), *with* Appellate Opinion, DE 57-1 (issued Dec. 20, 2022). The court may reasonably assume that Nutt "will someday be subjected to another [criminal charge] relying on" the Board's interpretation and enforcement of the Act, should court no longer have jurisdiction to settle the dispute. *See Globe Newspaper*, 457 U.S. at 603 (citation omitted); *see also Turner v. Rogers*, 564 U.S. 431,

---

[7] Ninety-nine percent of federal civil cases are resolved before trial within 17.9 months. *See Table C-5—U.S. District Courts–Civil Federal Judicial Caseload Statistics (March 31, 2023)*, U.S. Courts (Mar. 31, 2023), https://www.uscourts.gov/statistics/table/c-5/federal-judicial-caselo ad-statistics/2023/03/31.

17

440 (2011) ("Our precedent makes clear that the 'challenged action,' [12-months' imprisonment],

is 'in its duration too short to be fully litigated' . . . prior to its 'expiration.'" (quoting *First Nat.*

*Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978))); *see also Bellotti*, 435 U.S. at 774 (18-month

period too short); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 514–516 (1911) (2-year

period too short). The dispute between Nutt and the Board is not moot.

### B. Canon of Constitutional Avoidance

Before turning to the heart of the parties' dispute, the court addresses whether the canon of

constitutional avoidance applies. At oral argument, the Board urged the court to apply the canon

of constitutional avoidance because the canon, as the Board indicated, instructs the court first to

interpret whether the statutory definition of engineering practice covers expert reports and

testimony on engineering matters before considering the constitutionality of the Board's ban on

those activities. At face value, the Board's position makes sense. If the Act does not cover expert

engineering reports and testimony, then the court need not consider the constitutionality of the

regulatory restraint on Nutt's speech. But if it does, the court must consider whether the

constitution frees Nutt's speech from the Board's oversight.

The Board takes too much from the canon. "The so-called canon of constitutional

avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to

avoid serious constitutional doubts." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516

(2009). No doubt, Nutt's claim raises "serious constitutional doubts" about the Act's reach. But

that reach arises from unambiguous statutory text. Rendering an expert report and testimony

containing engineering opinions about a stormwater diverter system on behalf of purportedly

aggrieved citizens plainly qualifies as "any service or creative work" such as the consultation and

evaluation of "engineering works or systems" that "requires engineering education, training, and

experience." N.C. Gen. Stat. § 89C-3(6). "In the absence of more than one plausible construction,

18

the canon simply has no application." *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022) (citation omitted).

### C. First Amendment

The court turns to the heart of this case. Nutt states he wants "to publicly speak his mind." Mem. in Supp. of Pl.'s Mot. for Summ. J., DE 47 at 10 [hereinafter Pl.'s Mem.]. He wants to share his engineering opinion on the quality of municipal systems that fail to meet his expectations as an experienced engineer. *See id.* In voicing his dissent, he can protect his community members from bureaucratic misjudgments and errors. *Id.* at 10–11. But the state has tried to silence him because he expresses his engineering opinions without their license. *See id.* at 16–20. Although he does not have the state's approval to speak on engineering matters, he believes he should still be allowed to voice his dissent. *See id.* at 19.

Nutt therefore claims that two provisions of the Act, namely § 89C-3(6) and § 89C-23, violate the First Amendment on their face and as applied to his unlicensed expert testimony on engineering matters. *See id.* at 24–25. In his view, the statutes' enforcement turns on whether he communicates an engineering opinion based on his experience and education as an engineer. *See id.* at 25. He argues the First Amendment should apply with full force. *See id.*

The Board believes it must protect the public from incompetent engineers, dangerous public works and systems, and engineering misrepresentations. *See* Defs.' Mem., DE 45 at 27–29. To accomplish this task, the Board cannot police every instance of poor engineering practice. Nor can the Board allow poor practice to persist and simply respond to the damage that results. It needs a regulatory system to manage the state's risk. And it must vigorously protect that system. Thus, the Board relies on a licensing regime to regulate the engineering profession. *See id.* at 8–9, 27–29. The Board uses that licensing regime to prohibit unlicensed individuals from engaging in conduct that constitutes engineering practice, even when that conduct leads to the creation of

19

valuable dissent. *See, e.g.*, *id.* at 31 ("The Act not only protects [Nutt's] clients (North Carolina homeowners) but others that would use and rely upon the published findings of Plaintiff Nutt.").

The Board thus rejects what it characterizes as Nutt's "attempt[] to reframe the issue as one involving only speech." *Id.* at 7. Rather, the Board maintains that engaging in engineering conduct, not articulating engineering opinions, triggers enforcement against Nutt. *See, e.g.*, *id.* at 6, 20–21; Defs.' Resp., DE 50 at 8–11. To this end, the Board has clarified, in its briefings and at oral argument, that it does not dispute Nutt's claim that he should be allowed to provide expert testimony on engineering matters. *See* Defs.' Resp., DE 50 at 6–7. Rather, the Board maintains that, under the Act, Nutt cannot engage in "the conduct of investigating and preparing an engineering report" without a license. *See, e.g.*, *id.* at 6, 8–11, 14.[8] According to the Board, the Act therefore targets unlicensed engineering conduct, thus imposing only "incidental burdens on [engineering] speech." *See id.* at 14–15. The Board believes lesser scrutiny should apply. *See id.* at 18–19.

The court notes that both sides have intelligible values underlying their respective legal positions. As the following analysis shows, the court decides this case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" unless good reason requires otherwise. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

---

[8] In its briefing at times, the Board appears to dispute only Nutt's ability to render an expert report without a license. *See* Defs.' Resp., DE 50 at 6–7. At other times, it seeks to claim authority to regulate unlicensed report writing *and* testimony. *See id.* at 9–10; Answer & Countercl., DE 25 at 38 (seeking declaration that providing deposition testimony violates the Act). Regardless of the position advanced on paper, the Board has clarified at oral argument that it has no present interest in preventing Nutt from testifying as an expert as to engineering matters; its regulatory interest extends to unlicensed report writing.

20

### i. Expert Testimony

As mentioned above, Nutt seeks a judgment declaring that the Act, as interpreted and enforced, violates the First Amendment, both on its face and as applied to him and others similarly situated. Pl.'s Verified Compl., DE 1 at 14–15. He also seeks a permanent injunction allowing him and others similarly situated to testify about topics that require engineering knowledge without first obtaining an engineering license. *See id.* at 15. The Board has conceded on paper and at argument that it will not enforce the Act to prohibit Nutt and others similarly situated from testifying on engineering matters.

As explained above, this concession does not render the parties' dispute moot. It does, however, make clear that the Board does not contest Nutt's core claim. Namely, the prohibition on unlicensed expert engineering testimony violates the First Amendment. *See* Pl.'s Verified Compl., DE 1 at 14–15; Pl.'s Mot. for Summ. J., DE 46. Therefore, in light of the parties' positions, the court will accept that claim as applied to Nutt. The court will also enjoin the Board from enforcing the Act against Nutt for testifying about topics that require engineering knowledge without first obtaining an engineering license.

To the extent Nutt facially challenges the Act, namely § 89C-3(6) and § 89C-23, for substantial overbreadth, the court declines to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Instead, as the Supreme Court has instructed, the court invokes a reasonable limiting construction to avoid needless overbreadth adjudication. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The court derives that limiting construction

from the Board's concession. Therefore, § 89C-3(6) and § 89C-23 are unconstitutional when applied to unlicensed expert testimony requiring engineering knowledge.[9]

### ii.   *Expert Reports*

Nonetheless, a significant aspect of Nutt's claim remains. Nutt wants to write expert reports on engineering matters to support his expert testimony. But the Board maintains that it will enforce the Act to prohibit unlicensed persons from investigating, preparing, and writing engineering reports. The court will therefore consider whether the prohibition on unlicensed expert engineering reports violates the First Amendment.

### a.   *Protected Activity*

As stated above, the Board maintains that producing engineering reports constitutes unprotected activity under the First Amendment. *See, e.g.*, Defs.' Resp., DE 50 at 14–15. Nutt argues that the First Amendment protects that activity as a necessary part of developing and supporting his expert testimony. *See* Pl.'s Mem., DE 47 at 28–29; Pl.'s Reply, DE 54 at 8.

The question "what is speech" is a fundamental issue of First Amendment analysis. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). Sometimes, the inquiry is complicated, escaping intuition and prior case law. Courts would have to identify the prohibited activity (i.e., conduct) and ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id.* (quoting *Spence v. State of Wash.*, 418 U.S. 405, 411 (1974)). This test provides the necessary framework for extending the nation's "profound commitment" to free speech to certain conduct that would otherwise fall into the category of simple action. *See Sullivan*, 376 U.S at 270.

---

[9] Neither party addresses the severability of the Act's application to unlicensed expert testimony on engineering matters. Regardless, in light of the Act's severability clause, the court may sever this application without functionally rewriting state law or circumventing the intent of the state legislature. *See PETA*, 60 F.4th at 838; N.C. Gen. Stat. § 89C-28 (severability clause).

Other times, the inquiry is not so difficult. Specifically, the court need not scrutinize the extent of First Amendment coverage when the prohibited activity consists of pure forms of speech, such as writing and speaking one's mind. *Cf. Johnson*, 491 U.S. at 404 (distinguishing between "the spoken or written word" and expressive conduct). After all, those activities "necessarily convey [some] message" precluding their characterization as unprotected conduct. *Cf. Cohen v. California*, 403 U.S. 15, 18 (1971) (rejecting the notion that "the fact of communication" of an offensive epithet could be deemed "separately identifiable conduct" that "does not necessarily convey any message"). It is also settled that the conduct leading to the creation of pure speech is also protected activity under the First Amendment. *See PETA*, 60 F.4th at 829. Although forms of pure speech, such as "writing and painting[,] can be reduced to their constituent acts, and thus described as conduct, [courts] have not attempted to disconnect the end product from the act of creation." *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) (quoting *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010)).

Here, the prohibited activity is investigating, preparing, and writing expert engineering reports. That is plainly protected activity. The reports communicated the "complete statement of all opinions [Nutt] will express [as an expert witness] and the basis and reasons for them." N.C. Gen. Stat. § 1A-26(b)(4)(a)(2)(I). Although writing his expert reports required him to engage in some conduct, such as calculating the fluid-flow capacity of the diverter pipe, courts have never "drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded." *Turner*, 848 F.3d at 689.

Moreover, as Nutt argues, producing his expert reports was integral to developing and supporting expert testimony. The Board conceded this point during oral argument. Moreover, the

23

parties in the state lawsuit relied on Nutt to furnish an expert report before deposing him. *See* Pl.'s SOF, DE 48 ¶¶ 35–40. True, state law does not require expert witnesses to furnish written reports before providing deposition or trial testimony. *See* N.C. Gen. Stat. § 1A-26(b)(4)(a)–(b). But the discovery timeline for the state lawsuit indicates the court or the parties elected to require designated experts to produce their report summarizing their opinion before participating in depositions or at trial. In sum, Nutt's expert reports were both integral and necessary to his testimony as an expert witness. To the extent that investigating, preparing, and writing those reports enabled him to testify as a designated expert in the state lawsuit, that activity constitutes the "'creation' of information' and thus "demands as much protection as its 'dissemination'" as verbal testimony. *See PETA*, 60 F.4th at 829 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)). Investigating, preparing, and writing expert reports are protected activities under the First Amendment.

### b. *Content Discrimination*

The next issue is whether the Board's ban against unlicensed expert engineering reports discriminates based on the content of those reports. The Board argues that the focus of this analysis is the "actual language of the Act." *See* Defs.' Resp., DE 50 at 18. According to the Board, to impose a content-based restriction, the statutory language must possess a content-based distinction. *See id.* And since the statutory language "draws no such distinction," the Act is content neutral. *See id.* at 18–19.

Generally, regulations discriminate based on content when they "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In other words, if a "law applies to particular speech because of the topic discussed or the idea or message expressed," it is content based. *Id.* Even if a law "may be described as directed at conduct" rather than speech, the law still "regulates speech on the basis of its content" when as applied to the speaker "the

conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–28 (2010).

For example, in *Holder*, the Supreme Court assessed whether a statute prohibiting providing material support in the form of speech to designated terrorist organizations violated the First Amendment. *Id.* at 25–26. Because the statute applied when the plaintiffs' speech imparted a specific skill or communicated specially derived advice (but did not apply when the plaintiffs' speech imparted general or unspecialized knowledge), the Court held that the statute "regulate[d] speech on the basis of its content." *Id.* at 27.

*Cohen v. California*, 403 U.S. 15 (1971) is also a case that "involved a generally applicable regulation of conduct," namely "barring breaches of the peace." *Holder,* 561 U.S. at 27–28. In *Cohen*, if the speaker had not donned a jacket bearing an offensive epithet ("Fuck the Draft"), the regulation barring breaches of peace would not have applied to him. *See id.* Thus, the Supreme Court applied strict scrutiny to analyze the constitutionality of the breach-of-peace statute's application to the speaker. *See id.*

Consistent with *Holder* and *Cohen*, the Fourth Circuit recently observed that laws "cast in broad terms" do not categorically escape strict scrutiny, especially if they target expressive activity. *PETA*, 60 F.4th at 825–828. *PETA* concerned a pre-enforcement challenge to North Carolina's Property Protection Act ("PPA"), which contained three provisions banning undercover employees from (1) copying or removing and then disloyally using employer data; (2) placing unoccupied cameras to capture employer data; and (3) interfering substantially with an employer's ownership or possession of its premises. *Id.* at 820. The government in *PETA* (like the Board here) argued that the PPA is "generally applicable" and thus should not face constitutional scrutiny because "enforcement against the press has incidental effects on [protected activity]." *Id.* at 825.

25

In rejecting the government's position, the court held that laws that "implicate a variety of conduct" must face the appropriate level of scrutiny "when [those laws are] applied to speech." *See id.* at 825–26. Thus, newspapers must obey antitrust laws, unless those laws "are being applied to them because of their speech," and the government may prosecute breaches of peace, unless its prosecution turns on the communication of an inflammatory message. *Id.* (citing *United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Cohen*, 403 U.S. at 22–26; *Holder*, 561 U.S. at 28). Despite the general applicability of the PPA, the court held that the challenged statutory prohibitions, as interpreted and enforced by the government, "must clear strict scrutiny" because their application in context directly "burden[ed] newsgathering and publishing activities." *See PETA*, F.4th at 828–31.[10]

This court takes instructions from *Holder, Cohen*, and *PETA*. In this case, the court cannot rely on the Board's focus on the text of the challenged statutory provisions and their operation in the abstract. Rather, to give full force to the First Amendment, the court must scrutinize the provisions in context, based on the true nature of the government's interpretation and enforcement. *See id.* at 827 ("Laws cast in broad terms can restrict speech as much as laws that single it out.").

The Board's "long standing position" is that the Act prohibits "rendering opinions on *engineering* matters." *See, e.g.*, Email from David Tuttle to Kyle Nutt (May 18, 2021), DE 49-35 (emphasis added). The Board has long extended this position to apply to expert reports. *See* Position Stmt., DE 1-2 ("That is more clearly evidence of the practice of the profession."). With

---

[10] Although the court held that the challenged provisions "must clear strict scrutiny," the court did not apply strict scrutiny because "North Carolina has conceded—here and, previously, before the district court—that the Act cannot satisfy this highest bar." *PETA*, 60 F.4th at 831. The court then held that the challenged provisions failed intermediate scrutiny because "the legislature produced no record evidence justifying its expansive restrictions on newsgathering speech and because their newsgathering prohibitions are not tailored to any substantial government interest." *Id.* at 831–33.

Case 7:21-cv-00106-M   Document 63   Filed 12/20/23   Page 26 of 36

respect to Nutt himself, the Board expressly confirmed that producing a "chemical engineering report" and "providing opinions to a 'reasonable degree of engineering certainty'" without licensure violated the Act. Findings Letter, DE 49–39 at 3. As interpreted and enforced by the Board, the Act makes "distinctions" by "defining regulated speech by particular subject matter," namely speech communicating an engineering opinion. *See Reed*, 576 U.S. at 163; *see also Wash. Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (finding that the state's notice-and-disclosure requirement for online political advertising was a "content-based regulation" because the law "single[d] out one particular topic of speech—campaign-related speech—for regulatory attention"). Strict scrutiny should apply.

      *c.*    *Professional Conduct "Exception"*

Despite the content-based nature of the Act's challenged application to unlicensed expert engineering reports, the Board maintains intermediate scrutiny should apply based on the "exception for professional regulations that incidentally affect speech," as articulated in *National Institute of Family and Life Advocates ("NIFLA") v. Becerra*, 138 S. Ct. 2361 (2018) and applied in *Capital Associated Industries, Inc. ("CAI") v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) and related cases. DE 50 at 18.

The Board first invokes *NIFLA*, arguing that lesser scrutiny should apply because the Act "generally regulates" the conduct of professional engineers. Defs.' Resp., DE 50 at 15–18; Defs.' Reply at 6–8. According to the Board, the Act does so by imposing a licensing requirement, which does not regulate speech itself but rather "who can practice engineering." *See* Defs.' Resp., DE 50 at 17–18; Defs.' Reply, DE 55 at 7–8 (citing *CAI*, 922 F.3d at 207). This same statutory focus on the question "who gets a say" instead of "what they say" led the court in *CAI* to deem the unauthorized corporate practice of law ban content neutral and subject to intermediate scrutiny. *See* 922 F.3d at 207. So too here, the Board argues. *See* Defs.' Resp., DE 50 at 18.

27

The court rejects that argument. The Board places dispositive value on the fact that the Act "generally functions" as a regulation on professional conduct. That fact may start the relevant analysis, but it does not end it. Indeed, when the Supreme Court rejected the idea of a professional speech doctrine, it also rejected the idea that the government could regulate any speech "uttered by professionals" simply because "it involves personalized services and requires a professional license from the State." *NIFLA*, 138 S. Ct. at 2371–75. The Court explained that that would allow the government to get a free pass to abridge speech by "simply imposing a licensing requirement." *Id.* at 2375. Thus, in accordance with *NIFLA*, this court may not except the challenged ban from strict scrutiny just because the Act "generally regulates" professional conduct. Rather, this court must decide the appropriate scrutiny level based on whether the Act *as applied to expert reports* targets "speech as speech," rather than professional conduct that just so happens to sweep up speech. *See id.* at 2372–74. The court decides in favor of applying strict scrutiny: The communication of engineering opinions in Nutt's expert reports triggered the bureaucratic limit Nutt seeks to abolish. Therefore, the ban against expert reports directly, rather than incidentally, regulates speech. *See, e.g.*, *Holder*, 561 U.S. at 28; *Cohen*, 403 U.S. at 16; *PETA*, 60 F.4th at 826–27.

For substantially the same reasons, the court rejects the Board's argument from *CAI*. Recall, the Board argues that, like the court in *CAI*, this court should apply lesser scrutiny because the Act generally regulates "who can practice engineering." Defs.' Resp., DE 50 at 17–18 (citing 922 F.3d at 207). *CAI* examined whether a ban on the practice of law by corporations, as applied to a trade association that wanted to draft contracts and give legal advice, regulated pure speech or professional conduct. 922 F.3d at 202. The court held that the ban regulated conduct because unauthorized practice of law "statutes don't target the communicative aspects of practicing law,

28

such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of *who* may conduct themselves as a lawyer." *Id.* at 208 (emphasis added). True, the Act generally focuses on the question who may conduct themselves as an engineer. But Nutt's claim implicates a specific application of the Act: the ban on expert reports containing engineering opinions. That ban does not focus on who may engage in nonexpressive engineering conduct; that ban focuses on what an unlicensed individual may say when writing expert reports.

The Board invokes two other cases to support its position: *360 Virtual Drone Services LLC v. Ritter*, No. 5:21-CV-137-FL, 2023 WL 2759032, at *1 (E.D.N.C. Mar. 31, 2023) (pending appeal); and *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). Generally speaking, these cases held that a professional licensing restriction directly targeting expressive activity nonetheless regulates professional conduct. Neither persuades the court.

In *360 Virtual Drone*, the court held that a ban on creating land surveying maps and models without a land surveying license regulated expressive activity but nonetheless is "part of a generally applicable licensing regime" and therefore "does not control what surveyors may tell their clients, instead focusing more broadly on the question of who may conduct themselves as a surveyor." 2023 WL 2759032, at *9–11 (cleaned up). *360 Virtual Drone* focused on the general applicability of the land surveying licensing regime to determine whether the challenged ban targeted speech or conduct. In contrast, this court looks to a specific application of the challenged licensing regime to determine whether that application targets speech as speech. And since it does, strict scrutiny should apply.

In *Brokamp*, the appellate panel assumed, without deciding, that a ban on unlicensed mental health counseling regulates pure "speech without any non-verbal conduct." 66 F.4th at 392. The court held that the ban applied "regardless of what is said" between counselor and client

but rather when the unlicensed speech concerned "one of the statutorily identified therapeutic purposes, in addressing a mental disorder or problem, in the context of a private practice, group, or organized setting." *Id.* at 393–97. In contrast, the ban here "applies to particular speech because of the topic discussed or the idea or message expressed," namely opinions on engineering matters, *see Reed*, 576 U.S. at 163–64. The theory of content discrimination here renders *Brokamp* distinguishable.

### d. Application of Intermediate Scrutiny

Because the ban on unlicensed expert reports targets engineering opinions, the ban must pass strict scrutiny. However, the court need only apply intermediate scrutiny to decide this case. *See Billups v. City of Charleston*, 961 F.3d 673, 684 (4th Cir. 2020) ("Simply put, there is nothing extraordinary about declining to decide the level of scrutiny to be applied to a given law."). In applying lesser scrutiny, the court assumes without deciding that the Board's asserted interests are substantial. The court focuses its inquiry on whether the challenged ban is narrowly tailored to serve the Board's asserted interests.

#### i. Serving State Interests

The Board asserts several interests supporting the ban. *See* Defs.' Mem., DE 45 at 31–32; Defs.' Resp., DE 50 at 22–24. Specifically, according to the Board, the ban advances the state's interest in establishing and enforcing "a minimum level of competence" for an engineer's opinion within a particular subject matter. *See* Defs.' Mem., DE 45 at 31; Defs.' Resp., DE 50 at 22–23.[11]

---

[11] The Board frames its interest differently. It states that, in addition to establishing and maintaining a competency standard, the Act "provides a system of accountability," should Nutt make any mistakes or violate the Professional Rules of Conduct, and ensures that Nutt complies with the obligations promulgated in the Professional Rules of Conduct, "including limiting [an engineer's] practice within [his] area of competence." *E.g.*, Defs.' Mem., DE 45 at 32.

The Board also states that the ban promotes the health, safety, and welfare of the public and the preservation of property. *See* Defs.' Resp., DE 50 at 22–23.

Courts "do not typically require governmental entities to present evidence demonstrating the existence of a significant interest" when "'common sense and the holdings of prior cases' [are] sufficient to establish the existence of such an interest." *Billups*, 961 F.3d at 685 (quoting *Reynolds v. Middleton*, 779 F.3d 222, 227 (4th Cir. 2015)). Moreover, "when it is obvious that a challenged law serves a significant governmental interest, we do not require that the government produce evidence so demonstrating." *Id.* However, "the government [must satisfy] its evidentiary burden when the relationship between a challenged regulation and the governmental interest it allegedly furthers is not obvious." *Id.* at 685 n.6. That is the case here.

The relationship between the Board's ban on unlicensed expert engineering reports and its asserted interests is not so obvious as to allow the Board to rest solely on case law and common sense. The Board does not even argue otherwise. *See* Defs.' Resp., DE 50 at 24. Moreover, some states—including the State of North Carolina—permit litigants to offer unlicensed expert engineering testimony to support their claims, and they do so without apparent reservation based on maintaining competency standards for practicing engineers and protecting the public. *See, e.g.*, *Stark v. N.C. Dep't of Env't & Nat. Res., Div. of Land Res.*, 736 S.E.2d 553, 561 (N.C. 2012) (holding that "the law in this state does not require a testifying scientific expert to be a person duly licensed to practice in a particular field" because "the line between [certain scientific subjects] is

---

The court sees little reason to treat these additional "interests" as materially distinct from the Board's interest in establishing and maintaining a competency standard. In context, those interests are important to the Board because they help ensure licensed engineers provide competent services for their clients. In other words, everything boils down to competency. Thus, for the court, the above formulation of the interests at stake sufficiently captures the Board's position. In any case, even if the court accepts the Board's formulation of its interests, the Board cannot justify its restriction on Nutt's testimony due to its evidentiary default. *See infra.*

too indefinite to admit of a practicable separation of topics" and "some of the most capable investigators have probably not needed or cared to obtain a license"); *see also Lance v. Luzerne Cnty. Mfrs. Ass'n*, 77 A.2d 386, 388 (Pa. 1951) ("The justification for a statute requiring the registration of engineers by the State as a valid exercise of the police power rests upon considerations other than an engineer's ability to testify as an expert before some tribunal . . . ."); Tex. Occ. Code Ann. § 1001.004(e) (exempting from the state's regulation of engineering "a person from giving testimony or preparing an exhibit or document for the sole purpose of being placed in evidence before an administrative or judicial tribunal").

The Board has failed to demonstrate the link between the ban and its interest in promoting the public welfare and safeguarding property. The Board merely reiterates that the Act has been declared to achieve that interest. *See, e.g.*, Defs.' Resp., DE 50 at 24–35. But declaring a purpose does not necessarily amount to achieving that purpose, especially in this instance. To be clear, the court has no doubt that the Act generally allows the state to effectively maintain and enforce educational and experiential standards for professional activities that often have the capacity to transform cityscapes and deflect torrential rain and turbulent winds. The issue, however, is whether the Act actually promotes the public welfare when applied to unlicensed expert engineering reports. On this issue, the evidence is scant.

On the next issue, however, the Board presents some viable evidence demonstrating the ban's connection to establishing and maintaining a level of professional competence for expert engineering reports. The evidence presented shows that, although Nutt practiced chemical engineering before his retirement, he rendered opinions on stormwater engineering in his reports. *See, e.g.*, Defs.' Resp., DE 50 at 26. And since chemical engineering and stormwater engineering

32

are different practice areas, Nutt's prior experience as a chemical engineer does not make him competent to opine on stormwater engineering matters. *See id.*

In contrast, Nutt maintains that he has the necessary experience to allow him to competently render the opinions presented in his reports. *See* Pl.'s Mem., DE 47 at 34–35. Specifically, prior to the state lawsuit, Nutt gained extensive experience designing and evaluating trench systems that managed water flow around buildings (functionally the same as stormwater drainage systems). *See* Pl.'s SOF, DE 48 ¶¶ 6–8, 29–30, 34. Those systems were far simpler than the one implicated in the state lawsuit. *See id.* ¶ 34.

Clearly, the parties disagree on the issue of Nutt's competence. Whereas Nutt attempts to demonstrate that he is competent to render the opinions in his reports due to his prior work experience, the Board attempts to demonstrate that Nutt is not competent to render those opinions based on his lack of credentials specifically related to the field of stormwater engineering. This disagreement is material because it determines whether the ban advances the Board's asserted interest in establishing and maintaining a competence standard as applied to Nutt's reports. Even so, to preclude summary judgment altogether and proceed to trial, the Board must clear another analytical hurdle.

### ii. *Considering Less-Restrictive Alternatives*

"To prove that [the ban] is narrowly tailored to serve a significant governmental interest, the government must, inter alia, present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it'" and "that such alternatives were inadequate to serve the government's interest." *Billups*, 961 F.3d at 688 (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)); *see also Reynolds*, 779 F.3d at 229 (explaining that "intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not

33

burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden"). In other words, the Board must present evidence of serious governmental efforts to use less restrictive means to advance its asserted interest in establishing and maintaining a competence standard, and to the extent it remains relevant, its interest in protecting the public welfare and safeguarding property.

Nutt argues that one such means the Board could have used was its existing regulations prohibiting the unlicensed use of an official stamp to certify engineering reports. *See* N.C. Gen. Stat. § 89C-16. The unlicensed stamping restriction is a less restrictive alternative. It provides for "more speech, not enforced silence," to remedy "the evil[s]" of incompetent engineering practice. *See Whitney v. California*, 274 U.S. 357, 377 (1927), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). In this case, the Board's expert testified that members of the public would likely rely on the certification to know that an engineer had a certain level of competence and was accountable to the Board for incompetence or other professional misconduct. *See* Pl.'s SOF, DE 48 ¶ 97. Thus, the unlicensed stamping restriction appears to be a less restrictive and effective alternative.

Yet, the Board presents no evidence demonstrating that it "'seriously undertook' to utilize those ordinances for [its] purpose[s] before" adopting the challenged ban. *See Billups*, 961 F.3d at 689. Rather, in response to the stamping restriction's potential as an alternative to the ban, the Board states that no disclaimer would prevent persons like Nutt from writing reports and testifying on matters outside their area of competence. *See* Defs.' Resp., DE 50 at 33. The Board also states that no disclaimer would prevent the public or Nutt's clients from relying on his incompetent work to determine liability and remediation. *See id.* However, the Board merely presents "myriad post-hoc justifications" regarding why the stamping restriction "could not be used to effectively

34

regulate" the interests threatened by Nutt's reports. *See Billups*, 961 F.3d at 689. These justifications are insufficient to satisfy the Board's burden.

The Board does not seriously dispute its evidentiary default. In fact, it fails to seriously dispute any of its evidentiary shortcomings with respect to its efforts to seriously consider any other alternative. *Compare* Pl.'s SOF, DE 48 ¶ 98 ("The Board has no evidence that its interests could not be equally well served simply by requiring unlicensed witnesses to affirmatively disclose that they are not professional engineers.") and *id.* ¶ 99 ("The Board's designated expert was unaware of any evidence regarding any alternatives to requiring a license to testify about engineering or whether those alternatives might protect the public.")*, with* Defs.' Resp. to Pl.'s SOF, DE 51 ¶ 98 (noting "disputed") and *id.* ¶ 99 (noting "[n]ot disputed, the referenced testimony speaks for itself"). In light of the Board's evidentiary default, there is no triable dispute on the issue of tailoring.

In summary, the Board's ban on Nutt's unlicensed engineering testimony cannot survive intermediate scrutiny. The Board has failed to present evidence demonstrating that its ban on Nutt's unlicensed engineering reports substantially vindicates its asserted interest in protecting the public welfare and safeguarding property. Although the Board has presented some evidence demonstrating that the ban furthers its interest in establishing and maintaining a competence standard, the Board has also failed to show that it seriously considered any less restrictive alternatives before it adopted its ban on unlicensed expert engineering reports. Nutt is entitled to summary judgment declaring the ban unconstitutional as applied to his reports.

    *e.*    *Overbreadth Challenge*

As stated above, Nutt facially challenges § 89C-3(6) and § 89C-23 of the Act for substantial overbreadth. *See* Pl.'s Mem., DE 47 at 34. Again, the court declines Nutt's invitation to adjudicate overbreadth. *See Broadrick*, 413 U.S. at 613. Instead, the court holds that § 89C-

35

3(6) and § 89C-23 are unconstitutional when applied to unlicensed expert engineering reports. *See*

*PETA*, 60 F.4th at 838; N.C. Gen. Stat. § 89C-28 (severability clause).

## IV. Conclusion

At its core, this case concerns the extent to which a law-abiding citizen may use his

technical expertise to offer a dissenting perspective against the government. Stating that dissent

required the speaker to use his expertise in several ways. He had to do some math. He had to

apply recognized methodologies. He even had to write a report memorializing his work. Some of

that work may plausibly be considered conduct. But it ends up providing him the basis to speak

his mind. Thus, although the government may properly exercise its interests in policing the use of

technical knowledge for nonexpressive purposes, those interests must give way to the nation's

profound national commitment to free speech in this case. At the very least, the government had

to show that it seriously considered less restrictive alternatives before targeting pure speech. The

government failed to meet its obligations under the First Amendment.

For the foregoing reasons, the court GRANTS in part and DENIES in part Nutt's motion

for summary judgment [DE 46]. The court DENIES the Board's motion for summary judgment

[DE 42]. The court will issue a judgment in conformance with this opinion and order.

SO ORDERED this ____19th____ day of December, 2023.

Richard E Myers II
_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE